## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEIGTECH EAST BAY LLC, | |
| Plaintiff, | Civil Action No. |
| v. | **JURY TRIAL DEMANDED** |
| LUTRON ELECTRONICS CO., INC., | |
| Defendant. | |

## COMPLAINT

Plaintiff GeigTech East Bay LLC ("J Geiger") files this Complaint against Defendant Lutron Electronics Co., Inc. ("Defendant" or "Lutron") for infringement of U.S. Patent No. 9,237,821, infringement of J Geiger's trade dress, and unjust enrichment at J Geiger's expense. J Geiger alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1, *et seq.*, and for trade dress infringement and unfair competition arising under the Trademark Laws of the United States, 15 U.S.C. § 1051, *et seq.* ("the Lanham Act"), including in particular 15 U.S.C. § 1125(a).

## <u>PARTIES</u>

2.      Plaintiff J Geiger is a South Carolina limited liability company with a place of business located at 7421 Industry Drive, North Charleston, South Carolina 29418.

3.      Upon information and belief, Defendant Lutron is a Pennsylvania corporation having a principal place of business at 7200 Suter Road, Coopersburg, Pennsylvania 18036, and

can be served through its registered agent, Hoffinger Friedland Dobrish & Stern, P.C., 110 East 59th Street New York, New York, 10022.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction under at least 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338(a).

5.     Defendant is subject to this Court's specific and general personal jurisdiction due to their substantial business in this forum. For example, upon information and belief, Defendant is subject to the specific personal jurisdiction of this Court because J Geiger's claims for patent infringement arise from Defendant's acts of infringement in the State of New York. These acts of infringement include selling infringing products in the State of New York and placing infringing products into the stream of commerce through an established distribution channel with full awareness that substantial quantities of the products have been shipped into the State of New York. Additionally, Defendant operates a "Residential Experience Center" in this District at 979 Third Avenue, Suite 138, New York, NY 10022 and a "Commercial Experience and Training Center" at 1 Penn Plaza, Suite 1714, New York, NY 10119.  Therefore, this Court has personal jurisdiction over Defendant under the New York long-arm statute, NY CPLR § 302 (2012).

6.     Based upon at least the above, Defendant has a regular and established place of business in this District, and thus, venue is proper in this judicial district under 28 U.S.C. § 1400(b) and 28 U.S.C. §§ 1391(b) and (c).

## BACKGROUND

7.     James Geiger, founder and president of GeigTech East Bay LLC (d/b/a J Geiger Shading Technology), has been a pioneer and entrepreneur in the field of home integration for over 20 years.  Mr. Geiger got his start in audio visual ("AV") technology as a sales representative

for Video Concepts, Inc. and then became an AV integrator in Charleston, South Carolina.  AV integration involves the installation and coordination of various types of home electronic systems and technology, such as home theater, audio systems, lighting systems, and window shades.  Mr. Geiger started his own AV integration company in 2003 (HeAVi LLC), which grew into a very successful business.

8.      Mr. Geiger first installed window shades as an integrator in 1999.  Traditionally, shades were a design afterthought. As such, it was standard to conceal mounting hardware with a "ceiling pocket," "valance," or "fascia" as shown in the representative pictures below.

- "Ceiling Pocket": Perimeter system used to hide shades in the ceiling.



- "Valance": Decorative drapery hung above a window to screen the curtain fittings.



- "Fascia": A wooden board or other piece of material used to conceal the roller shade from view.



9.      Around 2011, while working on a multi-million dollar home, Mr. Geiger devised a new solution for the above described traditional methods of concealing screws, wires, and other hardware.

10.     Mr. Geiger's concept involved exposed window roller shades ("roller shades") without any visible screws, wires, or other unsightly hardware. This concept would ultimately become the "J Geiger Shading System."

11.     Mr. Geiger began working on his radical solution in 2011 in his Charleston home where he first designed his unique, exposed mounting hardware.  Mr. Geiger's new hardware was elegant and distinct from traditional methods of window dress, and also allowed for screws and wires to be concealed from view.  Mr. Geiger realized these inventions were a complete shift in the world of window shades with the potential to flip the industry on its head. With Mr. Geiger's

revolutionary shade design and enabling inventions, shading technology would cease to be an afterthought for designers and architects; instead, shading technology and design – using J Geiger's Shading System - would become an integral part of home design.  This is illustrated by the following pictures, comparing traditional shading systems to J Geiger's revolutionary, inventive, and ornamental designs of its jamb, center, and end brackets:

| Representative Lutron Jamb Brackets | J Geiger's Jamb Bracket |
|---|---|
|  | |

| Representative Lutron Prior Center Brackets | J Geiger's Center Bracket |
|---|---|



| Representative Prior End Brackets | J Geiger's End Bracket |
|---|---|



12.     Though the result of the first installation of the J Geiger Shading System was beautiful and unique, industry insiders were initially skeptical.  In a complacent industry, Mr. Geiger could not find an industry partner willing to help bring his revolutionary concept to scale.

13.     So instead, Mr. Geiger set out on his own to bring his invention to the attention of architects, designers, builders, and consumers.  He ran an ad in Dwell Magazine in June of 2012 and immediately received hundreds of inquiries marveling at his elegant exposed roller shades.  *See* Exhibit B, p. 1.  With the full support of his wife and two boys, Mr. Geiger hit the road and began telling his story of innovation and design.  By August of 2014, J Geiger had opened offices in Los Angeles and Manhattan and caught the attention of the world's foremost designers and architects.

14.     J Geiger's pioneering signature look is represented by its circle and U-shaped brackets and floating couplers, which connect two shades together.  In addition to this signature look and trade dress, the innovative J Geiger patented shading mechanism conceals all of the "ugly parts" that would be exposed in a normal shade system. This was something that other shading systems had never offered.

15.     J Geiger's invention, marketed to the consumer under the "J Geiger" ornamental trade dress, is now (and has been since shortly after its inception) widely recognized and praised by architects and designers throughout the United States and the world.  J Geiger's innovations to the shading industry have proven popular in the marketplace and the company's sales have consistently grown.

16.     Though Mr. Geiger began marketing his Shading System in 2012, J Geiger began selling the J Geiger Shading System in 2014. Since that time, sales grew by 286% in 2015, followed by 412% in 2016, and 50% in 2017.

17.     J Geiger has extensively marketed its pioneering shade system, spending approximately 1.2 million dollars during 2015-2017.   Representative examples of some of J Geiger's advertising can be seen in Exhibit B.

18.     From the inception of Mr. Geiger's advertising campaign in 2012, as represented in the above discussed Dwell Magazine advertisement found on page 1 of Exhibit B, J Geiger not only touted the inventive functioning of the J Geiger Shading System, but also expressly equated the look of its brackets with its identifying trade dress.   For example, as represented below, J Geiger's trade dress is incorporated into the name and business information at the bottom of the Dwell ad, serving to expressly equate in the consumer's mind the company name "GeigTech" with the ornamental design trade dress of the J Geiger products:



19.     As is extensively demonstrated throughout the examples of J Geiger advertising set forth in Exhibit B, this "look for"-type advertising has been a continuous and prominent part of all J Geiger marketing ever since 2012.

20.     As J Geiger's products have gained popularity, the products' unique appearance has proven to be desirable to consumers and has become inextricably linked with J Geiger's reputation for quality, innovation, and elegance.

21.     Upon information and belief, Defendant introduced its infringing Palladiom Shading System (discussed in more detail below) in September, 2017, long after issuance of J

Geiger's U.S. Patent No. 9,237,821 on January 19, 2016, and long after J Geiger's trade dress had acquired distinctiveness in the minds of the consuming public.

## PATENT-IN-SUIT

22.     J Geiger is the owner and the assignee of U.S. Patent No. 9,237,821 (the "'821 Patent"), issued on January 19, 2016 and entitled "Assembly for Mounting Shades." J Geiger holds the exclusive right to license the '821 Patent.  J Geiger has ownership of all substantial rights in the '821 Patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringement. A true and correct copy of the '821 Patent is attached hereto as Exhibit A.

23.     The '821 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

## ACCUSED PRODUCTS

24.     Upon information and belief, Defendant makes, uses, offers to sell, sells, and/or imports its Palladiom Shades.  Such products include, but are not limited to:  end brackets, center brackets, and jamb brackets.  These products, and any of Defendant's other similar products, are collectively referred to herein as the "Accused Products."

25.     Upon information and belief, the Accused Products are offered for sale and sold throughout the United States, including within this District.

26.     Upon information and belief, Defendant has purposefully and voluntarily placed the Accused Products into the stream of commerce with the expectation that these products will be purchased and used by end users in the United States, including end users in this District.

27.     Upon information and belief, Defendant provides direct and indirect support concerning the Accused Products to end users, including end users within this District.

<u>**COUNT I**</u>
<u>**INFRINGEMENT OF U.S. PATENT NO. 9,237,821**</u>

28.     J Geiger alleges and hereby incorporates by reference every allegation made in the foregoing paragraphs of this Complaint as if each were separately set forth herein.

29.     In violation of 35 U.S.C. § 271, Defendant has directly infringed and continues to directly infringe, both literally and/or under the doctrine of equivalents, the '821 Patent by making, using, offering for sale, selling, and/or importing the Accused Products in the United States, including within this District, that infringe at least claim 9 of the '821 Patent without the authority of J Geiger.

30.     The claims of the '821 Patent are presumed valid.

31.     As claim 9 requires, each of the accused jamb bracket products is a fastening device for mounting a roller window shade.  For example, the representative Lutron Palladiom window shade is described as:

## Palladiom Shading System

Lutron Palladiom Motorized Roller Shades are ideal for exposed applications. Controlled by an ultra-quiet, precision Sivoia QS Palladiom drive, these shades are mounted on solid aluminum brackets that completely conceal wiring and offer a refined aesthetic in a variety of finishes to match any setting.

Palladiom_Shading_System_Spec_Submittal.pdf, p. 1.

32.     As claim 9 requires, the accused jamb bracket products comprise two disk-shaped mounting brackets, each having one side configured to bear against a flat surface and one side having a projection configured to hold an end of a tube shade, wherein each of the mounting

brackets have two recessed apertures therethrough constructed and arranged to receive a fastener to secure the mounting bracket to the flat surface. For example, the Lutron Palladiom jamb bracket has a side configured to bear against a flat surface as highlighted in green in the figure below. The Lutron Palladiom jamb bracket has a projection configured to hold an end of a tube shade as highlighted in blue in the figure below. The Lutron Palladiom jamb bracket has two recessed apertures that each receive a fastener such as a screw to secure the mounting bracket to a flat surface as highlighted in purple in the figure below.



Palladiom_Shading_System_Spec_Submittal.pdf, p. 5 (color annotations added).

33. As claim 9 requires, each of the accused jamb bracket products is designed so that when holding a window tube shade, the outer circumferences of each disk-shaped mounting bracket is visible, and the fastener is obscured by the window tube shade. For example, the Lutron Palladiom Shade jamb bracket's outer circumference is visible; otherwise the bracket would not need to be available in four finishes (Pure White, Clear Anodized, Black Anodized, and Satin Nickel):

- Finishes available: Pure White, Clear Anodized, Black Anodized, Satin Nickel

Palladiom_Shading_System_Spec_Submittal.pdf, p. 5.



https://youtu.be/p_n5AMkXp_s?t=177.  The fasteners are obscured by the window tube shade:



Palladiom_Shading_System_Brochure.pdf, p. 12.

34.     As claim 9 requires, each of the accused Lutron Palladiom jamb brackets is

designed such that the projection of at least one of the mounting brackets is configured as a key to

engage a tube shade clutch or a tube shade motor.  For example, the Lutron Palladiom Shading

System is described as:

## Palladiom Shading System

Lutron Palladiom Motorized Roller Shades
are ideal for exposed applications.
Controlled by an ultra-quiet, precision
Sivoia QS Palladiom drive, these shades
are mounted on solid aluminum brackets
that completely conceal wiring and offer a
refined aesthetic in a variety of finishes to
match any setting.

Palladiom_Shading_System_Spec_Submittal.pdf, p. 1.  The engagement of the tube shade motor

with the mounting bracket projection is described in step c below:

**Hang the Shade in the Mounting Brackets (Idler End First)**

a.  Holding both ends of the shade in alignment with the brackets, aim the **idler\*** mandrel at the bracket-shade interface opening as shown and insert.
b.  Push the mandrel into the bracket until it seats with a click.
c.  Repeat steps a. and b. at the drive end of the shade.
d.  After both ends of the shade are pushed in and seated, pull back on the shade to confirm it is securely locked into both brackets.




**\*NOTE:** The idler is spring-loaded, with 1/8 in (3 mm) of travel to allow for installation tolerance. At the correct bracket-to-bracket distance, the idler will be fully compressed. Extension of the idler indicates increased bracket-to-bracket distance, and results in a larger light gap at the idler side of the shade. Refer to section **5** for more information.

Palladiom_Shades_Installation_Guide_Wired_Wireless_045641.pdf, p. 2.

35.     Accordingly, as explained in the previous four paragraphs, Defendant has and continues to directly infringe at least claim 9 of the '821 Patent, both literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing into the United States the Accused Products without the authority of J Geiger.

36.     Defendant has been on notice of the '821 Patent since at least filing of this Complaint. *See 3D Sys. V. Formlabs, Inc.*, 2014 U.S. Dist. LEXIS 65127, at \*11-13 (S.D.N.Y. May 9, 2014).

37.     In addition, in violation of 35 U.S.C. § 271(b), Defendant has indirectly infringed the '821 Patent by inducing its customers to directly infringe the '821 Patent, both literally and/or under the doctrine of equivalents, at least (1) by providing its customers with instructions on using the Accused Products, and (2) by making, using, offering for sale, selling, and/or importing devices in the United States the Accused Products, in each case, without the authority of J Geiger.  For example, the Lutron Palladiom Shading System's installation instructions direct "factory trained and equipped installers" on how to install Palladiom Shades for customers:

## INTRODUCTION:

This guide is intended only for factory trained and equipped installers of Lutron's PALLADIOM Shades. The following instructions detail wiring, shade bracket mounting, chassis installation, and setup/operation at a site which has already been planned and prepared using the dedicated wall, ceiling or jamb installation templates according to the PALLADIOM Installation Planning and Template Guide.

Palladiom_Shades_Installation_Guide_Wired_Wireless_045641.pdf, p. 1.

38.     Upon information and belief, and in violation of 35 U.S.C. § 271(b), Defendant has indirectly infringed the '821 Patent by contribution knowing (1) that the Accused Products would be combined with other components to infringe the '821 Patent and (2) that the Accused Products have no substantial non-infringing use.  For example, Lutron's Palladiom Shading System's installation instructions direct installers on how to use the Lutron Palladiom product during installation:

## 2 MOUNT THE SHADE BRACKETS:

⚠ **CAUTION:** RISK OF FALLING OBJECTS. Read and follow all instructions for mounting the shade system. Failure to follow these instructions could result in minor to moderate injury.

Align the bracket with the marks or predrilled pilot holes made in the template stage, and fasten using the mounting screws provided or other fasteners appropriate for the mounting surface.

**NOTE:** The mounting holes in all brackets are elongated to allow for adjustment. Confirm that brackets are level and aligned (add shims if necessary), and verify the correct bracket-to-bracket distance before tightening the mounting screws. (For more information about positioning, light gaps, and final adjustment, please refer to section **5** on page 2.)

| End | Center | Jamb |
|---|---|---|



**End**

*When concealing the wire housing, the center of the bracket's foot must be concentric with the housing opening ± ⅛ in (3 mm)

**Center**



**Jamb**

Preferred Orientation

Alternate Orientation

**When concealing the wire housing, the housing opening should align with the bracket's wire hole, without mounting screw interference

### Install Finishing Rings

a. Orient a finishing ring as shown and spread it slightly to fit it over and around the bracket-shade interface.

   The lip on the finishing ring fits in the groove on the bracket, and the ring will rotate freely when properly installed.

b. Rotate the finishing ring so that its opening aligns with the opening in the bracket-shade interface as shown.

c. Repeat steps a. and b. to install a finishing ring on each bracket.



Lip Spread Slightly

Groove

Opening    Rotate

Palladiom_Shades_Installation_Guide_Wired_Wireless_045641.pdf, p. 1.

39.     Unless enjoined by this Court, Defendant will continue to infringe the '821 Patent.

40.     Because of Defendant's infringing activities, J Geiger has suffered damages and will continue to suffer damages in the future.

## COUNT II
## TRADE DRESS INFRINGEMENT AND UNFAIR COMPETITION UNDER § 43(a) OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

41.      J Geiger alleges and hereby incorporates by reference every allegation made in the foregoing paragraphs of this Complaint as if each were separately set forth herein.

42.      Defendant's advertisements, promotions, offers to sell, sales, and/or distribution of its infringing products violate § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) by infringing J Geiger's trade dress.  Defendant's use of J Geiger's trade dress and/or colorable imitations thereof is likely to cause confusion, mistake, or deception as to the affiliation, connection, and/or association of Defendant with J Geiger and as to the origin, sponsorship, and/or approval of the infringing products, at least by creating the false and misleading impression that the infringing products are manufactured by, authorized by, or otherwise associated with J Geiger.

43.      J Geiger's trade dress is entitled to protection under the Lanham Act.  J Geiger's trade dress includes unique, distinctive, and non-functional designs for its jamb, center, and end brackets of the J Geiger Shading System. J Geiger has extensively and continuously promoted and used its trade dress in the United States as a source indicator of its products. Through that extensive and continuous use, J Geiger's trade dress has become a well-known indicator of the origin and quality of J Geiger's products. J Geiger's trade dress has also acquired substantial secondary meaning in the marketplace. Moreover, J Geiger's trade dress acquired this secondary meaning long before Defendant commenced its unlawful use of J Geiger's trade dress in connection with the infringing products.

44.      J Geiger trade dress includes the following: (1) J Geiger's jamb bracket; (2) J Geiger's center bracket; and (3) J Geiger's end bracket.  The look of each trade dress is shown in the images below.

**(1) J Geiger's Jamb Bracket:**



45.     The image above displays the J Geiger jamb bracket trade dress.  As stated in J Geiger's advertising, the J Geiger jamb bracket trade dress is "pretty" and "simple" or "Simply. Modern." The look is that of a clean circular element that is integral and seamless with both the shade and the wall.  As stated in James Geiger's first ad, there are "No Valances-No Fascias-No Ceiling Pockets-No Visible Screws-No Stress" with J Geiger's jamb bracket.  As previously discussed in the Background section of this Complaint, the ornamental design of J Geiger's jamb bracket was a radical departure from the existing jamb brackets when introduced, and has been used in J Geiger's "look for" advertising as a source indicator for J Geiger.

46.     Mr. Geiger first began marketing his jamb bracket in 2012, and J Geiger has spent over a million dollars marketing the J Geiger Shading System and drawing the eye of the consumer to the J Geiger ornamental jamb bracket. Indeed, between 2015 and 2017, J Geiger spent approximately 1.2 million dollars on marketing to create awareness of the jamb bracket and other products and to encourage acceptance of the J Geiger Shading Systems in the market.  Because of

J Geiger's marketing efforts and the touted distinctive look of the J Geiger jamb brackets, the J Geiger jamb bracket has acquired secondary meaning in the marketplace.

47. J Geiger's jamb bracket trade dress is not functional. The trade dress protection of J Geiger's jamb bracket is directed to the ornamental appearance of the bracket, as described immediately above. These ornamental features are not functional because (1) as explained in the Background section, other designs for jamb brackets existed prior to the creation of the J Geiger jamb bracket that accomplished the purpose of holding roller shades in place, (2) the design does not provide a cost or quality advantage in the market for jamb brackets, and (3) competitors' ability to compete is not significantly undermined by protecting J Geiger's ornamental design because other designs, such as those shown in the Background section, exist and are still used throughout the shading industry.

48. In January 2017, the industry learned that J Geiger intended to enter a manufacturing sales agreement with Savant Systems, LLC, which would increase sales of J Geiger Shading Systems, including the J Geiger jamb bracket. In an apparent response to J Geiger's Savant agreement, Lutron announced the Palladiom Shading System, including a jamb bracket in September 2017. Defendant's Palladiom Shading System includes a jamb bracket that infringes J Geiger's jamb bracket trade dress. The following comparison illustrates how Defendant has copied J Geiger's jamb bracket design.

| J Geiger Jamb Bracket | Defendant's Jamb Bracket Copy |
|---|---|
| | |
| | Palladiom_Shading_System_Brochure.pdf, p. 12. |



**(2) J Geiger's Center Bracket:**



49.     The image above displays the J Geiger center bracket trade dress.  As stated in J Geiger's advertising, the J Geiger center bracket trade dress is "pretty" and "simple" or "Simply Modern." The look is that of a clean, U-shaped element, where the U-Shaped element fits seamlessly between two shade ends that abut the same, effectively creating a "shade sandwich" with the U-shaped element in the middle.  As stated in James Geiger's first ad, there are "No Valances-No Fascias-No Ceiling Pockets-No Visible Screws-No Stress" with J Geiger's center

bracket. As previously discussed in the Background section of this Complaint, the ornamental design of J Geiger's center bracket was a radical departure from the existing center brackets when introduced, and has been used in J Geiger's "look for" advertising as a source indicator for J Geiger.

50.     Mr. Geiger first began marketing his center bracket in 2012, and J Geiger has spent over a million dollars marketing the J Geiger Shading System including the center bracket.  Indeed, between 2015 and 2017, J Geiger spent approximately 1.2 million dollars on marketing to create awareness for the center bracket and other J Geiger products and to encourage acceptance of the J Geiger Shading Systems in the market.  Because of J Geiger's marketing efforts and the center bracket's distinctive looks, the J Geiger center bracket has acquired secondary meaning in the marketplace.

51.     J Geiger's center bracket trade dress is not functional.  The trade dress protection of J Geiger's center bracket is directed to the ornamental appearance of the bracket, as described immediately above.  These ornamental features are not functional because (1) as explained in the Background section, other designs for center brackets existed prior to the creation of the J Geiger center bracket that accomplished the purpose of holding roller shades in place, (2) the design does not provide a cost or quality advantage in the market for center brackets, and (3) competitors' ability to compete is not significantly undermined by protecting J Geiger's ornamental design because other designs, such as those shown in the Background section, exist and are still used throughout the shading industry.

52.     In January 2017, the industry learned that J Geiger intended to enter a manufacturing sales agreement with Savant Systems, LLC, which would increase sales of J Geiger Shading Systems including the J Geiger center bracket.  In an apparent response to J Geiger's

Savant agreement, Lutron announced the Palladiom Shading System including a center bracket in September 2017.   Defendant's Palladiom Shading System includes a center bracket that is a colorable use of J Geiger's center bracket trade dress.   The following comparison illustrates how Defendant has copied J Geiger's center bracket design:

| J Geiger Center Bracket | Defendant's Center Bracket Copy |
|---|---|
|  | Palladiom_Shading_System_Brochure.pdf, p. 15. |

**(3) <u>J Geiger's End Bracket:</u>**



53.     The image above displays the J Geiger end bracket trade dress.  As stated in J Geiger's advertising, the J Geiger end bracket trade dress is "pretty" and "simple" or "Simply. Modern." The look is that of a clean U-shaped element that stands alone in its ornamental connection of the end of the shade to a wall, where the outward face side of the U-shaped element is unencumbered with any of the normally "ugly" mechanisms required to attach the element to the wall.  As stated in James Geiger's first ad, there are "No Valances-No Fascias-No Ceiling Pockets-No Visible Screws-No Stress" with J Geiger's end bracket. As previously discussed in the Background section of this Complaint, the ornamental design of J Geiger's end bracket was a radical departure from the existing end brackets when introduced, and has been used in J Geiger's "look for" advertising as a source indicator for J Geiger.

54.     Mr. Geiger first began marketing his end bracket in 2012, and J Geiger has spent over a million dollars marketing the J Geiger Shading System including the end bracket.  Indeed, between 2015 and 2017, J Geiger spent approximately 1.2 million dollars on marketing to create awareness of the end bracket and other J Geiger products and to encourage acceptance of the J Geiger Shading Systems in the market.  Because of J Geiger's marketing efforts and the end bracket's distinctive looks, the J Geiger end bracket has acquired secondary meaning in the marketplace.

55.     J Geiger's end bracket trade dress is not functional.  The trade dress protection of J Geiger's end bracket is directed to the ornamental appearance of the bracket, as described immediately above.  These ornamental features are not functional because (1) as explained in the Background section, other designs for end brackets existed prior to the creation of the J Geiger end bracket that accomplished the purpose of holding roller shades in place, (2) the design does not provide a cost or quality advantage in the market for end brackets, and (3) competitors' ability to

compete is not significantly undermined by protecting J Geiger's ornamental design because other designs, such as those shown in the Background section, exist and are still used throughout the shading industry.

56.     In January 2017, the industry learned that J Geiger intended to enter a manufacturing sales agreement with Savant Systems, LLC, which would increase sales of J Geiger Shading Systems including the J Geiger end bracket.  In an apparent response to J Geiger's Savant agreement, Lutron announced the Palladiom Shading System including an end bracket in September 2017.  Defendant's Palladiom Shading System includes an end bracket that is a colorable use of J Geiger's end bracket trade dress.  The following comparison illustrates how Defendant has copied J Geiger's end bracket design:



| J Geiger End Bracket | Defendant's End Bracket Copy |
|---|---|

Palladiom_Shading_System_Brochure.pdf, p. 16.

57.     Defendant's use of J Geiger's trade dress and/or colorable imitations thereof has caused and, unless enjoined, will continue to cause substantial and irreparable injury to J Geiger for which J Geiger has no adequate remedy at law, including at least substantial and irreparable injury to the goodwill and reputation for quality associated with J Geiger's trade dress, J Geiger's products, and J Geiger.

58.     On information and belief, Defendant's use of J Geiger's trade dress and/or colorable imitations thereof has been intentional, willful, and malicious. Defendant's bad faith is evidenced at least by the similarity of the infringing products to J Geiger's trade dress and by Defendant's continuing disregard for J Geiger's rights.

59.     J Geiger is entitled to injunctive relief, and J Geiger is entitled to recover at least Defendant's profits, J Geiger's actual damages, enhanced damages, costs, and reasonable attorney fees under at least 15 U.S.C. §§ 1125(a), 1116, and 1117.

## COUNT III
## UNJUST ENRICHMENT

60.     J Geiger alleges and hereby incorporates by reference every allegation made in the foregoing paragraphs of this Complaint as if each were separately set forth herein.

61.     Defendant's advertisements, promotions, offers to sell, sales, and/or distribution of the infringing products, in direct competition with J Geiger, constitute unjust enrichment, at least because Defendant has wrongfully obtained benefits at J Geiger's expense.  Defendant has also, *inter alia*, operated with an undue advantage.

62.     J Geiger created the products covered by J Geiger's trade dress through extensive time, labor, effort, skill, and money.  Defendant has wrongfully used and is wrongfully using J Geiger's trade dress and/or colorable imitations thereof, in competition with J Geiger, and has gained and is gaining a wrongful benefit by undue advantage through such use.  Defendant has not

been burdened with the expenses incurred by J Geiger, yet Defendant is obtaining the resulting benefit for its own business and products.

63.    J Geiger's trade dress is entitled to protection under the common law.  J Geiger's trade dress includes unique, distinctive, and non-functional designs.  J Geiger has extensively and continuously promoted and used J Geiger's trade dress for years across the United States and in the State of New York.  For example, Exhibit B shows an advertisement for J Geiger's Shading System in Dwell Magazine from June 2012.  Through that extensive and continuous use, J Geiger's trade dress has become a well-known indicator of the origin and quality of J Geiger's products.  J Geiger's trade dress has also acquired substantial secondary meaning in the marketplace. Moreover, J Geiger's trade dress acquired this secondary meaning before Defendant commenced its unlawful use of J Geiger's trade dress and/or colorable imitations thereof in connection with the infringing products.

64.    Defendant's use of J Geiger's trade dress and/or colorable imitations thereof, has caused and, unless enjoined, will continue to cause substantial and irreparable commercial injury to J Geiger for which J Geiger has no adequate remedy at law, including at least substantial and irreparable injury to the goodwill and reputation for quality associated with J Geiger's trade dress, J Geiger's products, and J Geiger.  J Geiger accumulated this goodwill and reputation through extensive time, labor, effort, skill, and investment.  Defendant has wrongfully obtained and is wrongfully obtaining a benefit at J Geiger's expense by taking undue advantage and free-riding on J Geiger's efforts and investments and enjoying the benefits of J Geiger's hard-earned goodwill and reputation.

65.     Defendant's unjust enrichment at J Geiger's expense has been intentional, willful, and malicious.  Defendant's bad faith is evidenced by at least the similarity of the infringing products to J Geiger's trade dress and by Defendant's continuing disregard for J Geiger's rights.

66.     J Geiger is entitled to injunctive relief, and J Geiger is also entitled to recover at least Defendant's profits.

## ADDITIONAL ALLEGATIONS

67.     J Geiger complies with 35 U.S.C. § 287.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, J Geiger demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

J Geiger requests that this Court find in its favor and against Defendant, and that this Court grant J Geiger the following relief:

A.     An adjudication that Defendant has infringed the '821 Patent;

B.     An award of damages to be paid by Defendant adequate to compensate J Geiger for Defendant's past infringement of the '821 Patent and any continuing or future infringement through the date such judgment is entered (but in no event not less than a reasonable royalty in accordance with 35 U.S.C. § 284), including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C.     A preliminary and permanent injunction enjoining Defendant and its officers, agents, servants, employees, users, attorneys, and all those persons in active concert or participation with Defendant from the acts described in this Complaint;

D.      An award of damages to be paid by Defendant adequate to compensate J Geiger for J Geiger's lost profits for Defendant's past infringement of the '821 Patent and any continuing or future infringement through the date such judgment is entered including interest, costs, expenses and an accounting of all infringing acts;

E.      Alternatively, an Order requiring Defendant to pay an ongoing royalty for any continued infringement after the date judgment is entered in an amount to be determined at trial;

F.      An award of pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs;

G.      A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of J Geiger's reasonable attorneys' fees;

H.      A judgement that Defendant has infringed J Geiger's trade dress in violation of § 1125(a) of Title 15 in the United States Code;

I.      A judgement that Defendant has diluted J Geiger's trade dress in violation of § 1125(c) of Title 15 in the United States Code;

J.      A judgment that Defendant has been unjustly enriched at J Geiger's expense;

K.      A judgment that Defendant's wrongful activities were willful;

L.      A preliminary and permanent injunction against further infringement and dilution of J Geiger's trade dress;

M.      An Order directing Defendant to recall all infringing products sold and/or distributed and to provide a full refund for all recalled infringing products;

N.      An Order directing the destruction of (i) all infringing products, including all recalled products, (ii) any other products that use a copy, reproduction, or colorable imitation of J Geiger's trade dress in Defendant's possession or control, (iii) all molds, tooling, plates, and any

other means of making the infringing products in Defendant's possession, custody, or control, and (iv) all advertising materials related to the infringing products in Defendant's possession, custody, or control, including on the Internet, pursuant to at least 15 U.S.C. § 1118;

      O.     An Order directing Defendant to publish a public notice providing proper attribution of J Geiger's trade dress to J Geiger, and to provide a copy of this notice to all customers, distributors, and/or others from whom the infringing products are recalled; and

      P.     An award to J Geiger of such further relief at law or in equity as the Court deems just and proper.

Dated: June 12, 2018               Respectfully submitted,

/s/ *Jeffrey I. Kaplan*
Jeffrey I. Kaplan  (JK  4706)
Michael R. Gilman  (MG  7608)
KAPLAN BREYER SCHWARZ, LLP
100 Matawan Rd., Ste 120
Matawan,  NJ  07747
Telephone:  732-578-0103
Telephone  ext.  231  Kaplan  and  233  Gilman
Facsimile:  732-578-0104
jkaplan@kbsiplaw.com
mgilman@kbsiplaw.com

/s/ *Pro Hac Vice Applications Forthcoming*
Gary R. Sorden
Texas Bar No. 24066124
gary.sorden@klemchuk.com
Brian L. King
Texas Bar No. 24055776
brian.king@klemchuk.com
KLEMCHUK LLP
8150 N. Central Expressway
10th Floor
Dallas, Texas 75206
Tel: 214-367-6000
Fax: 214-367-6001

**ATTORNEY FOR PLAINTIFF
GEIGTECH EAST BAY LLC**