IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEIGTECH EAST BAY LLC,<br><br>        Plaintiff,<br><br>  v.<br><br>LUTRON ELECTRONICS CO., INC.,<br><br>        Defendant. | Civil Action No. 1:18-cv-05290<br><br>**JURY TRIAL DEMANDED** |

**DECLARATION OF JAMES GEIGER IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

I, James Geiger, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

1. I am over the age of 18 and have personal knowledge regarding the facts set forth in this declaration, unless stated on information and belief, and if called upon to testify to those facts, I could and would competently do so.

2. I am the founder and President of Geigtech East Bay LLC (d/b/a J Geiger Shading Technology, referred to herein as "J Geiger"). J Geiger is a designer of innovative window shading systems. J Geiger markets and sells the products-at-issue in this case. In addition to making day-to-day decisions relating to the operations of J Geiger, in collaboration with our CEO, I have overall responsibility for various aspects of the company, including but not limited to marketing, sales, planning, delegating, coordinating, staffing, organizing, and decision-making to attain profit making results.

3.    In addition, I have extensive experience in the relevant shading product industry. I have worked in the field of home integration for over 20 years. I started in audio visual ("AV") technology as a sales representative for Video Concepts, Inc. and then became an AV integrator in Charleston, South Carolina. AV integration involves the installation and coordination of various types of home electronic systems and technology, such as home theater, audio systems, lighting systems, and window shades. I started my own AV integration company in 2003 (HeAVi LLC), which became a very successful business selling and installing home theaters, lighting, audio systems, and window shades. I also have extensive experience monitoring the relevant shading product marketplace and have gathered information both on competitive products and customer patterns and behavior.

4.    I first installed window shades as an integrator around 1999. Traditionally, shades were a design afterthought. As such, it was standard to conceal mounting hardware with a "ceiling pocket," "valance," or "fascia" as shown in the pictures below:

- "Ceiling Pocket": Perimeter system used to hide shades in the ceiling.



- "Valance": Decorative drapery hung above a window to screen the curtain fittings.



- "Fascia": A wooden board or other piece of material used to conceal the roller shade from view.



5. Around 2011, while working on a multi-million dollar home, I devised a new solution for the above-described traditional methods of concealing screws, wires, and other hardware.

6. My concept involved exposed window roller shades ("roller shades") without any visible screws, wires, or other unsightly hardware. This concept would ultimately become the "J Geiger Shading System."

7. In 2011, I began working on what would become J Geiger's unique, exposed mounting hardware in my Charleston home. My new hardware was elegant and distinct from traditional methods of window dress, and also allowed for screws and wires to be concealed from view.

8. Prior to this invention, shade mounting brackets were screwed directly into the wall or ceiling and, as stated above, typically hidden with a "ceiling pocket," "valance," or "fascia."

As the comparison pictures below show, my design of the J Geiger Shading System allows the mounting screws to be hidden within the shading system itself.







| Representative Prior Shade Brackets | J Geiger's Shade Bracket |

9. Even though the result of the first J Geiger Shading System installation was beautiful and unique, industry insiders were initially skeptical. I could not find an industry partner willing to help bring my concept to scale.

10. So instead I set out to bring my invention directly to the attention of architects, designers, builders, and consumers. I ran an ad in Dwell Magazine in June of 2012 and received hundreds of inquiries marveling at the beautiful and elegant exposed roller shades. *See* Exhibit 1 attached hereto, p. 1. With the full support of my wife and two boys, I then hit the road and began telling the story of my innovation.

11. By August of 2014, J Geiger had opened offices in Los Angeles and Manhattan. J Geiger's pioneering signature look is represented by its circle and U-shaped brackets and floating couplers. In addition to this signature look, the innovative J Geiger patented shading mechanism

conceals all of the "ugly parts" that would be exposed in a typical shading system. This was something that other shading systems had never offered.

12. My invention, marketed to the consumer with the J Geiger signature look, is now (and has been since shortly after its inception) widely recognized and praised by architects and designers throughout the United States and the world. J Geiger's innovations in the shading industry have proven popular in the marketplace and the company's sales have consistently grown.

13. While I began marketing and selling my shading system in 2012, J Geiger began selling the J Geiger Shading System in 2014. Since that time, sales grew by 286% in 2015, followed by 412% in 2016, and 50% in 2017.

14. J Geiger has also marketed its pioneering shading system extensively, spending approximately 1.2 million dollars on marketing during 2015-2017. Examples of some of J Geiger's advertising are attached as Exhibit 1. The example on page 1 of Exhibit 1 identifies some of the unique features of J Geiger's Shading System, including "No Valances-No Fascias-No Ceiling Pockets-No Visible Screws." As J Geiger's products have gained popularity, the products' unique appearance has proven to be desirable to consumers and has become inextricably linked with J Geiger's reputation for quality, innovation, and elegance.

15. On February 1, 2018, the online publication for the magazine that ran my first ad, Dwell, featured the J Geiger Shading System in an article titled, "These Modern Shades Are Revolutionizing the Market." *See* Exhibit 2. The J Geiger Shading System has also been featured in other prestigious publications, including Elle Décor, Architectural Digest, Interior Designs, and Modern Luxury.

16. J Geiger has invested substantial time and resources in research and development in order to design and develop the J Geiger Shading System. Accordingly, J Geiger has taken

affirmative steps to protect the intellectual property associated with the J Geiger Shading System. I applied for design patents in 2011 and filed a utility application for the patent-in-suit on May 21, 2012. I was listed as the sole inventor. On January 19, 2016, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 9,237,821 (the "'821 Patent") entitled "Assembly for Mounting Shades." A copy of the '821 Patent is attached hereto as Exhibit 3. J Geiger holds the exclusive right to license the '821 Patent, which encompasses "a system of fastening devices, e.g., mounts, brackets, and assemblies for installing roller window shades." Ex. 3 at Abstract. Embodiments of the '821 Patent "provide for improved means for mounting window shades (roller shades), including motorized shades, in which the portion of the mounting means (i.e., the "mount", "mounting plate", or "mounting bracket") affixed to the supporting structure (e.g., the window casing, walls, columns, etc.) are hidden from view by the structure of the bracket or mounting bracket." *Id.* at 3:45-51.

17. In addition to patent rights, the J Geiger Shading System has several unique and distinctive non-functional design features that I'm told qualify as protectable trade dress. The distinctive and elegant appearance of the jamb, center, and end brackets are well known in the industry and are easily identified as the J Geiger Shading System.

18. J Geiger's jamb bracket trade dress includes a clean circular element that is integral and seamless with both the shade and the wall. J Geiger's jamb bracket was a radical departure from the existing jamb brackets when introduced. I began marketing and selling the jamb bracket in 2012 and J Geiger has spent approximately 1.2 million dollars between 2015-2017 marketing the jamb bracket along with other J Geiger products. We spent this significant amount on marketing to create awareness of the jamb bracket and other J Geiger products and to encourage acceptance of the J Geiger Shading Systems in the market.

19. The aesthetic design of J Geiger's jamb bracket is not functional. Other designs for jamb brackets existed prior to the creation of the J Geiger jamb bracket that accomplished the purpose of holding shades in place.

20. J Geiger's center bracket trade dress includes a central U-shaped bracket, where the U-shaped bracket fits seamlessly between two shade ends that abut the same, effectively creating a "shade sandwich" with the U-shaped bracket in the middle. J Geiger's center bracket was a radical departure from the existing center brackets when introduced. I began marketing and selling the center bracket in 2012 and J Geiger has spent approximately 1.2 million dollars between 2015-2017 marketing the center bracket along with other J Geiger products. We spent this significant amount on marketing to create awareness of the center bracket and other J Geiger products and to encourage acceptance of the J Geiger Shading Systems in the market.

21. The aesthetic design of J Geiger's center bracket is not functional. Other designs for center brackets existed prior to the creation of the J Geiger center bracket that accomplished the purpose of holding shades in place.

22. J Geiger's end bracket trade dress includes a clean U-shaped element that stands alone in its ornamental connection of the end of the shade to a wall, where the outward face of the side of the U-shaped bracket is unencumbered by any of the normally "ugly" mechanisms required to attach the element to the wall. J Geiger's end bracket was a radical departure from the existing end brackets when introduced. I began marketing and selling the end bracket in 2012 and J Geiger has spent approximately 1.2 million dollars between 2015-2017 marketing the end bracket along with other J Geiger products. We spent this significant amount on marketing to create awareness of the end bracket and other J Geiger products and to encourage acceptance of the J Geiger Shading Systems in the market.

23. The aesthetic design of J Geiger's end bracket is not functional. Other designs for end brackets existed prior to the creation of the J Geiger end bracket that accomplished the purpose of holding shades in place.

24. I am familiar with the facts and circumstances underlying this matter, and I make this declaration in support of Plaintiff J Geiger's motion for preliminary injunction barring Defendant Lutron Electronics Co., Inc. ("Lutron") from continuing to make, market, or sell products that infringe J Geiger's patent and trade dress rights.

25. Lutron is the only competitor in the high-end roller shade market that sells "J Geiger style" window shades. While roller shades and high-end roller shades have existed for quite some time, J Geiger's innovative design and superior product changed the roller shade market and created a new tier of products: the high-end *exposed* roller shade. Prior to Lutron's Palladiom Shading System, J Geiger was the only company that provided high-end roller shades with integrated parts concealed in the mounting system. When a customer was looking for a roller shade with clean lines and minimalist style, it went to J Geiger. Thus, J Geiger is operating in a new strata of the high-end roller shade market, one created by the unique and innovative style of its own products.

26. Upon information and belief, Lutron first disclosed its Palladiom Shading System on or about September 2017, long after issuance of J Geiger's' 821 Patent on January 19, 2016, and long after J Geiger's trade dress had acquired distinctiveness in the minds of the consuming public. Upon learning of the Palladiom Shade, J Geiger diligently began investigating whether it infringed J Geiger's intellectual property. J Geiger ultimately found that Lutron's Palladiom Shade infringed J Geiger's patent and trade dress.

27.  Lutron's introduction of the Palladiom Shading System appears to be a response to a manufacturing sales agreement that J Geiger reached with Savant Systems, LLC ("Savant"). In January 2017, the industry learned that J Geiger intended to enter a manufacturing sales agreement with Savant. This deal would allow the J Geiger Shading System to be sold nationally through Savant dealers and would greatly increase sales of certain J Geiger Shading Systems, including the J Geiger jamb bracket, center bracket, and end bracket. Eight months later, Lutron announced its Palladiom Shading System with indistinguishable versions of J Geiger's jamb bracket, center bracket, and end bracket. The following comparison illustrates how Lutron copied J Geiger's designs.



| J Geiger Jamb Bracket | Lutron's Jamb Bracket Copy |
|---|---|
|  | Palladiom_Shading_System_Brochure.pdf, Sorden Decl., Ex. 2 at p. 12. |



See also, Shading_System_Brochure.pdf, Sorden Decl., Ex. 2 at p. 15.



Palladiom_Shading_System_Brochure.pdf, Sorden Decl., Ex. 2 at p. 16.

28. I'm aware of evidence that suggests Lutron was following J Geiger and its products during 2017 in advance of its launch of the Palladiom Shading System in September 2017. Google Analytics shows a disproportionate number of people located in Coopersburg, Pennsylvania, the

location of Lutron's headquarters, monitoring J Geiger's website in 2017. A copy of these analytics is attached hereto as Exhibit 4. According to Google Analytics, Coopersburg is a small town with a population of 2,478 people. Ex. 4 at 8. Yet, of all the cities in the state of Pennsylvania, Coopersburg had the second largest number of visits to the J Geiger website during the period of December 2016 – December 2017. *Id.* Coopersburg was second only to Philadelphia, a city with a population of 1.568 million. *Id.* The image from the analytics report below shows that 111 sessions on the J Geiger website came from Coopersburg during this time and 306 came from Philadelphia, a city more than 632 times the size of Coopersburg. *Id* at 9. Sessions on the J Geiger site from Coopersburg dwarf the number of sessions from other cities in Pennsylvania, such as Pittsburgh (population of 305,704), Allentown (population of 118,032), and Levittown (population of 52, 983).[1]

---

[1] *See* https://en.wikipedia.org/wiki/Pittsburgh; https://en.wikipedia.org/wiki/Allentown,_Pennsylvania; and https://en.wikipedia.org/wiki/Levittown,_Pennsylvania (last visited June 13, 2018).



| City | Acquisition | | | Behavior | | | Conversions Goal 1: Smart Goal | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sessions | % New Sessions | New Users | Bounce Rate | Pages / Session | Avg. Session Duration | Smart Goal (Goal 1 Conversion Rate) | Smart Goal (Goal 1 Completions) | Smart Goal (Goal 1 Value) |
| | 671 % of Total 2.17% (30,863) | 82.12% Avg for View 75.77% (8.38%) | 551 % of Total 2.36% (23,384) | 61.40% Avg for View 58.58% (8.52%) | 2.88 Avg for View 3.05 (5.77%) | 00:01:22 Avg for View 00:01:53 (127.62%) | 0.00% Avg for View 0.05% (100.00%) | 0 % of Total 0.00% (18) | $0.00 % of Total 0.00% ($0.00) |
| 1. Philadelphia (pop 1.566 mil) | 306 (45.60%) | 88.24% | 270 (49.00%) | 76.47% | 1.92 | 00:00:34 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 2. Coopersburg (pop 2.47K) | 111 (16.54%) | 61.26% | 68 (12.34%) | 22.52% | 5.56 | 00:04:01 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 3. Pittsburgh | 21 (3.13%) | 100.00% | 21 (3.81%) | 47.62% | 2.67 | 00:00:35 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 4. Allentown | 17 (2.53%) | 64.71% | 11 (2.00%) | 35.29% | 4.29 | 00:01:20 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 5. Levittown | 13 (1.94%) | 38.46% | 5 (0.91%) | 7.69% | 7.00 | 00:07:22 | 0.00% | 0 (0.00%) | $0.00 (0.00%) |

As the statistics from this data show below, when you factor in population, Coopersburg had more than 273 times the number of sessions compared to the average number of sessions in Philadelphia, Pittsburgh, Allentown, and Levittown. Further, the average session duration for viewing J Geiger's website lasted much longer—4.85 times longer—for people in Coopersburg compared to most other larger cities.[2]

---

[2] This is calculated by averaging the "Avg. Session Duration" with cities populated by 100,000 or more in the provided chart (Philadelphia, Pittsburgh, and Allentown), which is 49.66 seconds, and comparing that with the 4:01 minute "Avg. Session Duration" of Coopersburg.

| PA City | Sessions | Avg. Session Duration | New Users | 2016 Population | Sessions/ Population | New Users/ Population |
|---|---|---|---|---|---|---|
| Philadelphia | 306 | 0:34 | 270 | 1,568,000 | 0.020% | 0.017% |
| Coopersburg | 111 | 4:01 | 68 | 2,478 | 4.479% | 2.744% |
| Pittsburgh | 21 | 0:35 | 21 | 303,625 | 0.007% | 0.007% |
| Allentown | 17 | 1:20 | 11 | 120,443 | 0.014% | 0.009% |
| Levittown | 13 | 7:22 | 5 | 51,881 | 0.025% | 0.010% |
| | | | | Average Excluding Coopersburg | 0.016% | 0.011% |
| | | | | Coopersburg vs. Average | 273.1x | 255.8x |

29.     That is an enormous and irregular number of sessions for a small suburban town. As the analytics report further demonstrates, most of J Geiger's website views come from urban areas, such as New York or Los Angeles. *Id.* at 7. Indeed, J Geiger has no record of a sale ever coming from Coopersburg. Therefore, it is surprising that such a large number of people from this small town, where we have sold no products, would be visiting the J Geiger website. For example, one person in Coopersburg viewed the J Geiger website 42 times in 2017 (*id.* at 10), repeatedly looking at J Geiger products (*id.* at 12-16).

30.     I have received information that Lutron's sales representatives are currently marketing the Palladiom Shading System as unique and innovative technology. For example, I have heard recordings of a Lutron representative at the HD Expo in Las Vegas, Nevada, on May 4, 2018, referring to Lutron's new Palladiom Shading System as a "unique design" that was the result of "a lot of research and development." *See* O'Connor Decl., Ex. 1 at 2. In another recording taken on May 21, 2018, at the ICFF Show in New York, a Lutron representative stated the Palladiom Shading System was the "only solution out there where every single piece [of the shade] is integrated." *See* Milianta Decl., Ex. 1 at 2. Such representations are utterly false and damage J Geiger's business. I invented the technology and created the design for the integrated exposed roller shade almost seven years ago and have been actively marketing it since 2012.

31. The Palladiom Shading Systems are nearly exact copies of the J Geiger Shading Systems I invented. For example, as shown in the pictures above, the shape, style, and finish of the jamb, end, and center brackets are the same. Furthermore, the Palladiom Shading System appears to have similar hardware that functions in the same manner as the J Geiger Shading System.

32. Customers for J Geiger Shading Systems include home owners, business owners, designers, and architects that are looking for sleek, innovative, and elegant window shades. Lutron is targeting the very same customer base for its Palladiom Shading System. In addition, the J Geiger Shading System is now often sold in the same location as the Palladiom Shading System. In 2017, J Geiger entered into a manufacturing agreement with Savant, where J Geiger would manufacture its J Geiger Shading System for Savant (the "Savant Shading System by J Geiger"). The Savant and Lutron Shading Systems are often sold by the same home electronics and AV dealers/retailers. Upon information and belief, from a customer's point of view, Lutron's knockoff products are direct substitutes for those offered by J Geiger. In fact, Lutron's Palladiom Shading System is the only product I know of that would be a direct substitute for the J Geiger Shading System. Based upon information and belief, Lutron sales representatives are marketing the Palladiom Shading System as the "same" as the J Geiger Shading System.

33. Lutron's Palladiom Shading System has created consumer confusion since its initial announcement. On September 9, 2017, Lutron made a post on its Facebook page introducing the Palladiom Shading System. A copy of the Lutron Facebook post and comments is attached hereto as Exhibit 5. One consumer commented to the post and said, "Wow, looks like a copy of the Savant Shade product." This is a reference to the J Geiger Shading System manufactured for

Savant. Another consumer then replied, "Don't forget the Savant product has been around for years from J Geiger."

34. This is particularly concerning because, in general, there is a high "stickiness" factor associated with shading systems. Once the customer, such as an architect or designer, has chosen a brand, it is difficult to get them to switch. Thus, to the extent customers choose Lutron's knockoff products, it will be extremely difficult for J Geiger to get them back.

35. One way to attract customers away from Lutron's knockoff products would be for J Geiger to reduce the price of the J Geiger Shading System. However, if J Geiger is forced to reduce its prices to compete with Lutron, it will be very difficult to later increase the price to the point it was prior to the decrease. Thus, J Geiger stands to lose considerable revenue that cannot be replaced.

36. With Lutron having the only competing product to J Geiger in the high-end roller shade market, every Palladiom Shading System sale Lutron makes is a lost sale for J Geiger and any Palladiom Shading System sale made by Lutron directly impacts J Geiger's market share. Indeed, by poaching J Geiger's patented hardware and distinctive trade dress, Lutron's window shade will take market share from J Geiger, dilute the uniqueness of J Geiger's design, cause J Geiger to lose goodwill associated with its products, and damage the reputation for high quality that J Geiger has labored long and hard to build. J Geiger will also be deprived of the opportunity to reinvest earnings from its innovative products into future research and development.

37. If an injunction does not issue, the hardship to J Geiger will be greater than the hardship to Lutron. Lutron is a much larger and more mature business than J Geiger. It offers thousands of products. Indeed, its main business has always been and still is in lighting and

lighting controls. It is my understanding that window shading is a small portion of Lutron's overall business.

38. By promoting its infringing products as the "same" as the J Geiger Shading System, Lutron is likely to cause confusion or mistake or to deceive consumers as to the affiliation, connection, or association between J Geiger and Lutron, as well as confusion concerning the source, sponsorship, or approval of the Palladiom Shading System. This false association with a knockoff brand damages J Geiger's reputation and goodwill.

39. Significant harm to J Geiger's reputation is far greater than simply lost profits and cannot be easily remedied.

40. In my opinion, the J Geiger brand, reputation, and business model are all irreparably damaged by the introduction of Lutron's knockoff product.

41. Finally, J Geiger is being denied the competitive advantage afforded to it under the '821 Patent as a result of the continuing infringement by Lutron. In the absence of a preliminary injunction, J Geiger will be irreparably harmed by Lutron's conduct in taking unauthorized advantage of J Geiger's patented technology during the pendency of this suit.

Dated: June 18, 2018

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　James Geiger