**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

GEIGTECH EAST BAY LLC,

        Plaintiff,

    v.

LUTRON ELECTRONICS CO., INC.,

        Defendant.

Civil Action No. 1:18-cv-05290 (PAE)

**JURY TRIAL DEMANDED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     RELEVANT BACKGROUND FACTS ..................................................................2

        A.      J Geiger and the J Geiger Shading System ................................................2

        B.      Lutron and its Palladiom Shading System .................................................6

III.    J GEIGER IS ENTITLED TO A PRELIMINARY INJUNCTION ......................8

        A.      J Geiger is Likely to Succeed on the Merits of its Patent and Trade Dress
                Infringement Claims ...................................................................................9

                1.      Patent Infringement...........................................................................9

                2.      Trade Dress Infringement ................................................................10

                        (1)     The Strength of J Geiger's Trade Dress...........................12

                        (2)     The Similarity Between the Trade Dress .........................13

                        (3)     The Proximity of the Products in the Marketplace .........15

                        (4)     Bridging the Gap.............................................................15

                        (5)     Evidence of Actual Confusion ........................................16

                        (6)     The Defendant's Bad Faith ..............................................16

                        (7)     The Quality of Defendant's Product ................................18

                        (8)     Sophistication of Relevant Consumer Group .................18

        B.      J Geiger Will Suffer Irreparable Harm Absent an Injunction ................19

        C.      The Balance of Hardships Tips in J Geiger's Favor .............................24

        D.      Public Interest Favors an Immediate Injunction ...................................25

IV.     CONCLUSION....................................................................................................26

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*Abbott Labs. v. Sandoz, Inc.*,
   544 F.3d 1341 (Fed. Cir. 2008)................................................................23, 25

*Apple Inc. v. Samsung Elecs. Co.*,
   809 F.3d 633 (Fed. Cir. 2015)........................................................................25

*Atlas Powder Co. v. Ireco Co.*,
   773 F.2d 1230 (Fed. Cir. 1985)........................................................................9

*Bio-Tech. Gen. Corp. v. Genentech, Inc.*,
   80 F.3d 1553 (Fed. Cir. 1996)........................................................................20

*Blumenthal Distrib., Inc. v. Executive Chair, Inc.*,
   2010 WL 5980151 (E.D.N.Y. Nov. 9, 2010)..................................................20

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012)...................................................................19, 21

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
   717 F.3d 1336 (Fed. Cir. 2013)...................................................19, 21, 22, 25

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
   257 F.3d 1364 (Fed. Cir. 2001)........................................................................9

*Edwards v. Lifesciences AG v. CoreValve, Inc.*,
   2014 U.S. Dist. LEXIS 51778 (D. Del. Apr. 15, 2014)..................................20, 21, 23, 25

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009)...........................................................................18

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
   111 F.3d 993 (2d Cir. 1997)............................................................ 9, 10-11, 12

*Guttman, Inc. v. Kopykake Enters., Inc.*,
   302 F.3d 1352 (Fed. Cir. 2002)........................................................................8

*H.H. Robertson Co. v. United Steel Deck, Inc.*,
   820 F.2d 384 (Fed. Cir. 1987)........................................................................19

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
   858 F.2d 70 (2d Cir. 1988)......................................................................................12

*Hutzler Mfg. Co., Inc. v. Bradshaw Int'l, Inc.*,
   11 CIV. 7211 PGG, 2012 WL 3031150 (S.D.N.Y. July 25, 2012) .................................20

*Hybritech, Inc. v. Abbott Labs.*,
   849 F.2d 1446 (Fed. Cir. 1988).............................................................................19, 20

*i4i Ltd. P'ship. v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010).................................................................................24

*Interactive Gift Express, Inc. v. CompuServe, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001)...............................................................................10

*LeSportsac, Inc. v. K Mart Corp.*,
   754 F.2d 71 (2d. Cir. 1985).................................................................................11, 12

*Lois Sportswear, U.S.A., Inc., v. Levi Strauss & Co.*,
   799 F.2d 867 (2d Cir. 1986)................................................................................15, 18

*Malletier v. Burlington Coat Factory Warehouse Corp.*,
   426 F.3d 532 (2d Cir. 2005)..................................................................................8, 23

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ..................................9

*Marks Org., Inc. v. Joles*,
   784 F.Supp.2d 322 (S.D.N.Y. 2011)........................................................................21, 22

*McGregor-Doniger Inc. v. Drizzle Inc.*,
   599 F.2d 1126 (2d Cir. 1979).................................................................................12

*Mint, Inc. v. Amad*,
   2011 WL 1792570 (S.D.N.Y. May 9, 2011) ...................................................................21

*N.Y. City Triathlon v. NYC Triathlon Club, Inc.*,
   704 F.Supp.2d 305 (S.D.N.Y. 2010)........................................................................18, 21

*Paddington Corp. v. Attiki Importers & Distributors, Inc.*,
   996 F.2d 577 (2d Cir. 1993)..................................................................................11

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)..............................................................................9, 10

*Polaroid Corp. v. Polarad Electronics, Corp.,*
    287 F.2d 492 (2d Cir. 1961).............................................................................12

*Polymer Techs., Inc. v. Bridwell,*
    103 F.3d 970 (Fed. Cir. 1996).........................................................................19

*Power Survey, LLC v. Premier Utility Services, LLC,*
    61 F.Supp. 3d 477 (S.D.N.Y 2014)................................................................23

*Power Test Petroleum Distribs. v. Calcu Gas, Inc.,*
    754 F.2d 91 (2d Cir. 1985)..............................................................................22

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
    237 F.3d 1359 (Fed. Cir. 2001).......................................................................20

*Robert Bosch LLC v. Pylon Mfg. Corp.,*
    659 F.3d 1142 (Fed. Cir. 2011).......................................................................20

*Smith Int'l., Inc. v. Hughes Tool Co.,*
    718 F.2d 1573 (Fed. Cir. 1983).................................................................23, 25

*Tactica Int'l, Inc. v. Atlantic Horizon Intern., Inc.,*
    154 F.Supp.2d 586 (S.D.N.Y. 2001).................................................................9

*Teledyne Industries, Inc. v. Windmere Products, Inc.,*
    433 F.Supp. 710 (S.D. Fla. 1977) ...................................................................20

*Trebro Mfg. v. FireFly Equip., LLC,*
    748 F.3d 1159 (Fed. Cir. 2014)........................................................................9

*Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.,*
    No. 12 CV 3599, 2012 U.S. Dist. LEXIS 110974 (S.D.N.Y. Aug. 7, 2012)....................11

*Warner-Lambert Co. v. Northside Devel. Corp.,*
    86 F.3d 3 (2d Cir. 1996)..................................................................................24

*Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.,*
    698 F.2d 862 (7th Cir. 1983) ...........................................................................24

*Yurman Design, Inc. v. PAJ, Inc.,*
    262 F.3d 101 (2d Cir. 2001)............................................................................11

*Zino Davidoff SA v. CVS Corp.,*
    571 F.3d 238 (2d Cir. 2009)..............................................................................9

*Statutes*

35 U.S.C. § 283................................................................................................................................8

## I.       INTRODUCTION

Plaintiff GeigTech East Bay LLC ("J Geiger") submits this memorandum in support of its motion to preliminarily enjoin ongoing patent and trade dress infringement by Defendant Lutron Electronics Co., Inc. ("Lutron") in this matter.   This motion seeks to stop Lutron's infringement of U.S. Patent No. 9,237,821 (the "'821 Patent") and the consumer confusion intentionally caused by Lutron's sale of a high-end roller shading system that is virtually identical to the J Geiger Shading System.

The '821 Patent describes an innovative bracket system for mounting window roller shades ("roller shades").  Lutron has infringed, and continues to infringe, the patent-at-issue by making, using, importing, selling, and/or offering for sale its Palladiom Shading System.   In addition to infringing the '821 Patent, Lutron's Palladiom Shading System unlawfully uses the unique, distinctive, non-functional design of the J Geiger Shading System, which causes consumer confusion resulting in harm to J Geiger's trade dress.  Lutron's infringing activities must be enjoined.

J Geiger's founder, James Geiger, has been a pioneer in the field of home integration for over 20 years.  Mr. Geiger entered the audio visual ("AV") integration industry in 1993, selling and installing home theaters, lighting, audio systems, and motorized window shades.  Seeing a hole in the market, Mr. Geiger started to develop innovative shading solutions in 2011. In doing so, Mr. Geiger conceived, designed, and implemented an elegant and distinctive shading system where the screws and wires associated with traditional mounting brackets were hidden from view.  Due in large part to J Geiger branding and marketing efforts, the J Geiger Shading System has been very successful and seen strong sales growth.  However, this success has spawned Lutron's knockoff.

Lutron is the only competitor in the high-end roller shade market that sells "J Geiger style" window shades. *See* Declaration of James Geiger ("Geiger Decl.") at ¶ 25.[1] While roller shades and high-end roller shades have existed for quite some time, J Geiger's innovative design and superior product completely changed the roller shade market and created a new tier of products: the high-end *exposed* roller shade. *Id*. Prior to Lutron's Palladiom Shading System, J Geiger was the only company that provided high-end roller shades with integrated parts concealed in the mounting system. *Id*. When a customer was looking for a roller shade with clean lines and minimalist style, it went to J Geiger. *Id*. Thus, J Geiger was operating in a new strata of the high-end roller shade market, one created by the unique and innovative style of its own products. *Id*. J Geiger is now forced to compete with Lutron's infringing product.

As a result of this infringement, J Geiger is suffering irreparable harm to its business, brand, and reputation. After devoting substantial time and resources to building its brand, J Geiger faces the prospect of having its brand recognition coopted by a competitor attempting to ride the coattails of J Geiger's success. Absent an injunction preventing Lutron from marketing and selling its infringing imitation window shades, J Geiger's business will continue to be jeopardized.

## II.     RELEVANT BACKGROUND FACTS

### A.     <u>J Geiger and the J Geiger Shading System</u>

James Geiger, founder and president of GeigTech East Bay LLC (d/b/a J Geiger Shading Technology), has been a pioneer and entrepreneur in the field of home integration for over 20 years.  Geiger Decl. at ¶ 3.

---

[1] *See also* https://sivermont.com/blog/item/aesthetically-pleasing-solutions (last visited June 15, 2018) ("Windows – For years, we've worked hard to conceal window shades and blinds, with the latest offerings from Savant (by J Geiger) and Lutron Palladiom are changing that, these are rollers that beg to be seen.").

Mr. Geiger first installed window shades as an integrator around 1999.  *Id*. at ¶ 4. Traditionally, shades were a design afterthought.  *Id*. As such, it was standard to hide mounting hardware with a "ceiling pocket," "valance," or "fascia."  *Id*. Around 2011, while working on a multi-million dollar home, Mr. Geiger came up with a new concept for exposed shades without any visible screws, wires, or other unsightly hardware.  *Id*. at ¶ 6. Mr. Geiger's new hardware was not only elegant and distinctive, but it also allowed for screws and wires to be concealed from view.  *Id*. at ¶ 7.  On May 21, 2012, J Geiger applied for a patent for this inventive shading system, which would later issue as the '821 Patent. *Id*. at ¶ 16.

Prior to this invention, shade mounting brackets were screwed directly into the wall or ceiling and hidden typically with a "ceiling pocket," "valance," or "fascia."  Geiger Decl. at ¶ 8. As the comparison pictures below show, the innovative design of the J Geiger Shading System allows the mounting screws to be hidden within the shading system itself.  *Id*.

| Representative Lutron Prior Shade Brackets | J Geiger's Shade Bracket |
|---|---|



| Representative Lutron Prior Shade Brackets | J Geiger's Shade Bracket |
|---|---|

| Representative Lutron Prior Shade Brackets | J Geiger's Shade Bracket |
|---|---|



| Representative Prior Shade Brackets | J Geiger's Shade Bracket |
|---|---|



Mr. Geiger's innovative shading system has been marketed and available since 2012. Geiger Decl. at ¶ 10. By August of 2014, J Geiger had opened offices in Los Angeles and Manhattan. *Id*. at ¶ 11. J Geiger's pioneering signature look is represented by its circle and U-shaped brackets and floating couplers, which connect two shades together. *Id*. In addition to this signature look, the innovative J Geiger patented shading mechanism conceals all of the "ugly parts" that would be exposed in a typical shading system. *Id*. This was something that other shading systems had never offered. *Id*. J Geiger's invention, marketed to the consumer under the

J Geiger ornamental trade dress, is now (and has been since shortly after inception) widely recognized and praised by architects and designers throughout the United States and the world. *Id*. at ¶ 12.

J Geiger's innovations in the shading industry have proven popular in the marketplace and the company's sales have consistently grown. *Id*. While Mr. Geiger began marketing and selling his shading system in 2012, J Geiger began selling the J Geiger Shading System in 2014. *Id*. at ¶ 13. Since that time, sales grew by 286% in 2015, followed by 412% in 2016, and 50% in 2017. *Id*. J Geiger has also marketed its innovative shading system extensively, spending approximately 1.2 million dollars on marketing during 2015-2017.  *Id*. at ¶ 14. Examples of some of J Geiger's advertising can be seen in Exhibit 1 to the Geiger Declaration.  As J Geiger's products have gained popularity, the products' unique appearance has proven to be desirable to consumers and has become inextricably linked with J Geiger's reputation for quality, innovation, and elegance. *Id*.

On January 19, 2016, the United States Patent and Trademark Office ("USPTO") issued the '821 Patent, entitled "Assembly for Mounting Shades."  Geiger Decl. at ¶ 16. J Geiger holds the exclusive right to license the '821 Patent, which encompasses "a system of fastening devices, e.g., mounts, brackets, and assemblies for installing roller window shades."  Geiger Decl., Ex. 3, '821 Patent at Abstract.  Embodiments of the '821 Patent "provide for improved means for mounting window shades (roller shades), including motorized shades, in which the portion of the mounting means (i.e., the "mount", "mounting plate", or "mounting bracket") affixed to the supporting structure (e.g., the window casing, walls, columns, etc.) are hidden from view by the structure of the bracket or mounting bracket."  *Id*. at 3:45-51.

### B.   Lutron and its Palladiom Shading System

Lutron is a large international electronics company and industry leader in lighting and shade control.[2]   Headquartered in Coopersburg, Pennsylvania, with additional offices in the United States, Europe, Asia, the Middle East, and Latin America, Lutron has more than a thousand employees,[3] currently offers 15,000 products,[4] and earns more than half a billion dollars in annual revenue[5].   Lutron has been in the window shade business since at least 1993.[6] However, prior to the introduction of its Palladiom Shading System, Lutron hid the "ugly parts" of the roller shade like everyone else, with a "ceiling pocket," "valance," or "fascia."[7]

Lutron initially disclosed its Palladiom Shading System on or about September 2017. Geiger Decl. at ¶ 26. Upon learning of the Palladiom Shading System, J Geiger diligently began investigating whether the product infringed its intellectual property. J Geiger ultimately found that the Palladiom Shading System infringes J Geiger's patent and trade dress as depicted in the images below:

| J Geiger Jamb Bracket | Defendant's Jamb Bracket Copy |
|---|---|

---

[2]   See   https://www.businesswire.com/news/home/20160607006778/en/Lutron-Electronics-Named-Top-Lighting-Control-Motorized (last visited June 15, 2018)

[3]   According to Lutron's LinkedIn page, it currently employs between 1001-5000 people.   *See* https://www.linkedin.com/company/lutron-electronics (last visited June 15, 2018).

[4]   *See* http://www.lutron.com/en-US/Company-Info/Pages/AboutUS/WorldwideLocation.aspx (last visited June 15, 2018).

[5] *See* http://www.hoovers.com/company-information/cs/company-profile.lutron_electronics_co_inc.1c1e99916a30d9a4.html (last visited June 15, 2018).

[6] See http://www.lutron.com/TechnicalDocumentLibrary/Lutron%20history_innovation.pdf at page 13 (last visited June 15, 2018).

[7] *See* https://vimeo.com/42886778 (Video clip from American Institute of Architecture (AIA) Convention six years ago where Lutron representative discusses Lutron roller shades at the time.  The roller shade demonstrated in the clip has a fascia covering up the shade and its mechanical components.   The interviewer tells the Lutron representative that she has been looking at lots of shades at convention and was wondering "how do you hide those ugly parts" at the top of the shade.  The Lutron representative responds that they can put the shade components into a pocket cut into the wall) (last visited June 15, 2018).

| J Geiger Jamb Bracket | Defendant's Jamb Bracket Copy |
|---|---|
|  | Palladiom_Shading_System_Brochure.pdf, Sorden Decl., Ex. 2 at p. 12. |

| J Geiger Center Bracket | Defendant's Center Bracket Copy |
|---|---|
|  | *See also,* Shading_System_Brochure.pdf, Sorden Decl., Ex. 2 at p. 15. |

| J Geiger End Bracket | Defendant's End Bracket Copy |
|---|---|
|  | Palladiom_Shading_System_Brochure.pdf, Sorden Decl., Ex. 2 at p. 16. |

Given that J Geiger and Lutron have the only competing products for high-end exposed roller shades, every sale Lutron makes of Palladiom is a lost sale for J Geiger and any sale of Palladiom directly impacts J Geiger's market share. Geiger Decl. at ¶ 36. Indeed, by poaching J Geiger's patented design and trade dress, Lutron's Palladiom Shading System will take market share from J Geiger, dilute the uniqueness of J Geiger's design, cause J Geiger to lose goodwill associated with its products, and damage the reputation that J Geiger has labored long and hard to build. *Id.* An injunction is also in the public interest because it will protect consumers from further confusion, while discharging the patent law's purpose: to maintain incentives for the creation of new and novel designs. J Geiger should be allowed to enjoy its right to exclude others from the high-end exposed roller shade market that it created with its patented technology and innovative design.  If Lutron is permitted to sell its competing roller shade, the harm to J Geiger and the public will be immediate and irreparable.  Accordingly, J Geiger requests an immediate injunction.

## III.    J GEIGER IS ENTITLED TO A PRELIMINARY INJUNCTION

To prevail on a motion for a preliminary injunction, a plaintiff must show (1) irreparable harm, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiff's favor. *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (citation omitted).

Section 283 of the Patent Act provides that courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent."  35 U.S.C. § 283; *Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002).  The Federal Circuit has made clear that preliminary injunctions should issue in patent cases where the legal

requirements have been met in order to vindicate the property right granted to protect the innovations of patent owners. *See Trebro Mfg. v. FireFly Equip., LLC*, 748 F.3d 1159, 1170-71 (Fed. Cir. 2014); *Atlas Powder Co. v. Ireco Co.*, 773 F.2d 1230, 1234 (Fed. Cir. 1985).

Similarly, Courts in this Circuit routinely grant preliminary injunctions in cases involving claims of trade dress infringement. *See*, *e.g.*, *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1006 (2d Cir. 1997) (affirming grant of preliminary injunction where plaintiff's trade dress is inherently distinctive and defendant's copying created substantial likelihood of confusion); *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 240 (2d Cir. 2009) (affirming grant of preliminary injunction prohibiting defendant from offering goods infringing on plaintiff's trademark); *Tactica Int'l, Inc. v. Atlantic Horizon Intern., Inc.*, 154 F.Supp.2d 586, 609 (S.D.N.Y. 2001) (enjoining defendants from infringing plaintiff's mark to sell beauty products).

Here, J Geiger is likely to succeed on the merits of its patent and trade dress infringement claims and will suffer irreparable harm if Lutron's infringing activities are not enjoined.

### A.   J Geiger is Likely to Succeed on the Merits of its Patent and Trade Dress Infringement Claims

#### 1.   Patent Infringement

A determination of patent infringement requires a two-step analysis: first, the patent claims must properly be construed, and second, a determination must be made as to whether the claims "read on" the accused product. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  Claim construction is a question of law. *Markman*, 52 F.3d at 979. To determine the meaning of the claims, the courts look to the claim language, the specification, and the prosecution history. *Id*. at 979.[8]

---

[8] *See also Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-17 (Fed. Cir. 2005); *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001).

The analytical focus must "begin and remain centered on the language of the claims themselves" because it is that language which the patentee has chosen to "particularly point out and distinctly claim the subject matter" of the invention. *Interactive Gift Express, Inc. v. CompuServe, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). In this case, the language of the claims is readily understood in accordance with its plain, ordinary meaning. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312- 14 (Fed. Cir. 2005).

Infringement is shown where the accused product (here, the Palladiom Shading System) contains the limitations recited in each asserted patent claim. Analyzing infringement here is thus a matter of comparing the limitations set forth in the claims of the '821 Patent to the Palladiom Shading System. An analysis of the product is described in detail in the claim charts attached as Exhibit 1 to the Sorden Declaration. *See generally* Sorden Decl., Ex. 1. The claim charts demonstrate in detail that Lutron's product literally infringes, at least, claims 9 and 15 of the '821 Patent. *Id.* Accordingly, J Geiger has demonstrated a likelihood of success on the merits.

### 2.      Trade Dress Infringement

Lutron's unlawful conduct also constitutes trade dress infringement. "The concept of trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer. These other elements include the other materials used in presenting the product to prospective purchasers." *Fun-Damental Too, Ltd. v. Gemmy Indust. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997).

To prevail on the merits in a trade dress infringement case under the Lanham Act, "plaintiff must first demonstrate that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning." *Fun-Damental Too, Ltd. v. Gemmy*

*Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997). "Second, plaintiff must demonstrate that there is a likelihood of confusion between defendant's trade dress and plaintiff's." *Id.*

It is axiomatic that unregistered trade dress is entitled to protection under Section 43(a) of the Lanham Act. *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 582 (2d Cir. 1993) ("Unregistered trademarks and trade dresses are protectable under § 43(a) of the Lanham Act"). A product's trade dress is its "total image . . . including features such as size, shape, color or color combinations, texture, [or] graphics." *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2d. Cir. 1985) (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)). Because "the possible varieties of advertising display . . . are virtually endless," courts routinely find that a trade dress is inherently distinctive, "and the only real question for the courts will be whether there is a likelihood of confusion between the products." *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 99 F.2d 577, 583 (2d Cir. 1993).

A product has acquired secondary meaning when, "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself." *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 115 (2d Cir. 2001) (internal quotation marks and citation omitted). When determining whether a trade dress has secondary meaning, courts consider several factors, including: (1) plaintiff's advertising expenditures; (2) consumer surveys linking the trade dress to a particular source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the trade dress; and (6) the length and exclusivity of the use. *See Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12 CV 3599, 2012 U.S. Dist. LEXIS 110974, at *17-18 (S.D.N.Y. Aug. 7, 2012).

J Geiger's trade dress includes unique, distinctive, and non-functional designs. J Geiger has extensively and continuously promoted and used its trade dress in the United States. Geiger

Decl. at ¶¶ 12-14. Through that extensive and continuous use, J Geiger's trade dress has become a well-known indicator of the origin and quality of J Geiger's products. *Id.* at ¶ 36.  J Geiger's trade dress has also acquired substantial secondary meaning in the high-end roller shade market. Moreover, J Geiger's trade dress acquired this secondary meaning before Lutron commenced its unlawful use of J Geiger's trade dress in connection with the infringing products.

To establish likelihood of confusion, plaintiff must establish a likelihood that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75 (2d Cir. 1988) (citation omitted). In deciding whether a given trade dress creates a likelihood of confusion, courts in the Second Circuit look to the eight factors articulated in *Polaroid Corp. v. Polarad Electronics, Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). "These non-exclusive factors are: (1) the strength of the plaintiff's trade dress, (2) the similarity between the two trade dress[es], (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendant's bad faith, (7) the quality of defendant's product, and (8) the sophistication of the relevant consumer group." *Fun-Damental Too*, 111 F.3d at 1002-03.  These factors weigh in favor of confusion in this case.

### (1)      The Strength of J Geiger's Trade Dress

The strength of a trade dress has been defined as "its tendency to identify the goods sold under the mark as emanating from a particular . . . source." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979).  In determining the strength of the trade dress, functional aspects that are essential to its use or purpose, which are not protected, must be weighed against the distinctive portions of the mark, which are protected. *LeSportsac*, 754 F.2d

at 75.

J Geiger's jamb bracket trade dress includes a clean circular element that is integral and seamless with both the shade and the wall. Geiger Decl. at ¶ 18. J Geiger's center bracket trade dress includes a U-shaped element, where the U-shaped element fits seamlessly between two shade ends that abut the same, effectively creating a "shade sandwich" with the U-shaped element in the middle. *Id*. at ¶ 20. J Geiger's end bracket trade dress includes a clean U-shaped element that stands alone in its ornamental connection of the end of the shade to a wall, where the outward face of the side of the U-shaped bracket is unencumbered with any of the normally "ugly" mechanisms required to attach the element to the wall.. *Id*. at ¶ 22. These distinctive features are well known in the industry, identify the shade as a J Geiger, and are not functional. *Id*. at ¶¶ 17, 19, 21, 23.

**(2)      The Similarity Between the Trade Dress**

Lutron clearly copies a variety of J Geiger trade dress.  This infringement covers at least three different versions of J Geiger Shading System brackets: (1) the J Geiger jamb bracket; (2) the J Geiger center bracket; and (3) the J Geiger end bracket.

Defendant's Palladiom Shading System includes a jamb bracket that is a colorable use of J Geiger's jamb bracket trade dress.  The following comparison illustrates how Defendant has copied J Geiger's jamb bracket design.

| J Geiger Jamb Bracket | Lutron's Jamb Bracket Copy |
|---|---|

| J Geiger Jamb Bracket | Lutron's Jamb Bracket Copy |
|---|---|
|  | Palladiom_Shading_System_Brochure.pdf, Sorden Decl., Ex. 2 at p. 12. |

Defendant's Palladiom Shading System includes a center bracket that is a colorable use of J Geiger's center bracket trade dress.  The following comparison illustrates how Lutron has copied J Geiger's center bracket design:

| J Geiger Center Bracket | Lutron's Center Bracket Copy |
|---|---|
|  | Photo from Lutron Facebook Page on June 6, 2018. |

Defendant's Palladiom Shading System includes an end bracket that is a colorable use of J Geiger's end bracket trade dress.  The following comparison illustrates how Lutron has copied J Geiger's end bracket design:

| J Geiger End Bracket | Lutron's End Bracket Copy |
|---|---|

 

Palladiom_Shading_System_Brochure.pdf,
Sorden Decl., Ex. 2 at p. 16.

### (3)     The Proximity of the Products in the Marketplace

The close proximity in the high-end roller shade market and the similarity between the two products is likely to lead to consumer confusion.  The Lutron Palladiom Shading System and the J Geiger Shading System are the only two competing high-end exposed roller shade products.  As stated above, in 2012, the J Geiger Shading System created an entirely new type of high-end roller shade.  The J Geiger Shading System was the only product of its kind until Lutron announced its Palladiom Shading System in 2017.  In addition, the J Geiger Shading System is now often sold in the same location as the Palladiom Shading System.  In 2017, J Geiger entered into a manufacturing agreement with Savant Systems, LLC, where J Geiger would manufacture its J Geiger Shading System for Savant (the "Savant Shading System by J Geiger").  The Savant and Lutron Shading Systems are often sold by the same home electronics and AV dealers/retailers.  Geiger Decl. at ¶ 32.

### (4)     Bridging the Gap

If the trade dress owner can show that it intends to enter the market of the alleged infringer, that showing helps to establish a future likelihood of confusion as to source. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).  Here, J Geiger

is already in the same high-end roller shade market as Lutron and has been for over five years, which strengthens J Geiger's claim to trade dress protection.

### (5)      Evidence of Actual Confusion

As stated in the Declaration of James Geiger, actual consumer confusion exists between the Palladiom Shading System and the J Geiger Shading System.  First, it is readily obvious from looking at the appearance of Lutron's Palladiom Shading System that it is a copy of J Geiger's signature trade dress.  *See*, *e.g.*, Geiger Decl. at ¶ 31 (finding the design and appearance of the Palladiom Shading System to be nearly exact copies of the J Geiger Shading System).

Second, consumers agree that the Palladiom Shading System looks just like the J Geiger Shading System.  Geiger Decl. at ¶ 33. When the Palladiom Shading System was announced on a September 9, 2017 post on Lutron's Facebook page, one consumer commented, "[w]ow, looks like a copy of the Savant Shade product," referring to the J Geiger Shading System made for Savant.  *See* Geiger Decl., Ex. 5. Another consumer replied, "Don't forget the Savant product has been around for years from J Geiger." *Id.*

Third, Lutron itself admits its Palladiom Shading System is the same as the J Geiger Shading System.  Lutron representatives have told customers that Lutron's Palladiom Shading System has the same hardware as the J Geiger Shading System.  *See*  Geiger Decl. at ¶ 32.[9]

### (6)      The Defendant's Bad Faith

Lutron's introduction of the Palladiom Shading System appears to be a response to a manufacturing sales agreement that J Geiger reached with Savant.  Geiger Decl. at ¶ 27.  In January 2017, the industry learned that J Geiger intended to enter a manufacturing agreement

---

[9] J Geiger concurrently files its Motion for Expedited Discovery.  Among other things, J Geiger has requested Lutron training, marketing, and sales materials related to the J Geiger Shading System.  J Geiger believes such documents will further prove that Lutron markets the Palladiom Shading System as a substitute for the J Geiger Shading System.

with Savant. *Id*. This deal would allow the J Geiger Shading System to be sold nationally through Savant dealers and would greatly increase sales of certain J Geiger Shading Systems, including the J Geiger jamb bracket, center bracket, and end bracket. *Id*. Eight months later, Lutron announced its Palladiom Shading System with identical versions of J Geiger's jamb bracket, center bracket, and end bracket. *Id*.

Evidence indicates that Lutron was following J Geiger during this period.[10]  Google Analytics shows a disproportionate number of people located in Coopersburg, Pennsylvania, the location of Lutron's headquarters, monitoring J Geiger's website in 2017.  Geiger Decl. at ¶ 28. According to the analytics report, Coopersburg is a small town with a population of 2,478 people.  *Id*. Yet, of all the cities in the state of Pennsylvania, Coopersburg had the second largest number of visits to the J Geiger website during the period of December 2016 – December 2017. *Id*. Coopersburg was second only to Philadelphia, a city with a population of 1.568 million, according to the report.[11]  When you factor in population, Coopersburg had more than 273 times the number of sessions on the J Geiger website compared to other major cities in Pennsylvania. *Id*. Further, the average session duration for viewing J Geiger's website lasted much longer— 4.85 times longer—for people in Coopersburg compared to most other larger cities. *Id*.

The large and irregular amount of traffic coming from Coopersburg is extremely suspicious.  As the analytics demonstrate, most of J Geiger's website views come from urban areas, such as New York or Los Angeles.  *See* Geiger Declaration, Ex. 4 at 8.  Yet, one person in Coopersburg viewed the J Geiger website forty-two times in 2017 (*id*. at 10), repeatedly looking at J Geiger products (*id*. at 12-16). This is especially strange given that J Geiger has no record of a sale ever coming from Coopersburg.  Geiger Decl. at ¶ 29.  The unusually high amount of

---

[10] This evidence further supports Lutron's infringement of the '821 Patent as well.

[11] 111 sessions on the J Geiger website came from Coopersburg during this time and 306 came from Philadelphia, a city more than 632 times the size of Coopersburg.  *See* Geiger Declaration, Ex. 4 at 8.

traffic coming from small town Coopersburg provides, at least, circumstantial evidence that Lutron employees were monitoring J Geiger during this important time period in an effort to gain valuable information for their foray into the high-end exposed and integrated roller shade market.[12]

Despite copying the technology and designs of J Geiger, Lutron is promoting the Palladiom Shading System as unique and innovative.  For example, on May 4, 2018, a Lutron representative at the HD Expo in Las Vegas, Nevada referred to Lutron's Palladiom Shading System as a "unique design" that was the result of "a lot of research and development." O'Connor Decl., Ex. 1 at 2. On May 21, 2018, at the ICFF Show in New York, a Lutron representative stated the Palladiom Shading System was the "only solution out there where every single piece [of the shade] is integrated."  *See* Milianta Decl., Ex. 1 at 2.  Such representations are false and damage J Geiger's business. Geiger Decl. at ¶ 30. James Geiger invented this technology and design for the integrated exposed roller shade almost seven years ago and has been actively marketing it since 2012. *Id.*

### (7)     The Quality of Defendant's Product

There is no serious dispute that the quality of the Palladiom Shading System is similar to the J Geiger Shading System. However, the similarity in the quality of the products only increases the likelihood of consumer confusion.  *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986). This factor weights in favor of trade dress protection.

### (8)     Sophistication of Relevant Consumer Group

While consumers of the J Geiger and Lutron Palladiom Shading Systems may be home owners, architects, or designers, they purchase these products based on the general aesthetic

---

[12] J Geiger's Motion for Expedited Discovery seeks to gather further evidence on Lutron's efforts to follow and gather information on the J Geiger Shading System.

appearance. Geiger Decl. at ¶ 32. Given the striking similarity of the products, sophisticated or unsophisticated consumers are likely to be confused.

Considering all these factors in total, a strong likelihood of confusion exists between the J Geiger Shading System and Lutron's Palladiom Shading System. Accordingly, J Geiger has demonstrated a likelihood of success on the merits for its trade dress claim.

### B.      J Geiger Will Suffer Irreparable Harm Absent an Injunction

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). The loss of customers will have a disproportionate impact on J Geiger, a newer, smaller business growing its client base and expanding its goodwill. *N.Y. City Triathlon v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 343 (S.D.N.Y. 2010) ("[p]rospective loss of ... goodwill alone is sufficient to support a finding of irreparable harm." (citing *Tom Doherty Assoc. v. Saban Entm't, Inc.,* 60 F.3d 27, 37–38 (2d Cir.1995)).

Further, the nature of a patent is the right to exclude others from enjoying the fruits of the inventor's efforts without the inventor's permission. *See Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456 (Fed. Cir. 1988) (holding that "the principal value of the patent is its statutory right to exclude"); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation. . . ."). This right to exclude is finite and lasts only as long as the patent term.

Thus, infringement during the patent term diminishes the patent right in a way that cannot later be recouped. The passing of a patent's expiration term and the patent's eventual expiration is not suspended during litigation "and the passage of time [during which infringement is

---

occurring] can work irremediable harm. 'The opportunity to practice an invention during the notoriously lengthy course of patent litigation may itself tempt infringers.'" *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987) (citation omitted).

The presence of unauthorized competitors in the marketplace can devastate the value of the intellectual property right, and a competitor's infringement by definition has market effects that are never fully compensable in money damages. *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("price erosion, damage to ongoing customer relationships, loss of customer goodwill, and loss of business opportunities are all valid grounds for finding irreparable harm"). "Competitors change the marketplace. Years after infringement has begun it may be impossible to restore a patentee's ... exclusive position by an award of damages and a permanent injunction." *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996).

During the time it takes to resolve an infringement lawsuit, the competitor, who in effect has granted itself a compulsory "license" by remaining in the marketplace during the pendency of the lawsuit, is likely to change the competitive landscape permanently. This result motivates the infringer to drag out litigation as long as possible to maintain its unauthorized "license." *See Teledyne Industries, Inc. v. Windmere Products, Inc.*, 433 F.Supp. 710, 740 (S.D. Fla. 1977). The intellectual property holder's market share will be eroded, and prices are likely to fall. *See, e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1367-68 (Fed. Cir. 2001). Other competitors may be encouraged to enter the marketplace. Their entry will further erode the intellectual property holder's market share, undermine its ability to secure a fair price to compensate for the costs of innovation, and increase its costs of patent enforcement. *See*

*Hybritech*, 849 F.2d at 1456 (noting that other potential infringers will be encouraged to infringe in the absence of an injunction).[13]

It is well-established that loss of current or future market share may constitute irreparable harm. *Hutzler Mfg. Co., Inc. v. Bradshaw Int'l, Inc.*, 11 CIV. 7211 PGG, 2012 WL 3031150 at *17 (S.D.N.Y. July 25, 2012) (citations omitted); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1152 (Fed. Cir. 2011). One of the reasons that lost sales and lost market share are considered irreparable harm is that such harm is not easily remedied by monetary damages. *See Blumenthal Distrib., Inc. v. Executive Chair, Inc.*, 2010 WL 5980151 at *13 (E.D.N.Y. Nov. 9, 2010) ("proving loss of sales due to infringement is notoriously difficult") (citation omitted).

Price erosion, as well as lost sales, market share, and revenue, can all be sources of irreparable harm. In *Edwards v. Lifesciences AG v. CoreValve, Inc.*, 2014 U.S. Dist. LEXIS 51778 (D. Del. Apr. 15, 2014), the court granted a preliminary injunction after finding that infringement on the plaintiff's patent would result in irreparable harm. The court found it significant that the defendant would be the plaintiff's only competitor in the market, competing for the same patients. This would allow the defendant to take advantage of the plaintiff's "significant expenditures of time and money" to develop the market and cause the plaintiff to lose "immeasurable market opportunities . . . because of the tendency of doctors and hospitals to remain faithful to [the] product once they begin using it." *Id.* at *11-12. Moreover, the defendant's product would cause irremediable price erosion, as the plaintiff's "customers would be disgruntled should [the plaintiff] attempt to restore the original price." *Id.* at *17-18.

---

[13] Losses caused by the infringement necessarily mean that fewer resources are available for research and development for the patent holder's next generation of products. *See Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (loss of revenue, goodwill, and research and development support constitute irreparable harm).

The presence in the market of unauthorized competitors irreparably harms the intellectual property holder by decreasing brand distinctiveness. In *Douglas Dynamics*, the Federal Circuit recognized that a product which "made its place in the market by infringing on the intellectual property of [the patentee] and capitalized on its similarity to the better product" causes more and different harm than simple lost sales. 717 F.3d at 1344. "The [patentee] would lose some of its distinctiveness and market lure because competitors could contend that they had 'similar features' without noting that those features infringe [the patentee]'s proprietary technologies." *Id.* at 1344.[14]

Additionally, in terms of trade dress infringement, causing consumer confusion in itself can cause irreparable harm. *See Marks Org., Inc. v. Joles*, 784 F.Supp.2d 322, 335 (S.D.N.Y. 2011) ("[W]here the likelihood of confusion is so high, it is impossible to disaggregate lost good will from confusion. . . . The extreme likelihood of confusion (as well as evidence of actual confusion) makes it clear that Plaintiff has lost good will because of this confusion."). Lutron's unauthorized use of a confusingly similar trade dress severely hinders J Geiger's ability to ensure that consumers associate its mark with a quality product. *Id.* at 343; *see also N.Y. City Triathlon v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 325 (S.D.N.Y. 2010) (holding that plaintiff established irreparable harm where "Defendant [was] not only trading on Plaintiff's earned goodwill, but also [was] taking from Plaintiff the ability to control its reputation and the services offered under its name and mark."); *Power Test Petroleum Distribs. v. Calcu Gas, Inc.,* 754 F.2d

---

[14] A loss of goodwill among customers resulting from a cheaper infringing product entering and then leaving the market can also be a source of unquantifiable, and thus irreparable, harm. *See also Celsis in Vitro, Inc. v. CellzDirect, Inc.,* 664 F.3d 922, 930 (Fed. Cir. 2012) (affirming a district court finding of irreparable harm, including price erosion, recognizing the "difficulty in quantifying the effect on reputation and business due to [the patentee] being precluded from marketing to potential and existing customers that it is the exclusive market leader."); *Mint, Inc. v. Amad,* 2011 WL 1792570 (S.D.N.Y. May 9, 2011) (loss of pricing power resulting from the sale of inexpensive "knock-offs" is, by its very nature, irreparable).

91, 95 (2d Cir. 1985) (holding that irreparable harm may be found when trademark owner demonstrates that "it will lose control over the reputation of its trademark pending trial").

J Geiger has established that it will suffer each and every type of irreparable harm recognized in the cases discussed above. *See generally* Geiger Decl. at ¶¶ 34-41.   Since launching the J Geiger Shading System, J Geiger has invested considerable sums in product development and marketing to earn its place as the leader in the high-end  roller shade market. *Id*. at ¶ 14.  It should not now be forced to compete for a share of this market with a product that infringes its patent and trade dress. *See Douglas Dynamics,* 717 F.3d at 1345 ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."). Moreover, if not immediately enjoined, Lutron will unfairly establish a critical foothold in this market by capitalizing on J Geiger's patent and trade dress. A later design change (upon a finding of infringement at trial) will not undo the damage or unfair boost gained at J Geiger's expense.

The Geiger Declaration specifically demonstrates that J Geiger will suffer irreparable harm in the form of: (1) lost sales, (2) loss of customer goodwill, and possibly (3) price erosion. *See* Geiger Dec. at ¶¶ 34-41. J Geiger will also be deprived of the opportunity to reinvest earnings from its patented products into future research and development. *Id*. at ¶ 36. Significantly, Lutron's Palladiom Shading System is the only known direct substitute for the J Geiger Shading System in the market at this time. *Id*. at ¶ 32.   Thus, Lutron's continued infringement will allow them to unfairly benefit from J Geiger's "significant expenditures of time and money" to develop the relevant market and will cause J Geiger to lose "immeasurable

market opportunities." *See Edwards*, 2014 U.S. Dist. LEXIS 51778, at * 11-12; Geiger Dec. at ¶ 36.

The continued presence of Lutron's infringing products in the market will result in irreparable injury to J Geiger, which cannot be remedied by monetary damages alone. The only way to maintain the status quo is to enforce the patent rights granted to J Geiger by preliminarily enjoining Lutron from continued infringement during the pendency of the lawsuit.

### C.      The Balance of Hardships Tips in J Geiger's Favor

A court may issue a preliminary injunction not only where the moving party has established a likelihood of success on the merits, but also where there are "sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly [in the movant's favor]." *Malletier v. Burlington Coat Factory*, 426 F.3d 532, 537 (2d Cir. 2000).  The Court must "balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Power Survey, LLC v. Premier Utility Services, LLC*, 61 F. Supp. 3d 477 (S.D.N.Y. 2014) (citing *Hybritech*, 849 F.2d at 1457). This balance tips in favor of the movant where it has demonstrated a reasonable likelihood of success on the merits and irreparable harm. *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008); *Smith Int'l., Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983).

As discussed above, J Geiger has established a likelihood of success on the merits and irreparable harm, and the balance of hardships tips sharply in J Geiger's favor. In contrast to the multiple irreparable harms that J Geiger will suffer, Lutron will suffer no real harm if a preliminary injunction issues. J Geiger has invested considerable amounts of time and money in designing, developing, and marketing its patented J Geiger Shading System. Geiger Dec. at ¶¶ 5-

14. Lutron, on the other hand, is an international company that focuses its business on a variety of home products.  As its website states, it currently offers more than 15,000 products.[15] Moreover, Lutron entered the market after J Geiger and had the choice to create its own product instead of copying J Geiger's.  Thus, any such harm is entirely attributable to Lutron's deliberate decision to imitate J Geiger's design. *See*, *e.g.*, *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir. 1983) ("[O]ne entering a field already occupied by another has a duty to select a trademark that will avoid confusion." (quotation marks and citation omitted)). When the movant will suffer uncompensable harm, and the defendant is harmed only economically, courts in this Circuit find that the balance of hardships tips decidedly in the movant's favor. *See*, *Warner-Lambert Co. v. Northside Devel. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996).

Therefore, enjoining Lutron from selling the Palladiom Shading System during the pendency of the suit will not harm Lutron in any material way.

### D.      Public Interest Favors an Immediate Injunction

The courts recognize the public interest in encouraging innovation by protecting property rights to inventions. "[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i Ltd. P'ship. v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010) (citation omitted). The Federal Circuit has repeatedly noted the strong public interest in the protection of patent rights and the elimination of unfair competition caused by the infringement of those rights. *See Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015) ("[T]he public interest nearly always weights in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions"); *Abbott Labs.*, 544 F.3d at 1362 ("[T]he public interest includes

---

[15] *See* http://www.lutron.com/en-US/Company-Info/Pages/AboutUS/OurStory.aspx (last visited June 15, 2018).

consideration of whether, by shifting market benefits to the infringer while litigation is pending for patents that are likely to withstand the attack, the incentive for discovery and development of new products is adversely affected").

Accordingly, in cases such as this, the public's interest favors granting an injunction to stop patent and trade dress infringement. *Smith Int'l.*, 718 F.2d at 1577 ("Without this injunctive power of the courts, the right to exclude granted by the patent would be diminished, and the express purpose of the Constitution and Congress, to promote the progress of the useful arts, would be seriously undermined"); *Edwards*, 2014 U.S. Dist. LEXIS 51778 at *38-41 (interest in protecting patent rights outweighed the benefit of making the arguably safer infringing product available). J Geiger is entitled to enforcement of its patent and trade dress rights against infringers like Lutron.

Further, the public is enriched by the availability of diverse and innovative designs, which aids in decision making and avoids deception, mistake, and confusion. Although competition serves the public interest, "cheap copies of patented inventions have the effect of inhibiting innovation and incentive." *Douglas*, 717 F.3d at 1346. The public interest therefore favors enforcement of J Geiger's patent and trade dress rights.

## IV.    CONCLUSION

J Geiger's motion for a preliminary injunction should be granted. This is a clear case of patent and trade dress infringement. For each day Lutron continues to sell their infringing products, J Geiger suffers irreparable harm, and the public interest suffers on multiple fronts. The Court should act now to prevent Lutron from continuing to infringe while this litigation is pending.

Dated: June 21, 2018                    Respectfully submitted,

                                        /s/ *Jeffrey I. Kaplan*
                                        Jeffrey I. Kaplan  (JK  4706)
                                        Michael R. Gilman  (MG  7608)
                                        KAPLAN BREYER SCHWARZ, LLP
                                        100 Matawan Rd.,  Ste 120
                                        Matawan,  NJ  07747
                                        Telephone:  732-578-0103
                                        Telephone  ext.  231 Kaplan and 233 Gilman
                                        Facsimile:  732-578-0104
                                        jkaplan@kbsiplaw.com
                                        mgilman@kbsiplaw.com


                                        /s/ *Pro Hac Vice Applications Forthcoming*
                                        Gary R. Sorden
                                        Texas Bar No. 24066124
                                        gary.sorden@klemchuk.com
                                        Brian L. King
                                        Texas Bar No. 24055776
                                        brian.king@klemchuk.com
                                        KLEMCHUK LLP
                                        8150 N. Central Expressway
                                        10th Floor
                                        Dallas, Texas 75206
                                        Tel: 214-367-6000
                                        Fax: 214-367-6001

                                        **ATTORNEY FOR PLAINTIFF**
                                        **GEIGTECH EAST BAY LLC**


## CERTIFICATE OF SERVICE

The undersigned certifies that Defendant Lutron Electronics Co., Inc. was served with a copy of this document via process server on June 21, 2018.

                                        /s/ *Jeffrey I. Kaplan*
                                        Jeffrey I. Kaplan