**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GEIGTECH EAST BAY LLC,<br><br>        Plaintiff,<br><br>      v.<br><br>LUTRON ELECTRONICS CO., INC.,<br><br>        Defendant. | No. 1:18-cv-05290-CM<br><br>ECF Case |

**DEFENDANT LUTRON ELECTRONICS CO., INC.'S MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**ARNOLD & PORTER KAYE SCHOLER LLP**
James D. Herschlein
Paul C. Llewellyn
Kyle D. Gooch
250 West 55th Street
New York, NY 10019-9710
T: 212.836.8000
F: 212.836.8689
james.herschlein@arnoldporter.com
paul.llewellyn@arnoldporter.com
kyle.gooch@arnold.porter.com

**CARTER ARNETT PLLC**
Scott W. Breedlove (*pro hac vice*)
John S. Torkelson (*pro hac vice*)
8150 North Central Expressway, Suite 500
Dallas, TX 75206
T: 214.550.8188
F: 214.550.8185
sbreedlove@carterarnett.com
jtorkelson@carterarnett.com

*Attorneys for Defendant*
*Lutron Electronics Co., Inc.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ................................................................................................................. 3

I.      GEIGTECH HAS NOT SHOWN THAT IT WILL SUFFER IRREPARABLE
        INJURY ABSENT A PRELIMINARY INJUNCTION.................................... 4

        A.      GeigTech's unjustified nine-month delay in filing suit and seeking
                preliminary relief confirms that expedition is not needed. ................... 4

        B.      Even apart from its delay, GeigTech's conclusory assertions are
                insufficient on their face to meet its burden of demonstrating irreparable
                injury. ....................................................................................................... 7

II.     GEIGTECH IS NOT LIKELY TO SUCCEED ON ITS PATENT CLAIM.................... 8

        A.      GeigTech's patent infringement claim is narrow and unsupported and is
                not likely to succeed on the merits.......................................................... 8

                1.      The asserted patent claims were narrowed during
                        prosecution in important ways. .................................................. 9

                2.      GeigTech makes no attempt to construe critical claim
                        elements and glosses over the requirement to compare them
                        to the accused product............................................................... 10

        B.      There are also substantial and serious questions about the validity and
                enforceability of GeigTech's patent........................................................ 13

                1.      Unbeknownst to the Patent Examiner, pre-existing Somfy
                        shades and motors practically mandated the "key"
                        limitation that GeigTech added to secure its patent................ 14

                2.      Still earlier Somfy shade brackets, which GeigTech also
                        did not disclose to the Patent Office, invalidate claims 9
                        and 15................................................................................... 16

III.    GEIGTECH IS NOT LIKELY TO SUCCEED ON ITS TRADE DRESS CLAIM. ....... 17

IV.     GEIGTECH'S UNJUST ENRICHMENT CLAIM IS NOT LIKELY TO
        SUCCEED ................................................................................................. 23

V.      THE BALANCE OF EQUITIES STRONGLY TIPS IN LUTRON'S FAVOR.............. 23

VI.     THE PUBLIC INTEREST WOULD BE DISSERVED BY AN INJUNCTION............. 25

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Allen Organ Co. v. CBS, Inc.*,
    1986 WL 4901 (S.D.N.Y. Apr. 21, 1986)..................................................................6

*Am. Permahedge, Inc. v. Barcana, Inc.*,
    857 F. Supp. 308 (S.D.N.Y. 1994) ......................................................................6, 25

*Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*,
    909 F. Supp. 896 (S.D.N.Y. 1995) ..........................................................................4

*Bubble Genius LLC v. Smith*,
    239 F. Supp. 3d 586 (E.D.N.Y. 2017) ....................................................................23

*Centricut, LLC v. Esab Grp., Inc.*,
    390 F.3d 1361 (Fed. Cir. 2004)...............................................................................12

*Century Time Ltd. v. Interchron Ltd.*,
    729 F. Supp. 366 (S.D.N.Y. 1990) ..........................................................................4

*Chem. Eng'g Corp. v. Marlo, Inc.*,
    754 F.2d 331 (Fed. Cir. 1984).................................................................................8

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
    696 F.3d 206 (2d Cir. 2012)....................................................................................21

*Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N. Am., Inc.*,
    270 F. Supp. 2d 432 (S.D.N.Y. 2003)......................................................................5

*Cicena, Ltd. v. Columbia Telecomm. Grp.*,
    900 F.2d 1546 (Fed. Cir. 1990)..............................................................................20

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)..................................................................................4, 6

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
    598 F.3d 30 (2d Cir. 2010)......................................................................................4

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006).................................................................................................7

*Fair Isaac Corp. v. Int'l Bus. Machs. Corp.*,
    2006 WL 1283852 (D. Minn. 2006) ......................................................................11

*Fisher-Price Inc. v. Well-Made Toy Mfg. Corp.*,
    25 F.3d 119 (2d Cir. 1994)......................................................................................7

Page(s)

*Genentech, Inc. v. Novo Nordisk A/S*,
   108 F.3d 1361 (Fed. Cir. 1997)......................................................................8

*Gidatex S.r.L. v. Campaniello Imps., Ltd.*,
   13 F. Supp. 2d 417 (S.D.N.Y. 1998)............................................................4

*Hasbro Inc. v. Lanard Toys Ltd.*,
   1987 WL 123983 (S.D.N.Y. Nov. 18, 1987), *rev'd*, 858 F.2d 70
   (2d Cir. 1988)...............................................................................................7

*Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*,
   2011 WL 6600267 (S.D.N.Y. Dec. 22, 2011), *aff'd*, 507 F. App'x 74
   (2d Cir. 2013).............................................................................................23

*Jeffrey Milstein v. Greger, Lawlor, Roth Inc.*,
   58 F.3d 27 (2d Cir. 1995)...........................................................................23

*Kind LLC v. Clif Bar & Co.*,
   2014 WL 2619817 (S.D.N.Y. June 12, 2014) ............................................23

*Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*,
   65 F.3d 1063 (2d Cir. 1995).......................................................................19

*Millipore Corp. v. W.L. Gore & Assocs., Inc.*,
   2011 WL 5513193 (D.N.J. Nov. 9, 2011) ..................................................11

*Monowise Ltd. Corp. v. Ozy Media, Inc.*,
   2018 WL 2089342 (S.D.N.Y. May 3, 2018) ................................................4

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
   269 F.3d 114 (2d Cir. 2001).......................................................................22

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)..................................................................10

*P.F. Cosmetique, S.A. v. Minnetonka Inc.*,
   605 F. Supp. 662 (S.D.N.Y. 1985) .............................................................20

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)..................................................................10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013)..................................................................12

Page(s)

*Qualitex Co. v. Jacobson Prod. Co.*,
   514 U.S. 159 (1995) ...................................................................................21

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ............................................................................7

*Sara Designs Inc. v. A Classic Time Watch Co.*,
   234 F. Supp. 3d 548 (S.D.N.Y. 2017) ...........................................................18

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
   279 F.3d 1357 (Fed. Cir. 2002) ......................................................................8

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ....................................................................12

*The Deal, LLC v. Korangy Publ'g, Inc.*,
   309 F. Supp. 2d 512 (S.D.N.Y. 2004) .............................................................4

*Thompson v. V.E.W. Ltd, Coty, Inc.*,
   2007 WL 1746739 (S.D.N.Y. June 15, 2007) ................................................18

*Tom Doherty Assocs. v. Saban Entm't*,
   60 F.3d 27 (2d Cir. 1995) ...............................................................................7

*Tough Traveler, Ltd. v. Outbound Prods.*,
   60 F.3d 964 (2d Cir. 1995) .............................................................................4

*Tracey Tooker & TT Ltd., Inc. v. Whitworth*,
   212 F. Supp. 3d 429 (S.D.N.Y. 2016) ...........................................................18

*Two Kids From Queens, Inc. v. J & S Kidswear, Inc.*,
   2009 WL 5214497 (E.D.N.Y. Dec. 30, 2009) .................................................4

*U.S. Water Servs., Inc. v. Novozymes A/S*,
   843 F.3d 1345 (Fed. Cir. 2016) ....................................................................15

*Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*,
   2013 WL 866867 (S.D.N.Y. 2013) ...............................................................20

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
   200 F.3d 795 (Fed. Cir. 1999) ......................................................................10

*W.B. Marvin Mfg. Co. v. Howard Berger Co.*,
   33 Fed. App'x 588 (2d Cir. 2002) ........................................................5, 6, 25

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
   529 U.S. 205 (2000) ....................................................................................19

Page(s)

*Ward v. Andrews McMeel Pub., LLC,*
   963 F. Supp. 2d 222 (S.D.N.Y. 2013)...................................................................21

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.,*
   423 F.3d 137 (2d Cir. 2005)..................................................................................6

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)...................................................................................................3

*Yurman Design, Inc. v. PAJ, Inc.,*
   262 F.3d 101 (2d Cir. 2001)..................................................................18, 19, 20

STATUTES

15 U.S.C. § 1125(a) ...........................................................................17, 20, 21, 23

35 U.S.C. § 103 ....................................................................................................14

Defendant Lutron Electronics Co., Inc. ("Lutron") respectfully submits this memorandum of law in opposition to plaintiff GeigTech East Bay LLC's ("GeigTech") motion for a preliminary injunction (Dkt. 11).[1]

## PRELIMINARY STATEMENT

GeigTech's motion is an ambush—one that depends entirely on a breathtakingly broad, supposed "right to exclude others from the high-end exposed roller shade market." Dkt. 15 at 8. After lying in wait for nine months while Lutron and scores of dealers, large and small, invested heavily in marketing a new Lutron product line, GeigTech—facing declining sales growth throughout 2017 *before* Lutron launched its product—sprang into action by filing this lawsuit and, before Lutron was even served, issuing a press release. Prior to that, GeigTech had not so much as written Lutron a letter. Now, suddenly, it demands "an immediate injunction." *Id.*

Lutron launched its new line of Palladiom window shading products at an industry trade show in September 2017. GeigTech concedes that it was aware of the launch and that its founder and president visited Lutron's booth at the trade show and observed Lutron's Palladiom products. Rather than object at that time, even with a simple letter, GeigTech instead waited more than *nine months* before filing this suit, during which time Lutron and many shade-system dealers continued the Palladiom launch, including publishing a product brochure and a detailed specification sheet in October 2017 (from which GeigTech could have readily learned anything it needed in order to investigate its claims), as well as extensive marketing, distribution, and installer training efforts since September 2017. Without any plausible justification for its lengthy delay, GeigTech only now seeks the extraordinary relief of a preliminary injunction that would

---

[1] Lutron references in this memorandum the Declaration of Edward J. Blair ("Blair Decl.") and the Declaration of Scott Breedlove ("Breedlove 7/26 Decl."), both dated July 26, 2018 and filed herewith, as well as other documents previously filed on the Court's docket ("Dkt.") in this case.

force Lutron to pull its Palladiom shading system off the market and cancel orders while this case continues. As explained below, however, GeigTech meets none of the requirements for a preliminary injunction.

As a result—to prevent incalculable harm to the businesses and reputations of Lutron and numerous shade-system dealers and to avoid cascading disruptions in ongoing construction projects for which Palladiom products have already been specified—the Court should deny GeigTech's surprise motion, and the case should proceed on a regular schedule.

## BACKGROUND

GeigTech alleges that its founder and president, James Geiger, invented a "concept" for a system of window roller shades that "allow[s] for screws and wires to be concealed from view." Compl. (Dkt. 1) ¶¶ 10–11. GeigTech is the assignee of U.S. Patent No. 9,237,821, entitled "Assembly for mounting shades." *Id.* ¶ 22. It also claims to own unregistered product configuration trade dress in the combination of three bracket designs—a circular jamb bracket, a U-shaped center bracket, and a U-shaped end bracket. *Id.* ¶¶ 43–44. GeigTech apparently believes that no competitor may offer window roller shades in a "clean" and "minimalist" design, a concept GeigTech claims to have invented. *See, e.g.*, Dkt. 15 at 1–2.[2]

Lutron is a leading innovator and manufacturer of lighting controls and shading systems. In 2015, Lutron launched its Palladiom brand, which features sleek and modern aesthetic options for keypads, thermostats, and other components. In September 2017, Lutron expanded the Palladiom brand and announced its new Palladiom shading system at the CEDIA Expo trade show in San Diego, California. Compl. (Dkt. 1) ¶¶ 48, 52, 56; Geiger Decl. (Dkt. 16) ¶ 26; Pejic Decl. (Dkt. 35) ¶¶ 5–6. The Palladiom shading system—including a jamb bracket, a center

---

[2] *See also* Breedlove Decl. (Dkt. 36-1) Ex. 1 (GeigTech 6/19/18 press release announcing this lawsuit and accusing Lutron of "'poach[ing]'" GeigTech's "'simply modern' look").

bracket, and an end bracket—was "prominently featured" in Lutron's booth, in both fully assembled form and as loose parts. Pejic Decl. (Dkt. 35) ¶¶ 7–9 & Ex. 2. As GeigTech concedes, its founder and president, James Geiger, visited Lutron's booth in September 2017 and specifically noted the appearance of Lutron's Palladiom shade brackets. *Id.* ¶¶ 10–11; Geiger Decl. (Dkt. 41-2) ¶ 4. After announcing its new Palladiom shading system in September 2017, Lutron then engaged in extensive efforts, at significant expense, to promote the system to the target market and to familiarize dealers and installers with the system and its technical details and installation requirements. Blair Decl. ¶ 12.

Also in September 2017, Lutron launched a webpage for the Palladiom shading system, which included images of the products. Pejic Decl. (Dkt. 35) ¶ 6. In October 2017, Lutron added to the webpage a downloadable brochure and a specifications sheet that included detailed images of the brackets' outer and internal appearances as well as technical details and measurements. *Id.* ¶ 6 & Ex. 1; Blair Decl. ¶¶ 9–10 & Exs. 1–2.

Although Mr. Geiger saw working samples of the brackets at the CEDIA show in September 2017 and had access by October 2017 to detailed technical specifications and images published in obvious locations online, GeigTech did not object at that time, neither suing nor sending a letter. Instead, it waited until June 12, 2018—nine months after seeing Lutron's products at CEDIA—to sue (and to issue a press release). Nine days later, GeigTech served the complaint on Lutron, and only then did it file its motion for injunctive relief.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy" and is available only where the movant demonstrates that he "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

20, 24 (2008).[3] GeigTech does not satisfy any—much less all—of these requirements.

## I.   GEIGTECH HAS NOT SHOWN THAT IT WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION.

### A.   GeigTech's unjustified nine-month delay in filing suit and seeking preliminary relief confirms that expedition is not needed.

It is well established in this Circuit that a plaintiff's delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (vacating preliminary injunction due to ten-week delay) (citation omitted). Indeed, an unexplained delay—"standing alone"—may "preclude the granting of preliminary injunctive relief" by establishing a lack of irreparable injury. *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (vacating preliminary injunction due to nine-month delay between when the plaintiff's president admitted to first seeing the allegedly infringing product and when the plaintiff moved for a preliminary injunction). Courts in this Circuit routinely deny requests for preliminary injunction when the movant's delay demonstrates a lack of irreparable injury.[4]

---

[3] The Court of Appeals also holds that it is possible to grant an injunction where there are "sufficiently serious questions going to the merits," but that "serious questions" standard permits a district court to grant a preliminary injunction only "in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction.... Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citations omitted; emphasis by the Court of Appeals).

[4] *See, e.g.*, *Monowise Ltd. Corp. v. Ozy Media, Inc.*, 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (delay of "almost nine months" warranted denial of preliminary injunction motion); *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F. Supp. 896, 910 (S.D.N.Y. 1995) (3 months); *Century Time Ltd. v. Interchron Ltd.*, 729 F. Supp. 366, 369 (S.D.N.Y. 1990) (over 2 months); *Gidatex S.r.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 420 (S.D.N.Y. 1998) (4.5 months); *Two Kids From Queens, Inc. v. J & S Kidswear, Inc.*, 2009 WL 5214497, at *3 (E.D.N.Y. Dec. 30, 2009) (5 months); *The Deal, LLC v. Korangy Publ'g, Inc.*, 309 F. Supp. 2d

Lutron announced its Palladiom shading system at the September 2017 CEDIA Expo trade show and prominently displayed actual specimens of the brackets at issue during the show. Compl. (Dkt . 1) ¶¶ 48, 52, 56; Geiger Decl. (Dkt. 16) ¶ 26; Pejic Decl. (Dkt. 35) ¶¶ 5–8. GeigTech's founder and president, James Geiger, visited Lutron's booth at the CEDIA show at least twice and observed and commented on the Palladiom shading system. Pejic Decl. (Dkt. 35) ¶¶ 9–10; Geiger Decl. (Dkt. 41-2) ¶ 4. Yet GeigTech did not notify Lutron of any objection until June 2018, nine months later when it sued.

GeigTech attempts to explain its astonishing delay by arguing that the CEDIA show merely put GeigTech "on notice of the possibility of the sale of a potentially infringing product in the future." Dkt. 41 at 2. But the evidence shows that this assertion is not credible. The brackets that Mr. Geiger saw in Lutron's CEDIA booth in September 2017 included working specimens; the brackets were displayed in a full-page ad on the back cover of the official CEDIA show magazine; the brackets were displayed on the Palladiom shading page on Lutron's website since September 2017; the brackets were advertised and described in detail (accompanied by detailed images and technical specifications) in other materials published on Lutron's website by October 2017; and the brackets won at least one industry award in early 2018. Pejic Decl. (Dkt. 35) ¶¶ 5–10 & Ex. 1; Blair Decl. ¶¶ 6–11, 14 & Exs. 1–4; Geiger Decl. (Dkt. 41-2) ¶ 4. Nothing suggested that the brackets Mr. Geiger saw were "mere prototypes," and the materials on Lutron's public website in the fall of 2017 confirmed that these were actual products being marketed to the public. Blair Decl. ¶¶ 9–11.

Moreover, trade show promotion is routinely held to put a plaintiff on notice of intellectual property claims. Thus, in *W.B. Marvin Mfg. Co. v. Howard Berger Co.*, 33 Fed.

---

512, 521 (S.D.N.Y. 2004) (4 months); *Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N. Am., Inc.,* 270 F. Supp. 2d 432, 438 (S.D.N.Y. 2003) (8 to 9 months).

App'x 588 (2d Cir. 2002), the Court of Appeals held that the plaintiff unduly delayed in suing
and seeking a preliminary injunction for trade dress infringement when it "could have filed its
lawsuit" when it saw defendant's product at a trade show. *Id.* at 592 (affirming denial of
preliminary injunction). *See also, e.g.*, *Am. Permahedge, Inc. v. Barcana, Inc.*, 857 F. Supp. 308
(S.D.N.Y. 1994) (measuring delay from when plaintiff first learned of allegedly patent-infringing
product at trade shows); *Citibank*, 756 F.2d 273, 276 (measuring delay from when plaintiff
learned, through the media, about the defendant's plans); *Allen Organ Co. v. CBS, Inc.*, 1986 WL
4901, at *2 (S.D.N.Y. Apr. 21, 1986) (measuring delay from when plaintiff saw allegedly
infringing product in the advertising brochure).[5]

In addition, there is no merit to the suggestion that GeigTech could not assess the patent
claim without seeing the inner workings of the product: The brackets at Lutron's CEDIA booth
included loose specimens with the inner workings visible, and, as noted above, Lutron published
easily located photos of the inside of the brackets, as well as diagrams of technical specifications,
beginning in October 2017. Blair Decl. ¶¶ 9–11 & Exs. 1–2; Pejic Decl. (Dkt. 35) ¶¶ 6–7 &
Ex. 1. Tellingly, plaintiff used *those very diagrams* in its complaint and patent claim chart, which
repeatedly cite the Palladiom product brochure and specifications document that were published
online in October 2017. *See* Sorden Decl. (Dkt. 17) Exs. 1 & 2; Compl. (Dkt. 1) ¶¶ 31–34; Blair
Decl. ¶¶ 9–12 & Exs. 1, 2. And as for GeigTech's trade dress and unjust enrichment claims,
which relate to the outer look of the brackets, there was no need for further investigation.[6]

---

[5] For the sake of accuracy, Palladiom shading products were shipped to some Lutron dealers
starting in November 2017. Blair Decl. ¶ 13. In addition, GeigTech erroneously says (Dkt. 41 at
3 n.2) that one dealer posted a video on YouTube on "May 21, 2018" announcing the products'
first availability in Colorado; the cited YouTube video is actually dated March 21, 2018.

[6] The cases cited in GeigTech's reply brief (Dkt. 41 at 2–3) are factually much different. In
*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144–45 (2d Cir. 2005), the party
seeking to modify an injunction contacted the other party promptly after discovering the

**B.     Even apart from its delay, GeigTech's conclusory assertions are insufficient on their face to meet its burden of demonstrating irreparable injury.**

A party seeking a preliminary injunction may no longer rely on a presumption of irreparable injury, but "must show that, on the facts of [its] case, the failure to issue an injunction would actually cause irreparable harm." *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–93 (2006). GeigTech has recently suggested that, absent an injunction, competition from Lutron will "crush" the company.  Dkt. 41 at 1. But that suggestion is undermined not only by GeigTech's failure to show anything unfair about Lutron's competition, but also by GeigTech's nine-month silence after the Palladiom system's very public launch last year. To support its assertion of irreparable injury, GeigTech relies on a few paragraphs from Mr. Geiger's declaration, which GeigTech contends shows irreparable injury in the form of lost sales, lost goodwill, and "possibly" price erosion. Dkt. 15 at 23 (citing Geiger Decl. (Dkt. 16) ¶¶ 34–41). However, Mr. Geiger's declaration contains only vague, conclusory assertions of harm with no factual details related to this case. *See, e.g.*, Geiger Decl. (Dkt. 16) ¶ 36 (conclusory allegation that Lutron's so-called "poaching" will cause GeigTech to lose goodwill and damage its reputation).[7] GeigTech cannot meet its burden to

---

packaging at issue, and, when its effort to resolve the issue was unsuccessful, spent a few months conducting necessary consumer testing before moving to modify the injunction. In *Tom Doherty Assocs. v. Saban Entm't,* 60 F.3d 27, 39–40 (2d Cir. 1995), plaintiff's employee merely heard about the book at issue from a news account, and filed suit three weeks after learning that another publisher had published a book in violation of plaintiff's contractual rights. Here, GeigTech was directly aware of Lutron's new product nine months before seeking relief—more than twice as long as the delay in *Tom Doherty*. In *Fisher-Price Inc. v. Well-Made Toy Mfg. Corp.,* 25 F.3d 119, 121 (2d Cir. 1994), plaintiff merely heard a "rumor" about infringing products but apparently did not see them until around one month before it sought an injunction. And in *Hasbro Inc. v. Lanard Toys Ltd.*, 1987 WL 123983, at *6 (S.D.N.Y. Nov. 18, 1987), *rev'd*, 858 F.2d 70 (2d Cir. 1988), the Court of Appeals found no undue delay where plaintiff formally objected to defendant's conduct and commenced discussions within one month, and filed suit less than two months later.

[7] GeigTech also claims that "it is axiomatic that any sale by Lutron will be a lost sale for

show irreparable injury by merely parroting back language from case law in the form of a declaration without any supporting detail.

## II.   GEIGTECH IS NOT LIKELY TO SUCCEED ON ITS PATENT CLAIM.

A plaintiff seeking a preliminary injunction in a patent case "must show that, in light of the presumptions and burdens applicable at trial, it will likely prove" infringement and "that the patent will likely withstand" a validity challenge. *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002); *see also Chem. Eng'g Corp. v. Marlo, Inc.*, 754 F.2d 331, 334 (Fed. Cir. 1984) ("[A] high burden of factual proof must be carried by a plaintiff seeking a preliminary injunction."). Where the accused infringer "raises a 'substantial question' concerning validity, enforceability, or infringement (*i.e.*, asserts a defense that [the patentee] cannot show 'lacks substantial merit') the preliminary injunction should not issue." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

Here, GeigTech fails to make even a prima facie case of patent infringement, offering only conclusory and incomplete attorney argument. Moreover, substantial questions related to validity and enforceability abound.

### A.   GeigTech's patent infringement claim is narrow and unsupported and is not likely to succeed on the merits.

While GeigTech's requested injunction targets Lutron's entire Palladiom shading system, GeigTech's patent infringement claim is limited to just one bracket, the Palladiom jamb bracket, which GeigTech accuses of infringing claims 9 and 15 of the '821 patent.  Compl. (Dkt. 1) ¶¶ 31–34. GeigTech does not allege that Lutron's end and center brackets infringe the '821 patent.

Despite having many months to prepare its patent infringement argument for just one

---

GeigTech." Dkt. 41 at 4. Although this is a dubious proposition (*see* Blair Decl. ¶ 25), if true, it suggests that any lost sales by GeigTech will be measurable in money damages, negating any claim of irreparable harm.

product, GeigTech's jamb-bracket patent allegations suffer at least four glaring deficiencies:

1. GeigTech fails to disclose the prosecution history of its patent, in which it was forced to limit both asserted claims by adding the "key" and "pin" requirements.

2. GeigTech fails even to attempt a construction of the claim elements reciting these critical "key" and "pin" requirements (or any other claim element).

3. GeigTech offers only incomplete attorney argument in a claim chart—and no expert opinion whatsoever—to somehow link the patent claim elements to the jamb bracket used in Lutron's Palladiom system.

4. Even in the expert-less claim chart, GeigTech's attorney argument effectively skips over the required "key" and "pin" structures, among others.

GeigTech has already had the chance to address these deficiencies in Plaintiff's Reply Memorandum of Law in Support of Motion for Expedited Discovery ("Discovery Reply"). *See* Dkt. 41. Yet despite having the burden, GeigTech continues to avoid claim construction and evidence. And most notably of all, GeigTech still does not explain how Lutron's jamb bracket could possibly satisfy both the "key" and "pin" elements of the asserted claims. *See id.* at 4–7. It is apparent that GeigTech has not done the basic work necessary to file a patent case, much less to come to Court seeking the extraordinary remedy of a preliminary injunction.

### 1. The asserted patent claims were narrowed during prosecution in important ways.

In its response to GeigTech's motion for expedited discovery, Lutron highlighted the claim amendments that GeigTech made during prosecution of U.S. Patent No. 9,237,821 (the "'821 patent") in order to get the Patent Office to allow asserted claims 9 and 15 and issue the patent. Dkt. 37 at 9–10. In reply, GeigTech misrepresents that "Lutron asserts the claim scope of the asserted claims were [sic] disclaimed during prosecution." Dkt. 41 at 5. What GeigTech did in prosecution was not mere disclaimer (a claim construction doctrine)[8]; it was claim

---

[8] Prosecution history disclaimer is a doctrine of claim construction. It "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."

*amendment*, which necessarily affects the scope of a claim—specifically, GeigTech narrowed

then-pending claim 7 by adding claim requirements, particularly the "key" element (now claim

9) and "pin" element (now claim 15). Other than these elements, the two asserted claims are

identical. Both claims have the following structural elements:

- Two "disk-shaped mounting brackets"

- Each bracket has one side configured to bear against a flat surface and one side having "a projection configured to hold an end of a tube shade"

- Each bracket has two recessed apertures to receive a fastener to secure the mounting bracket to the flat surface

The two claims differ only in the final element:

| Claim 9 – final element | Claim 15 – final element |
|---|---|
| wherein the projection of at least one of the mounting brackets is ***configured as a key*** to engage a tube shade clutch or a tube shade motor. | wherein the projection of at least one of the mounting brackets is ***configured to receive a tube shade pin*** or a motorized tube shade idler pin. |

These final elements were added by GeigTech during prosecution to get around *unrefuted* prior

art that the Patent Examiner relied on to reject the original claims. *See* Dkt. 37 at 9–10.

GeigTech fails to mention this history even as it seeks equitable relief. Its failure is

particularly inappropriate given that, as shown below, these added claim limitations are not

present in the accused jamb bracket.

> **2. GeigTech makes no attempt to construe critical claim elements and glosses over the requirement to compare them to the accused product.**

Evaluating infringement requires a two-step inquiry; yet GeigTech's motion skips the

first step. In that first step, a court must determine the scope and meaning of "any disputed terms

and limiting expressions in the [patent] claims" as a matter of law. *Vivid Techs., Inc. v. Am. Sci.*

*& Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see also Phillips v. AWH Corp.*, 415 F.3d

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). But here, GeigTech
has not even addressed claim construction.

1303, 1312 (Fed. Cir. 2005) (noting "'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude") (citation omitted).

GeigTech offers no claim construction. This alone confirms it has failed to carry its burden. *See Fair Isaac Corp. v. Int'l Bus. Machs. Corp.*, 2006 WL 1283852, at *6–7 (D. Minn. 2006) (finding the plaintiff, by failing to construe important claim terms, failed to carry its burden of showing likelihood of success on the merits); *Millipore Corp. v. W.L. Gore & Assocs., Inc.*, 2011 WL 5513193, at *8-11 (D.N.J. Nov. 9, 2011) (same).

And GeigTech has no room to argue that it did not realize the "key" and "pin" elements would be disputed claim limitations. Images from Lutron's Palladiom literature show nothing resembling a "key" projecting from the Palladiom bracket, or the bracket receiving a tube shade "pin." Again, claim 9 requires the projection "is configured as a key," and claim 15 requires the projection "is configured to receive a tube shade pin." Yet GeigTech's claim chart identifies the same alleged "projection" of Lutron's jamb bracket for both claims—*i.e.*, the blue structure highlighted in GeigTech's claim-chart excerpt below (left). In marked contrast, the "key" in the jamb bracket of GeigTech's '821 patent is the little projection numbered 740 in the patent figures below (right), showing two views of the bracket.

     

*Excerpt from Claim Chart, Dkt. 12-8, at 3 & 9*     *Figures 7A & 7B of the '821 Patent*

The patent illustrates a basic "key" that can insert into a similarly-shaped key hole. And, not surprisingly, the patent in no way suggests that the same projection that is the "key" could also

be the projection "to receive a tube shade pin." Rather, to illustrate a projection configured to receive a pin, Figure 6 of GeigTech's patent shows "a projection (622) having a bore (623) configured to receive an idler pin." '821 patent at 5:45–47. Again, not surprisingly, that bore (623) seems just the right size and shape—a small circular hole—to receive a classic "pin":



*Figure 6D of the '821 Patent*

Thus, it is readily apparent how the simple jamb brackets in GeigTech's patent include the "key" and "pin" elements: Figure 7 illustrates the first type of GeigTech bracket with a "key," and Figure 6 illustrates the second type of GeigTech bracket configured to receive a "pin."[9] GeigTech's claim chart leaves it a mystery, however, as to how Lutron's jamb bracket—having a completely different structure than GeigTech's jamb brackets—could possibly satisfy either element, much less both elements simultaneously.[10]

    Remarkably, GeigTech's only explanation for glossing over these critical limitations in

---

[9] In its reply on its expedited discovery motion, GeigTech misstates the law, arguing that "the Federal Circuit has long held that figures should not be used to construe claims." Dkt. 41 at 6. That is simply wrong. Drawings are absolutely part of the intrinsic evidence to be considered in construing patent claims. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013) ("We interpret the claim's words 'in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history.'") (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002)). So, if GeigTech ever tries to meet its burden of proof on infringement and proffers a proposed claim construction, it will not be able to run from the figures in its patent.

[10] Given this technological mystery, GeigTech's failure to offer expert testimony is conspicuous. *Cf. Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1369 (Fed. Cir. 2004) ("In other areas of the law courts have held that relevant expert testimony regarding matters beyond the comprehension of laypersons is sometimes essential. Expert testimony may be similarly important in patent cases involving complex technology such as this one.") (footnote omitted).

its claim chart is that "this is precisely why expedited discovery is necessary."  Dkt. 41 at 6.

Wrong.  This deficiency in GeigTech's argument and evidence is yet another reason why

expedited discovery and a preliminary injunction are unwarranted. GeigTech cannot show a

likelihood of success on the merits of its patent infringement claim.

### B.    There are also substantial and serious questions about the validity and enforceability of GeigTech's patent.

In its investigation during the weeks since this suit was filed, Lutron has learned

disturbing facts about GeigTech's prosecution of the '821 patent that call the patent's

enforceability and validity into question. At the heart of it all is a shade-motor manufacturer

known as Somfy Systems.

Lutron understands that GeigTech does not itself make shade motors.  Instead, apparently

GeigTech has for years used Somfy motors.  A comparison of Somfy and GeigTech specification

sheets, for example, confirms that GeigTech uses a Somfy motor—specifically the Sonesse® 30

RTS—but without the "Somfy" branding:



*Excerpt from Somfy Sonesse® 30 RTS Specification Sheet*[11]



*Excerpt from J Geiger Specification Sheet*[12]

---

[11] "© Copyright Somfy Systems, Inc. 5/2018" (excerpted from https://service.somfy.com/downloads/nam_v4/sonesse30_rts_-_d-0103.pdf).  Breedlove 7/26 Decl. Ex. 2.

In its patent, GeigTech states that an embodiment of its invention "is designed for use with motorized shades, wherein one mounting bracket is configured to key the shade motor." '821 patent at 1:36-39. But GeigTech did not disclose to the Patent Office that its brackets were made, as it appears, specifically for pre-existing Somfy shade motors.  Somfy is never even mentioned in the patent.  Nor does it appear that GeigTech disclosed relevant Somfy literature to the Patent Office for the Examiner to consider.  As explained below, that literature would have suggested strongly to the Patent Examiner that (1) not only were critical claim elements, such as the "key," obvious under 35 U.S.C. § 103, they were practically mandated; and (2) Somfy's own brackets, designed for Somfy shades and motors many years before GeigTech's patent application, anticipate and invalidate both claim 9 and claim 15.

> **1.      Unbeknownst to the Patent Examiner, pre-existing Somfy shades and motors practically mandated the "key" limitation that GeigTech added to secure its patent.**

It turns out that the bracket with the "key" in claim 9 of the '821 patent is essentially the inverse of the Somfy shade motor the bracket was apparently designed to mount. This can be seen from a guide that Somfy published in 2009 for the Sonesse® 30 RTS motor (the Somfy motor shown above). Page 3 of the guide includes the following figure illustrating how to mount the motorized shade tube to a Somfy bracket:



*Sonesse® 30 RTS catalog*[13]

---

[12] "© 2016 J|Geiger Shading Technology" (excerpted from https://static1.squarespace.com/static/581a2c2c893fc0c77e3689b4/t/59131e58ff7c505de89fffeb/1494425184936/Motors+and+Automation.pdf). *See* Breedlove 7/26 Decl. Ex. 3.

[13] "Copyright © 2009 Somfy SAS. All rights reserved - V0 - 09/2009" (excerpted from

This guide is dated three years prior to GeigTech's May 15, 2012 provisional patent application that ultimately led to the '821 patent. Magnification of the left side of the shade tube shows the "Somfy" stylized brand and the key hole for which GeigTech's "key" was apparently designed. A magnified image is shown below next to the patent's mounting bracket illustration:



*Magnified Somfy shade (2009)*          *'821 patent Fig. 7A (2012)*

A patent applicant has a duty of candor, good faith, and honesty to the Patent Office, and a breach of that duty may constitute inequitable conduct barring enforcement of the patent that results. *U.S. Water Servs., Inc. v. Novozymes A/S*, 843 F.3d 1345, 1352 (Fed. Cir. 2016). In this case, GeigTech did not disclose to the Patent Office any Somfy literature to show the Patent Office the preexisting third-party motor that apparently inspired GeigTech's bracket design; nor did it disclose long pre-existing Somfy brackets, discussed below, that are strikingly close to GeigTech's description of its own alleged jamb-bracket invention. Given the obvious connection between GeigTech brackets and Somfy shade motors, it would be unreasonable to assume GeigTech had no knowledge of the Somfy products. Thus, GeigTech's failure to disclose creates a substantial question as to whether the '821 patent is even enforceable.

---

https://service.somfy.com/downloads/hu_v4/sonesse30_rts_en.pdf). *See* Breedlove 7/26 Decl. ¶ 3 & Ex. 1.

### 2. Still earlier Somfy shade brackets, which GeigTech also did not disclose to the Patent Office, invalidate claims 9 and 15.

Years before the 2009 Somfy guide excerpted above, Somfy published a 2003 catalog which listed its own mounting brackets for motorized shades. Some of these brackets were "disk-shaped" (to use the term from the much-later '821 patent).[14] Pages 37 and 43 of the catalog illustrate particularly pertinent examples of a complementary pair of brackets:



*Excerpt from Somfy 2003 catalog, page 37*

*Excerpt from Somfy 2003 catalog, page 43*

These mounting brackets for Somfy motorized shades create a substantial question, to say the least, that claims 9 and 15 are invalid as anticipated, or at least as obvious (depending on how GeigTech will propose to construe claim terms). The brackets track GeigTech's alleged invention closely, as exemplified by comparing them to embodiments in the patent drawings:

---

[14] "© Somfy Systems, Inc. 12/2003" (excerpted from https://www.floridaautomatedshade.com/v/Somfy_Motor_Catalog_light.pdf). *See* Breedlove 7/26 Decl. ¶ 6 & Ex. 4.

**Claim 9 Illustration**





*Somfy LT50 Motor Bracket (2003)*                    *'821 patent Fig. 7A (2012)*

**Claim 15 Illustration**





*Somfy LT50 Idler Bracket (2003)*                    *'821 patent Fig. 6A (2012)*

In summary, GeigTech has not shown, and cannot show, that in light of the presumptions and burdens applicable at trial, it will likely prove infringement and that the patent will likely withstand a validity challenge. To the contrary, GeigTech fails to make even a prima facie case for infringement, and already there are numerous substantial questions concerning validity and enforceability which preclude a preliminary injunction.

## III.   GEIGTECH IS NOT LIKELY TO SUCCEED ON ITS TRADE DRESS CLAIM.

A plaintiff seeking to protect an unregistered product design trade dress under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), must plead and prove that (1) the design

has achieved secondary meaning; (2) the design is non-functional; and (3) there is a likelihood of confusion between the parties' goods. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114–15 (2d Cir. 2001). The plaintiff also has the burden to "articulate the design elements that compose the trade dress." *Id.* at 116. As set forth below, and as will be explained more fully in Lutron's forthcoming partial motion to dismiss, GeigTech's trade dress claim fails on all of these fronts.

*First*, GeigTech fails to adequately articulate its purported trade dress. GeigTech defines its trade dress as a combination of a (i) a jamb bracket with a "clean circular element that is integral and seamless with both the shade and the wall"; (ii) a "U-shaped" center bracket that "fits seamlessly between two shade ends that abut the same"; and (iii) a "U-shaped" end bracket that "stands alone in its ornamental connection of the end of the shade to the wall." Geiger Decl. (Dkt. 12-1) ¶¶ 17, 18, 20, 22. Putting aside that GeigTech is describing parts of its design that have utilitarian and aesthetic functionality and are therefore unprotectable, all GeigTech has articulated is the vague concept of combining modern-looking circular and U-shaped brackets together. But trade dress does not protect "an idea, a concept, or a generalized type of appearance," and "trade dress claims raise a potent risk that relief will impermissibly afford a level of 'protection that would hamper efforts to market competitive goods.'" *Yurman*, 262 F.3d at 115 (citation omitted).  Courts have repeatedly found descriptions of purported trade dresses that are even more detailed than GeigTech's to be insufficient as a matter of law.[15]

---

[15] *See Sara Designs Inc. v. A Classic Time Watch Co.*, 234 F. Supp. 3d 548, 555 (S.D.N.Y. 2017) (dismissing claim for infringement of unregistered watch design trade dress because the plaintiff failed "to articulate the precise nature of [its] trade dress" and its complaint merely contained "a high level description of features of several watches, such as 'gradient chain,' 'lobster claw closure,' and 'leaf-shaped logo,' without allegations as to whether and how those features [were] distinctive"); *Tracey Tooker & TT Ltd., Inc. v. Whitworth*, 212 F. Supp. 3d 429, 434 (S.D.N.Y. 2016) (dismissing claim for infringement of unregistered hat design where the plaintiff's complaint contained only "numerous photos of her hats," and "sweeping descriptions" of the elements of the claimed trade dress); *Thompson v. V.E.W. Ltd, Coty, Inc.*, 2007 WL 1746739, at

**Second**, GeigTech fails to establish that its purported trade dress has achieved secondary meaning—*i.e.*, that "in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself." *Yurman*, 262 F.3d at 115.[16] Although the burden to establish secondary meaning in a product design is particularly high, GeigTech devotes only a single paragraph to the issue in its brief, consisting of only conclusory statements that parrot back the legal standard with no factual detail. *See* Dkt. 15 at 11–12. As evidence, GeigTech cites nothing except for a few paragraphs in Mr. Geiger's declaration, which contain (1) an unsupported assertion that GeigTech's products are widely recognized in the industry; (2) the year-over-year percentage increases in GeigTech's sales for the last three years, without any actual sales numbers at all; and (3) an assertion that GeigTech has spent $1.2 million in advertising over three years for its entire product line, without any evidence of how that advertising relates to the claimed trade dress of the specific products at issue. *See* Geiger Decl. (Dkt. 16) ¶¶ 12–14. GeigTech offers no evidence of its actual sales, no consumer surveys, no third-party declarations, no evidence of unsolicited media coverage, and no evidence of prior attempts to plagiarize its design. *Cf. Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir. 1995) (listing secondary meaning factors). Given the number of generally similar minimalist designs for shade brackets in the market (Pejic Decl. (Dkt. 35) ¶ 12), this paucity of evidence is insufficient as a matter of law to show that GeigTech's claimed trade dress is distinctive. *See Mana Prods.*, 65 F.3d at 1067 (holding that $3 million in advertising and

---

*3 (S.D.N.Y. June 15, 2007) (dismissing claim for infringement of unregistered jewelry design for failure to provide "an adequate articulation of a distinctive trade dress").

[16] GeigTech incorrectly suggests that, instead of showing secondary meaning, it can show that its claimed trade dress is "inherently distinctive." Dkt. 15 at 10. However, As a matter of law, product designs are never inherently distinctive, and they always require secondary meaning. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 206, 215 (2000).

an affidavit of a third-party customer was insufficient); *P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F. Supp. 662, 672– 73 (S.D.N.Y. 1985) (holding that $5 million in cumulative advertising and $6 million in cumulative sales for the entire product line was insufficient).[17]

Nor can GeigTech seriously contend that there is any evidence of intentional copying that supports a claim of secondary meaning, much less that such evidence would establish that the "primary significance of [the claimed design] is to identify the source of the product rather than the product itself." *Yurman*, *supra*. GeigTech does not identify a single non-functional element of its claimed trade dress that Lutron purportedly copied. Contrary to its assertions, it does not have any evidence for its claim that Lutron markets its product "as the same as" its own (Dkt. 41 at 8), and it does not have any proof that Lutron—a leader in the shading business since the 1990s under its LUTRON® brand name, well before GeigTech ever entered the market—has any interest in trading on any claimed goodwill in GeigTech's design. In all events, alleged copying is only relevant where there is an attempt to capitalize on plaintiff's claimed mark, not where a defendant's entry into the market is "more likely based on an effort to capitalize on [a product's] intrinsic consumer-desirability." *Cicena, Ltd. v. Columbia Telecomm. Grp.*, 900 F.2d 1546, 1552 (Fed. Cir. 1990).

**Third**, GeigTech fails to carry its burden to show that its purported trade dress is non-functional. *See* 15 U.S.C. § 1125(a)(3) (plaintiff asserting unregistered product configuration trade dress bears "the burden of proving that the matter sought to be protected is not functional").

---

[17] In addition, GeigTech cannot use its $1.2 million in total advertising expenditures to prove secondary meaning because its advertising "promotes the functional advantages of [the] product and does not call attention to the design [details] alleged to be non-functional" and thus "provides little if any evidence of secondary meaning." *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, 2013 WL 866867, at *4 (S.D.N.Y. 2013); *see* Geiger Decl. (Dkt. 16) ¶ 14 ("No Valances–No Fascias–No Ceiling Pockets–No Visible Screws") & Ex. 1 ("eliminate the need to hide your roller shades"; "form meets function").

"The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 164 (1995). As noted above, GeigTech's own advertisements and its filings in this case tout the functional benefits of its purported trade dress, including that the design eliminates the need for valances, fascias, ceiling pockets, and visible screws.

Even apart from utilitarian functionality, however, GeigTech's purported trade dress plainly has aesthetic functionality. As the Second Circuit has explained, "a mark is aesthetically functional, and therefore ineligible for protection under the Lanham Act, where protection of the mark significantly undermines competitors' ability to compete in the relevant market." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 222 (2d Cir. 2012); *see also Ward v. Andrews McMeel Pub., LLC*, 963 F. Supp. 2d 222, 238 (S.D.N.Y. 2013). Here, as described above, GeigTech's vague and overly broad formulation of its purported trade dress would encompass any combination of circular and U-shaped brackets that use the "clean lines and minimalist style" that GeigTech purports to reserve for itself. Dkt. 15 at 2. GeigTech's only response is that "[o]ther designs for [the] brackets existed prior to the creation of [GeigTech's] bracket that accomplished the purpose of holding shades in place." Geiger Decl. (Dkt. 16) ¶¶ 19, 21, 23. But that is not the test. The question is whether granting GeigTech a monopoly on its "clean" and "minimalist" design would significantly harm competition. And it plainly would: Lutron and third-party competitors would be barred from introducing their own clean, minimalist window shade designs (such as those using circles which match the shape of roller shades, or those with low profiles to eliminate light gaps between shades or between the shade and the wall) which GeigTech itself concedes are desired by purchasers, thereby harming competition and

reducing consumer choice.[18]

   ***Fourth***, GeigTech fails to demonstrate a likelihood of confusion among prospective purchasers. GeigTech presents no consumer survey evidence supporting a likelihood of confusion. Its purported evidence of "actual confusion" (*see* Dkt. 15 at 16) is merely one or two vague references to GeigTech's product, which are not even clearly related to the appearance of Lutron's product rather than its function or method of installation, and do not indicate any confusion as to the source of Lutron's products. *Cf. Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (even inquiries about possible relationship between parties is not evidence of actual confusion). And, as GeigTech admits (Geiger Decl. (Dkt. 16) ¶¶ 25, 32), the parties' respective products are "high-end" and are sold through specialized distributors, which lessens the possibility of confusion. To the extent that GeigTech's trade dress is protectable at all, it is extremely weak given the lack of distinctiveness in its design and the lack of any evidence that it is viewed as a source-identifier by the public.

   Indeed, the lack of distinctiveness of GeigTech's design, and the extremely low likelihood that Lutron's designs would cause any confusion, are demonstrated by third-party use of designs that are generally similar to GeigTech's shade brackets. *See* Pejic Decl. (Dkt. 35) ¶ 12; Blair Decl. ¶¶ 25–26. Mr. Geiger asserts that these third-party designs are different because they use slip covers or caps (*see* Dkt. 41-2 at ¶ 17), but the claimed trade dress relates to the outward appearance of the product, not its method of assembly. And even from the different angles presented in Mr. Geiger's recent declaration, the third-party products look generally similar to GeigTech's in their use of minimalist and circular designs. *See id.* Nor is it relevant that Mr. Geiger does not view these products as competitors: The issue is whether the look

---

[18]   The brief discussion of functionality in GeigTech's Discovery Reply does not address—and does not appear to appreciate the concept of—aesthetic functionality. *See* Dkt. 41 at 8.

claimed by GeigTech is distinctive, not whether the products are identical. *See, e.g., Kind LLC v. Clif Bar & Co.*, 2014 WL 2619817, at *3 (S.D.N.Y. June 12, 2014) (holding that plaintiff's claimed trade dress "is not inherently distinctive" because many other products used one or more of the elements plaintiff sought to protect; denying injunction).

## IV.    GEIGTECH'S UNJUST ENRICHMENT CLAIM IS NOT LIKELY TO SUCCEED

While GeigTech's third cause of action is denominated as a claim for unjust enrichment, GeigTech's motion papers (Dkt. 41 at 9) describe it as a claim for common law unfair competition. Under New York law, such a claim is identical to a claim brought under Section 43(a) of the Lanham Act, except that the plaintiff bears the additional burden of proving the defendant's bad faith. *See Jeffrey Milstein v. Greger, Lawlor, Roth Inc.*, 58 F.3d 27, 34–35 (2d Cir. 1995); *Heptagon Creations, Ltd. v. Core Grp. Mktg. LLC*, 2011 WL 6600267, at *9 (S.D.N.Y. Dec. 22, 2011), aff'd, 507 F. App'x 74 (2d Cir. 2013). Putting aside the issue of bad faith—of which there is none—GeigTech's unfair competition claim fails for at least the same reasons as its trade dress infringement claim. See *Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 602 (E.D.N.Y. 2017) ("[P]laintiff's common law unfair competition claim fails for the same reason that its Lanham Act claim fails: plaintiff has not established ownership of a distinctive, nonfunctional trade dress.").

## V.    THE BALANCE OF EQUITIES STRONGLY TIPS IN LUTRON'S FAVOR

As discussed above, Lutron announced and displayed its Palladiom shading products to the trade and began advertising the products to the public online in September 2017, and, since that time, has expended significant time and resources marketing its new system, training dealers, manufacturing products, shipping products for installation in dealer showrooms, and working diligently to ensure a strong reception by its target market. Blair Decl. ¶¶ 12–13. GeigTech found out about Lutron's product in September 2017—now ten months ago—at the

very event at which it was announced. Mr. Geiger did not object at the trade show; GeigTech did not ask a lawyer to send a letter to Lutron (and, apparently, did not even consult a lawyer at that time); it did not do anything at all to let Lutron know that Lutron's new product purportedly infringed its claimed rights. To the contrary, GeigTech waited until June 2018 to file its complaint, and then waited nearly two more weeks to move for a preliminary injunction, while (1) Lutron, unaware of any objection by GeigTech, was expending time and resources to develop the market for its new product line; (2) Lutron's dealers were spending time, money, and goodwill to train on the new products, install them in their showrooms, and promote them to their customers; and (3) customers were writing Palladiom products into their blueprints and other project plans. Blair Decl. ¶¶ 12–13, 20.

An injunction at this time would cause serious and irreparable injury to Lutron, to its dealers, and to customers. Lutron's new product line, widely announced to the trade, would suddenly be unavailable; the loss of market share and goodwill from that alone would be incalculable. Moreover, Lutron would be unable to provide products to customers that have ordered or specified Palladiom shading for their projects, further damaging Lutron's reputation for reliability and service in an immeasurable way. And, all of Lutron's time and effort in marketing its new product line since September 2017 would be lost. Blair Decl. ¶¶ 12–13, 20. Lutron's dealers—many of them small businesses, often family owned—would find themselves unable to sell a product that they invested substantial time and money to train in, promote, and install into their showrooms; and *their* customers would be unable to obtain products that they had designed into their home and office construction projects, disrupting their plans and irreparably injuring the goodwill of the Lutron dealers who promoted the products. All of these irreparable injuries would result because of GeigTech's nine-month delay in seeking relief.

24

GeigTech, by contrast, would not be irreparably harmed if an injunction is not granted. GeigTech apparently made the calculation that it did not have to seek relief from the Court last year, or even to undertake the modest effort to notify Lutron of an objection. Instead, GeigTech chose to wait until Lutron's product was in the marketplace. Under these circumstances, the balance of hardships plainly favors Lutron. *See W.B. Marvin*, 33 Fed. App'x at 592 (holding that balance of hardships favored defendant when plaintiff delayed seeking an injunction for four months after seeing defendant's product at a trade show, during which time the defendant had commenced shipment of its product); *Am. Permahedge*, 857 F. Supp. at 324, 326 (denying preliminary injunction where, during plaintiff's delay after seeing defendant's product at a trade show, defendant spent money on marketing, advertising, and developing its customer base).

## VI.    THE PUBLIC INTEREST WOULD BE DISSERVED BY AN INJUNCTION.

According to GeigTech, it used to be the only one selling "high-end roller shades with integrated parts concealed in the mounting system" (Dkt. 15 at 2), "[b]ut now Lutron seeks to compete" in the sale of these products. Dkt. 41 at 4. There would be no public benefit, however, to an injunction that effectively granted GeigTech a monopoly in the sale of such products based on GeigTech's overly expansive reading of intellectual property law. Moreover, as discussed above, an injunction would significantly injure those members of the public (including Lutron's dealers and customers) who, during GeigTech's delay in seeking relief, have promoted and sold Palladiom products, and planned for them in their projects. Blair Decl. ¶¶ 12–13 ,20.

### CONCLUSION

For the foregoing reasons, GeigTech's motion for a preliminary injunction should be denied.

Dated: July 27, 2018      Respectfully submitted,

           **ARNOLD & PORTER KAYE SCHOLER LLP**

        By: */s/ James D. Herschlein*
           James D. Herschlein
           Paul C. Llewellyn
           Kyle D. Gooch
           250 West 55th Street
           New York, NY 10019-9710
           T: 212.836.8000
           F: 212.836.8689
           james.herschlein@arnoldporter.com
           paul.llewellyn@arnoldporter.com
           kyle.gooch@arnold.porter.com

           Scott W. Breedlove (*pro hac vice*)
           John S. Torkelson (*pro hac vice*)
           **CARTER ARNETT PLLC**
           8150 North Central Expressway, Suite 500
           Dallas, TX 75206
           T: 214.550.8188
           F: 214.550.8185
           sbreedlove@carterarnett.com
           jtorkelson@carterarnett.com

           *Attorneys for Defendant*
           *Lutron Electronics Co., Inc.*