**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GEIGTECH EAST BAY LLC,

      Plaintiff-Counter Defendant,

-against-

LUTRON ELECTRONICS CO., INC.,

      Defendant-Counter Plaintiff,

-against-

James GEIGER,

      Counter Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
4/4/19

No. 18 Civ. 5290 (CM)

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMS

McMahon, C.J.:

What started as a garden-variety intellectual property dispute has morphed into something less conventional. The facts are straightforward; the legal issues, less so.

GeigTech East Bay LLC ("GeigTech") initially brought suit against Lutron Electronics Co., Inc. ("Lutron") on June 12, 2018, alleging that Lutron's "Palladiom" exposed roller shade product copied certain parts its own shading system, thereby infringing GeigTech's purported patent and trade dress rights and resulting in unjust enrichment. After the Court denied GeigTech's motion for a preliminary injunction, GeigTech voluntarily dismissed its cause of action for patent infringement.

Lutron now alleges that Geigtech and its president, James Geiger ("Geiger"), filed the patent infringement claim in bad faith, made additional false and malicious public statements about

1

Lutron and its products, and so are liable for defamation, false advertising, unfair competition, and deceptive trade practices (collectively, the "Counterclaims"). (*See Generally* Answer and Counterclaims of Lutron ("Countercl."), dated Dec. 13, 2018, Dkt. No. 66.) Geigtech and Geiger have moved to dismiss the Counterclaims. (Dkt. No. 75.)

For the reasons that follow, the motion to dismiss the Counterclaims is **GRANTED IN PART AND DENIED IN PART.**

I.      Background

The Court presumes the parties' familiarity with the facts of this case, which were set out in detail in the Court's prior Decision and Order denying Geigtech's motion for a preliminary injunction (Dkt. No. 57) and Decision and Order granting in part and denying in part Lutron's motion to dismiss. (Dkt. No. 65.) The facts that are pertinent to the pending motion – which, for present purposes, are presumed to be true unless otherwise noted – are set out below.

**a. The Parties and Their Competing Products**

Lutron is a leading innovator and manufacturer in the "lighting control" industry – a position it has held since it introduced the world's first mass market "dimmer switch," an electronic lighting control device used to dim electric lamps. (Countercl.[1] ¶¶ 8–9.) Today, it develops, manufactures, and supplies "many thousands" of lighting control products, including shades and shading controls, one of which – the Palladium Shading System – is at issue in this case. (*Id.* ¶ 8–11.)

In September 2017, Lutron launched its Palladiom Shading System after conducting eighteen months of research and development. (*Id.* ¶ 14.) The Palladium Shading System consists of an integrated system of window shading products, including roller tubes with attached fabric

---

[1]      References to the "Countercl." refer to the paragraphs that proceed the "Counterclaims" section of Lutron's Answer

2

shades, bottom rails, mounting brackets, sensors, motors, and power supplies. (*Id.* ¶ 12.) Many of the Palladiom components are specifically designed and engineered to work with other Lutron components. (*Id.* ¶ 13.) The appearance of the Palladiom system was designed to match the look of Lutron's Palladiom wall-mounted control products (which have been sold since 2015), including controls that raise and lower motorized window shades. (*Id.*)

### b. Geigtech's Public Statements about this Lawsuit

On June 12, 2018, Geigtech filed a complaint against Lutron in this Court, asserting claims for patent infringement, trade dress infringement, and unjust enrichment (hereinafter referred to as the "Complaint"). (*Id.* ¶ 17; *see also* Compl., Dkt. No. 1.) GeigTech's principal contention was that the mounting brackets for Lutron's Palladiom shading system infringed a GeigTech patent and a purported unregistered trade dress claimed by GeigTech in the configuration of its brackets for its own shading system products. (*Id.*)

GeigTech did not contact Lutron about these issues before it filed suit. (*Id.* ¶ 18.) Instead, it issued a press release on June 19, 2018 (the "June 19, 2018 Press Release") – prior to serving its complaint on Lutron – announcing the lawsuit in coordination with a marketing and communications firm. (*Id.* ¶¶ 19, 21; Declaration of Gary R. Sorden ("Sorden Decl.") Ex. 1. Dkt. No. 77).[2]) Lutron alleges upon information and belief that the press release was disseminated to the media and members of the public. (*Id.* ¶ 21.)

The contents of the June 19, 2018 Press Release are, for the most part, unremarkable. It recounts the causes of action that GeigTech alleged in its Complaint, identifies the patent that

---

[2]     The Counterclaims purports to append the Press Release as "Exhibit A", but no such exhibit was attached to it. Nor is the press release available on GeigTech's website at the uniform resource locator ("URL") that Lutron identifies in paragraph 21; instead, an error message pops up when one navigates to that webpage, because GeigTech removed the press release from its website "shortly following the filing of Lutron's counterclaims." (Reply. Mem. in Supp. Mot. to Dismiss ("Reply") at 5, Dkt. No 79.). Geigtech and Geiger have provided the Court with a copy of the June 19, 2018 Press Release.

3

Lutron purportedly infringed upon, and describes how Palladiom "copies" the "'simply modern' look" of GiegTech's "R Series" shading system. (*Id.* at 2–3.) It also includes the following statement that is attributed to Geiger:

> Our premium products have become highly sought-after for both residential and commercial properties across the country thanks to their unique design, simple aesthetic, and our reputation for precise installation[.] It's unfortunate that rather than investing the time, effort, and resources necessary to innovate their own products, Lutron has instead opted to poach our patented designs and intellectual property to try and remain competitive in a segment of the market that we've cornered. Their blatant infringement has left us no choice but to file this lawsuit to protect our patented designs as we continue to focus on providing our customers with the most innovative, highest quality window shading solutions out there.

(*Id.* at 3.)

### c. Developments in this Case Since Filing

On June 21, 2018, nine months after Lutron first launched its Palladiom shading system (Compl. ¶ 21), GeigTech filed a motion for a preliminary injunction. (Dkt. No. 11.) The Court denied GeigTech's motion, finding that the company failed to establish a likelihood of success on the merits under either infringement claim. (Dkt. No. 57.)

By Order dated September 27, 2018, the Court set a schedule for briefing patent claim construction issues. (Dkt. No. 62.) However, on the eve of the deadline to exchange proposed constructions of claim terms, GeigTech filed a Notice of Voluntary Dismissal of its patent infringement claim, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). (Dkt. No. 63.) The patent infringement claim was dismissed on October 9, 2018. (Dkt. No. 64.)

Lutron then moved to dismiss Geigtech's remaining counts for failure to state a claim upon which relief could be granted under Fed. R. Civ. P. 12(b)(6). (Dkt. No. 46.) On November 29, 2018, the Court granted in part and denied in part Lutron's motion to dismiss, finding that GeigTech had stated a viable cause of action for trade dress infringement (count two) but not for unjust enrichment (count three), because Geigtech failed to allege that Lutron wrongfully obtained

4

benefits from Geigtech at Geigtech's expense by taking advantage of a business or other direct relationship between the parties. (Dkt. No. 65.)

In a press release dated December 20, 2018 (the "December 20, 2018 Press Release"), Geigtech touted the Court's decision not to dismiss the trade dress infringement claim, without indicating that the Court dismissed the unjust enrichment claim. (Declaration of Paul C. Llewellyn ("Llewellyn Decl.") Ex. A (December 20, 2018 Press Release), Dkt. No. 81.) Nor did the press release mention that GeigTech had voluntarily dismissed its patent infringement claim two months earlier. (*Id.*)

### d. Lutron's Counterclaims

Lutron now asserts counterclaims for false advertising under the Lanham Act (Count I), defamation (Count II), deceptive acts and practices (Count III), and unfair competition (Count IV). (*See generally* Countercl.) The gravamen of Lutron's Counterclaims is that GeigTech has used its lawsuit as a "launch pad" for making false and disparaging public remarks about Lutron. (*Id.* ¶ 1.) Lutron takes issue with the press release in two significant (but overlapping) respects.

*First*, Lutron alleges that the press release misrepresents both the nature of Lutron's products and the company's commercial activities. (*Id.* ¶¶ 26–29.) Contrary to the Geiger's suggestion that Lutron did not "invest[] the time, effort, and resources necessary to innovate their own products" (Sorden Decl. Ex. 1 at 3), Lutron asserts that it expended substantial resources in designing Palladiom in a distinctive fashion and with a particular purpose. (Countercl. ¶¶ 26–30.) The Palladiom brackets, which have a narrower profile than the brackets used in GeigTech's products, were specifically designed and engineered by Lutron to be thin enough to conform to other Palladiom products and to minimize "light gaps," *i.e.*, the vertical spaces between shades. (*Id.* ¶¶ 30–35.)

*Second*, Lutron objects to Geigtech's and Geiger's assertion that it engaged in patent infringement – a claim that Lutron insists was filed in bad faith. (*Id.* ¶ 39.) It alleges, on information and belief, that "[Geigtech and Geiger] had reason to know, and did know, at the time [that] the GeigTech Complaint was filed" that the Palladom brackets did not infringe GeigTech's purported patent rights, because, *inter alia*, (*i*) Palladiom's brackets did not meet critical limitations of the asserted patent claims that GeigTech was required to add during prosecution in order to obtain its patent in the first place; and (*ii*) the asserted patent claim was invalid and unenforceable in light of undisclosed prior art that GeigTech "not only knew about, but that actually inspired GeigTech's alleged invention." (*Id.*)

As evidence that GeigTech's lawsuit is a mere "marketing device," Lutron points to Geigtech's December 20, 2018 Press Release, which it claims is deceptive because it only provided the public with a partial – and, more to the point, a favorable – recounting of this Court's prior decision.   (Mem. of Law in Opp. Mot. to Dismiss ("Opp. Br.") at 6, Dkt. No. 80.)

Despite voluntarily dismissing the patent infringement claim, GeigTech has not retracted or corrected the June 19, 2018 Press Release (Countercl. ¶¶ 36–37). According to Lutron, it could be seen on GeigTech's website as late as January 17, 2019. (Llewellyn Decl. Ex. B.)

II.    Discussion

Geigtech and Geiger now move to dismiss the Counterclaims under Fed. R. Civ. P. (12)(b)(6). (Dkt. No. 75.) They offer two arguments. The first is that the statements contained in the June 19, 2018 Press Release are subject to immunity – both because they reflect a privileged description of a pending lawsuit and constitute statements of opinion. The second proposed basis for dismissal is that Lutron has insufficiently pleaded each of its Counterclaims.

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (internal quotation marks omitted). The Counterclaims will survive the motion to dismiss as long as they contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Claimants must do more, however, than merely attach "labels and conclusions" to bald factual assertions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

In addition to the text of the Counterclaims, the Court may consider documents that are appended as exhibits, incorporated by reference, or are otherwise "integral" to the allegations contained therein. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Because the June 19, 2018 Press Release and the Complaint are both incorporated by reference and integral to the Counterclaims, the Court can consider those items on the present motion to dismiss. The Court need not accept Lutron's characterizations of those items, but any ambiguities will be resolved in Lutron's favor.

The December 20, 2018 Press Release, however, is neither incorporated by reference nor integral to the Counterclaims – nor could it be, since it was published a week after the Counterclaims were filed. Accordingly, the Court may not consider it on the present motion.[3]

---

[3]   In fact, Lutron would have to amend its Counterclaims to assert a claim relating to the December 20, 2018 Press Release. However, were it to move for permission to do so, that motion would be denied on futility grounds, since the contents of the December 20, 2018 Press Release would not alter the Court's decision with respect to any of Lutron's four counterclaims.

### a. Whether Statements Contained in Press Release Are Immune From Suit

#### 1. *"Fair Report" Litigation Privilege*

Geigtech and Geiger argue that the statements contained in the June 19, 2018 Press Release – both the description of Geigtech's lawsuit as well as the quotes attributed to Geiger – constituted a "fair report" of an ongoing lawsuit and thus are privileged, shielding Geigtech and Geiger from suit under both federal and state law.

There are two threshold matters to address before turning to whether any "fair report" privilege applies.

*First*, the parties disagree over whether Pennsylvania's or New York's "fair report" litigation privilege law applies.[4] Pennsylvania's litigation privilege is a creature of common law, derived from Restatement (Second) of Torts § 611, whereas New York's is codified by statute at N.Y. Civ. Rights L. § 74. Ordinarily, the Court would undertake a choice-of-law analysis to determine whether Pennsylvania or New York law applies. But where there is no conflict of laws and New York is among the relevant choices, the Court need not undertake this analysis and instead may apply New York law. *See, e.g.*, *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004); *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 90 n.12 (2d Cir. 2013). Laws are in conflict where the applicable law from each jurisdiction provides different substantive rules." *Int'l Bus. Machs. Corp.*, 363 F.3d at 143 (internal quotation marks and alterations omitted); *accord Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (stating that an actual conflict is one that could "have a significant possible effect on the outcome of the trial").

---

[4]     Choice-of-law disagreements is a recurring theme in the parties' moving papers.

New York and Pennsylvania's fair report privileges do not embody different substantive rules and therefore are not in conflict.[5]   Although they use slightly different language, both privileges immunize statements that, in substance, offer a substantially accurate description of a legal proceeding. *Compare* Restatement (Second) of Torts § 611 (privileged attaches where "the report is accurate and complete or a fair abridgement of the occurrence reported.") *with* N.Y. Civ. Rights L. § 74 (privilege attaches to "a fair and true report of any judicial proceeding."); *accord Sciandra v. Lynett*, 409 Pa. 595, 600 (1963); *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 67 (1979).   Both privileges extend to court pleadings, including the filing of a complaint, and statements made in connection therewith. *See First Lehigh Bank v. Cowen*, 700 A.2d 498, 500–02 (Pa. Super. Ct. 1997) (citing *Medico v. Time, Inc*, 643 F.2d 134 (3rd Cir. 1981)); *Reszka v. Collins*, 136 A.D.3d 1299, 1301 (4th Dep't 2016).

And, as relevant here, both privileges are limited in scope.   Neither provides immunity for one who embellishes, mischaracterizes the nature of a lawsuit, or speaks in a manner that suggests more serious conduct than what is alleged – because, of course, such speech would not constitute a substantially accurate reporting of a judicial proceeding. *See Sciandra*, 409 Pa. at 600; *Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 436 (1995).   Nor do they permit parties to take advantage of the privilege by instituting a judicial proceeding alleging false and defamatory charges only to then issue a press release publicizing those defamatory allegations. *See ZS Assocs., Inc. v Synygy, Inc.*, No. Civ.A. 10-4274, 2011 WL 2038513, at *4 (E.D. Pa. May 23, 2011) (applying Pennsylvania law) (citing Restatement (Second) of Torts § 611 cmt. (c)); *Reszka*, 136

---

[5]      Indeed, despite raising the issue of choice-of-law, Lutron does not contend that New York's and Pennsylvania's fair report privileges are in conflict. On the contrary, its opposition papers repeatedly represent that the laws of the two states pertaining to this issue are in harmony with one another. (*See* Mem. of Law in Opp Mot. to Dismiss ("Opp. Br.") at 17–21, Dkt. No. 80.) Geigtech and Geiger agree that there is no conflict of laws. (Reply Mem. of Law. in Supp. Mot. to Dismiss ("Reply Br.") at 2, Dkt. No. 79.)

A.D.3d at 1300 (citing *Williams v. Williams*, 23 N.Y.2d 592, 599 (1969)); *see also Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 146 (E.D.N.Y. 2010) ("Section 74 does not apply to 'parties who maliciously institute a proceeding alleging false and defamatory charges and publicize them in the press.").[6]

So, no matter which law the Court were to consider – be it Pennsylvania's or New York's litigation privilege – the result would be the same. The Court will consider New York law since it sits in New York.

*Second*, the parties disagree -- or, to put it more accurately, Lutron raises the question, to which Geigtech and Geiger failed to respond – about whether the privilege can possibly attach to claims under the Lanham Act.

The weight of authority suggests that N.Y. Civ. Rights L. § 74 does not apply to Lanham Act cases. The Court has located only one case that applies N.Y. Civ. Rights L. § 74 to a claim for unfair competition under the Lanham Act. *Ergotron, Inc. v. Hergo Ergonomic Support Sys., Inc.*, No. 94 CIV. 2732, 1996 WL 143903, at *12 (S.D.N.Y. Mar. 29, 1996). In other instances, when a party has brought both state law and Lanham Act claims, courts have only considered applying the fair report privilege to the state law claims, suggesting that the privilege is not available to claims under that Act. *See, e.g.*, *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 47–49 (S.D.N.Y.), *aff'd in part*, 632 F. App'x 637 (2d Cir. 2015); *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 796 F. Supp. 2d 458, 471 (S.D.N.Y.

---

[6]     For good measure, the Court notes that the New York Court of Appeals has instructed that New York's fair report litigation privilege, which was first adopted in 1854 and evolved into N.Y. Civ. Rights L. § 74, "was not intended to, and did not, alter the common-law protection afforded to litigants. Rather, the enactment recognized another common-law rule which created a qualified privilege . . . for a fair and true report of a judicial proceeding by [a journalist]" – a rule that was later extended to "all persons." *Williams*, 23 N.Y.2d at 601.

2011). Nor does a plain reading of the statute, which is titled "Privileges in action for libel," indicate that the privilege has broader applicability beyond traditional torts.

But the Court need not resolve whether the fair report privilege can ever immunize claims under the Lanham Act, because – at least at this stage of the case – the fair report privilege does not apply.

As noted, the fair report litigation privilege does not exculpate false or defamatory statements simply because they restate the allegations of a lawsuit charging the same. *See Reszka*, 136 A.D.3d at 1300 (citing *Williams*, 23 N.Y.2d at 592). This is exactly what Lutron says happened in this case – that Geigtech knowingly filed a baseless lawsuit and publicized its contents for the sole purpose of harming its competitor. And this claim is supported by sufficient factual matter from which the Court can infer bad faith.

As alleged in the Counterclaims, Geigtech knew its patent infringement claim was meritless, because "(1) the [Palladiom] brackets did not meet critical limitations of the asserted patent claims that GeigTech was required to add during prosecution in order to obtain its patent in the first place; and (2) the asserted patent claims were invalid and unenforceable in light of undisclosed prior art that GeigTech not only knew about, but that actually inspired GeigTech's alleged invention." (Countercl. ¶ 39.) These issues came to light when Geigtech – after waiting nine months from the time the alleged infringement began – filed suit and moved for a preliminary injunction. Despite seeking such an extraordinary remedy in a patent case, Geigtech declined to perform the basic step of construing its own patent. In view of this, and because of other issues brought by Lutron in connection with the preliminary injunction motion pertaining to patent validity and enforceability, the Court found that Geigtech failed to demonstrate the requisite

showing of a likelihood of success of the merits of its patent infringement claim. (Decision and Order Denying Mot. for Prelim. Inj., at 5–7, Dkt. No. 57.)

The rest, as they say, is history: the Court set a schedule for briefing claim construction issues, and Geigtech withdrew its patent infringement claim on the eve of its deadline to file its papers.

Based on these facts, and drawing all inferences in Lutron's favor, one can conclude that Geigtech filed its lawsuit, not to prosecute what it believed to be a meritorious action, but to defame Lutron as a patent infringer. The deliberate institution of baseless litigation for the purpose of fabricating a reporting privilege falls squarely within the malicious filing exception to N.Y. Civ. Righrs L. § 74, as first recognized in *Williams*.

The facts of that case bear summarizing. There, the defendants brought a lawsuit alleging that the plaintiff had "misappropriate[d] and misue[d] the company's trade secrets and assets." 23 N.Y.2d at 595. The defendants then coordinated with a third party to have copies of the complaint circulated to "members of the trade." *Id.* In response, plaintiff brought its own lawsuit alleging that the defendant's action was filed "for the purpose of ruining his business reputation." *Id.* at 596. The defendants, like Geigtech and Geiger here, moved to dismiss, arguing that they were protected by N.Y. Civ. Rights L. § 74 because their communication had fairly reported the allegations made in a judicial proceeding. The trial court denied that motion, and the Appellate Division affirmed.

The New York Court of Appeals agreed. It reasoned that the statute (which originally protected only newspapers and their staffs) was enacted to protect "reports of judicial proceedings which are made in the public interest," *id.* at 599, in order to support the public nature of judicial proceedings by conveying information to citizens who could not attend in person. *Id.* at 597. The

Court rejected the defendants' argument, finding that the legislature could not have been so "malicious[ ]" as to protect a defendant who made scurrilous false accusations in court, where they would be protected by common-law privilege, only so as to be able to repeat them out of court, under the purported protection of N.Y. Civ. Rights L. § 74. *Id.* at 599. "[I]t was never the intention of the Legislature in enacting section 74 to allow 'any person' to maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability by invoking the statute." *Id.*

This case is on all fours with *Williams*, especially given the posture of the case. Whether Geigtech and Geiger filed their lawsuit as a device to disseminate defamatory information by way of a public press release is a factual issue that cannot be decided on a motion to dismiss. *See Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 673 (S.D.N.Y. 2016); *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 296 (S.D.N.Y. 2005); *accord Moritz v. Town of Warwick*, No. 15-CV-5424 (NSR), 2017 WL 4785462, at *10 (S.D.N.Y. Oct. 19, 2017), *appeal withdrawn sub nom. Moritz v Gorish*, No. 17-3645, 2017 WL 7409772 (2d Cir. Dec. 12, 2017).

Accordingly, the June 19, 2018 Press Release – even to the extent it simply repeated the allegations in the complaint – is not subject to a fair report privilege at this juncture.

2. *Statements of "Opinion"*

Geigtech and Geiger argue that any counterclaim based upon the statements contained in the June 19, 2018 Press Release that are specifically attributed to Geiger must be dismissed, because those statements reflect non-actionable opinions.

Geiger's statement reads in full:

Our premium products have become highly sought-after for both residential and commercial properties across the country thanks to their unique design, simple aesthetic, and our reputation for precise installation[.] It's unfortunate that rather than investing the time, effort, and resources necessary to innovate their own

13

products, Lutron has instead opted to poach our patented designs and intellectual property to try and remain competitive in a segment of the market that we've cornered. Their blatant infringement has left us no choice but to file this lawsuit to protect our patented designs as we continue to focus on providing our customers with the most innovative, highest quality window shading solutions out there.

(Sorden Decl. Ex. 1 at 3.)

The prohibition on liability for opinion statements is grounded in the First Amendment.

As the Supreme Court has stated:

> Under the First Amendment, there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in statements of fact.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974). The Lanham Act does not proscribe liability for mere opinions, nor do opinions give rise to liability under state law for defamation, deceptive acts and practices, or unfair competition. *See Casper Sleep, Inc. v. Derek Hales & Halesopolis LLC*, No. 16 Civ. 3223 (CM), 2016 WL 6561386, at *5 (S.D.N.Y. Oct. 20,2016) (no liability for opinions under Lanham Act); *Wexler v. Allegion (UK) Ltd.*, No. 16 Civ. 2252 (ER), 2017 WL 946301, at *5 (S.D.N.Y. Mar. 9, 2017) (no liability for opinions for defamation); *accord In re Elysium Health-Chromadex Litig.*, No. 17 Civ. 7394 (CM), 2018 WL 4907590, at *13 (S.D.N.Y. Sept. 27, 2018) (standards for bringing state unfair competition and deceptive practices claims same as under Lanham Act).[7]

"[W]hether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court." *Mr. Chow N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 195); *see also Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) (same). In

---

[7]    Although the parties disagree about choice of law with respect to each of Lutron's three state law claims – issues that will be addressed below, *infra* at II(b) – they do not dispute that statements of opinions are not actionable. Since there is no conflict of laws with respect to assessing whether a statement qualifies as a statement of fact or opinion, the Court applies New York law. *Int'l Bus. Machs. Corp* , 363 F.3d at 143.

deciding whether a statement is fact or opinion, courts must consider (*i*) "the common usage or meaning of the specific language" used in the challenged statements; (*ii*) whether the statement is "objectively capable of proof or disproof;" (*iii*) the context in which the statement was made, including its "broader social context" and whether the nature of the writing will "signal to readers or listeners what is being read or heard likely to be opinion, not fact." *Mr. Chow*, 759 F.2d at 226; *accord Davis v. Boeheim*, 24 N.Y.3d 262, 270 (2014) (considering same factors). These factors should be applied in view of an objective, reasonable listener. *See Davis*, 24 N.Y.3d at 270.

Geigtech and Geiger argue that this case is analogous to *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360 (S.D.N.Y. 1986), a case that also involved the statements of a company's president about its ongoing court battle with a competitor. The Court agrees that *Karp* is persuasive – but not in Geigtech's and Geiger's favor.

In *Karp*, the defendant, a public relations firm, issued a press release on behalf of its corporate client after the Second Circuit vacated a preliminary injunction that its client previously had won against a former employee. The press release attributed the following statement to the company's president: "Yesterday's decision . . . supports our claims that [the plaintiff] defrauded [the company] and that substantial relief should be granted." *Id.* at 362. The plaintiff brought an action for libel, arguing that the president's statement constituted a defamatory statement of fact. The district court disagreed, holding that the statement, when considered in context, "could reasonably have been understood only as an effort to put the best face on an unfavorable Second Circuit ruling." *Id.* at 365. Critical to the district court's reasoning was that the president's statement was simply "one interpretation of a relatively complex and lengthy judicial opinion," and thus "could never be proven right or wrong, much less 'true' or 'false.'" *Id.* "Indeed, whether

the Second Circuit approved of [the company's] claims on the merits is still an open question."
*Id*

The same cannot be said for Geiger's statement. Geiger's statement, unambiguous and explicit, was not subject to competing interpretations. Nor did he express a "subjective" view. Whether Lutron actually "invest[ed] the time, effort and resources necessary to innovate their own products" as opposed to "poach[ing]" Geigtech's "patented designs" and engaging in "blatant patent infringement" is susceptible to proof by way of objectively verifiable facts. (Sorden Decl. Ex. 1 at 3.) Put otherwise, whether the Palladiom Shading System was the product of innovation or copying is a question of fact, not a difference of opinion. "A fact is 'a thing done or existing' or '[a]n actual happening.' An opinion is 'a belief[,] a view, or a 'sentiment which the mind forms of persons or things.' Most important, a statement of fact . . . expresses certainty about a thing, whereas a statement of opinion . . . does not." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) (quoting Webster's New International Dictionary 782, 1509 (1927)).

Geigtech and Geiger insist that context is king – the statements appeared in a press release announcing a lawsuit against a competitor, were attributed to a person with a vested interest in that lawsuit, and so must be discounted as mere opinions. But it does not follow, as they urge, that "an average reader would understand the language used in Mr. Geiger's statement to be his opinion." (Reply Br. at 4.) An average reader might account for Geiger's bias, somewhat neutralizing the sting of his comments. But an average reader might also conclude, equally reasonably, that Geiger, as president of GeigTech, is privy to undisclosed and damning information, the details of which formed the basis for statements. *See, e.g.*, *Davis*, 24 N.Y.3d at 373 (reader could understand

statement to be based on "access to factual details unavailable to the public"). Context, therefore, cuts both ways.

Taking all the factors identified above – context, the meaning of the language used, and whether the statements are susceptible to truth or falsity – the Court must conclude that Geiger's statements are not immune from suit as statements of opinion. Indeed, it bears repeating that the principal allegation in this counterclaim is that the speaker did not hold the belief he professed, *viz*, that Lutron was actually engaged in patent infringement. Whether this is true presents a question of fact, not of opinion. At this moment, Lutron, as the non-movant, is entitled to have all inferences drawn in its favor. Because Lutron has pleaded sufficient factual matter from which one can conclude that Geiger never believed Lutron had infringed Geigtech's patents, it is not appropriate to foreclose Lutron's lawsuit at this stage of the proceeding.

## b. Whether Lutron Has Plausibly Pleaded its Causes of Action

Geigtech and Geiger argue that Lutron's claims for defamation, false advertising, deceptive trade practices, and unfair competition must be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. With one exception, they are correct.

### 1. *Lutron has Adequately Pleaded a Cause of Action for Defamation (Count II)*

Lutron alleges that the June 19, 2018 Press Release contained statements that were false and defamatory in nature, "including that Lutron did not invest the time, effort, and resources necessary to innovate its own products, including its Palladiom shading system, that Lutron's products and commercial activities include the violation of GeigTech's intellectual property rights, and that GeigTech is suing Lutron for patent infringement." (Countercl. ¶ 47.)

As an initial matter, the parties disagree about whether New York or Pennsylvania law applies. This issue mirrors the parties' disagreement about the appropriate choice of law governing the applicability of the fair report privilege to the present case. Once again, the dispute is purely

17

academic – New York and Pennsylvania's defamation laws are not in conflict, so the Court applies New York law. *See supra* at 9–10; *compare Brown v. Blaine*, 833 A.2d 1166, 1173 n.14 (Pa. Commw. 2003) (articulating elements of defamation under Pennsylvania law, as codified in Pa. C.S.A. § 8343); *with Epifani v. Johnson*, 65 A.D.3d 224, 233 (2d Dep't 2009) (articulating elements of defamation under New York law).

Having dispensed with Geigtech's and Geiger's two primary defenses – that the statements contained in the June 19, 2018 press release were subject to a fair report litigation privilege and contained non-actionable statements of opinion – their only remaining contention is that Lutron's cause of action for defamation must be dismissed because the statements contained in the June 19, 2018 Press Release were truthful when made.

Lutron is correct that truth provides a complete defense to a defamation claim. *See, e.g.*, *Dillon v. City of New York*, 261 A.D.2d 34, 39 (1st Dep't 1999). They are incorrect, however, in positing that this means that the defamation counterclaim can be dismissed.

As should be readily clear to the parties by now, Lutron's core contention is that Geigtech and Geiger lied. They purportedly did not believe that Lutron was engaged in patent infringement, they had reason to know Lutron was not engaged in patent infringement, and they used the judicial process – and, by extension, the press release – to proliferate the allegedly defamatory message that Lutron was engaged in patent infringement. Lutron supports these contentions with sufficient factual matter from which the Court can infer that Geigtech and Geiger made their claim in bad faith. *Supra* at 11–12.

Accordingly, the motion to dismiss Lutron's cause of action for defamation (Count II) is denied.

> 2. *Lutron's Cause of Action for False Advertising Under the Lanham Act (Count I) is Dismissed*

18

The Lanham Act expressly forbids false or misleading descriptions or representations of fact concerning "the nature, characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities," provided that they appear in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). Geigtech and Geiger argue that the June 19, 2018 Press Release is not "commercial advertising or promotion" and, thus, does not fall within the ambit of the Lanham Act.

The Court agrees.

"Although the Lanham Act encompasses more than the traditional advertising campaign, the language of the Act cannot be stretched so broadly as to encompass all commercial speech." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). Instead, "commercial advertising or promotion" is limited to speech that is (*i*) commercial, (*ii*) made for the purpose of influencing consumers to buy defendant's goods or services and, (*iii*) disseminated sufficiently to the relevant purchasing public. *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004). Three factors play with whether speech qualifies as "commercial."

*First*, commercial speech is defined as speech that "'does no more than propose a commercial transaction.'" *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 293 (S.D.N.Y. 2016) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). Such speech typically (although not necessarily) possesses certain hallmarks, including pertinent price and product information. *See, e.g., Bolger*, 462 U.S. at 66 ("Most of appellee's mailings" consisted primarily of price and quantity information and thus "'f[e]ll within the core notion of commercial speech.'").

*Second*, even where the intent of the statement is to promote one's product, that fact alone does not render the speech "commercial" in nature. *Fendi*, 314 F.3d at 57; *accord Bolger*, 463

19

U.S. at 66 ("economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech.") (citing cases).

*Third*, the "touchstone" of "commercial advertising or promotion" is "that the contested representations are part of an organized campaign to penetrate the relevant market." *Fendi*, 314 F.3d at 57. "Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement. Thus, businesses harmed by *isolated disparaging statements* do not have redress under the Lanham Act; *they must seek redress under state-law causes of action.*" *Id.* (emphases added).

Applying these factors to the case at bar, the June 2018 Press Release is not commercial speech – even drawing all inferences in Lutron's favor. It is of no moment that Geigtech and Geiger (presumably) were motivated by their own economic interests in issuing a press release, because it otherwise lacked the usual trappings of commercial speech.

Aside from summarizing how the Palladiom Shading System purportedly violated Geigtech's patent and trademarks, the press release did not contain core commercial information, including price and product information.

It was not part of an organized campaign to penetrate the relevant market. On this score, this case is wholly dissimilar to *In re Elysium Health-Chromadex Litigi.*, No. 17 Civ. 7394 (CM), 2018 WL 4907590 (S.D.N.Y. Sept. 27, 2018), a case that Lutron cited as its principal authority in support of its opposition to dismissal of its Lanham Act claim. (Opp. Br. at 10.) The counter-defendant in *Elysium* was accused of making four *categories* of false or misleading representations – with numerous specific examples in most of those categories – on its website, in newspaper articles, and in customer emails. *Id.* at *9–12. Moreover, there was no dispute that the press release at issue in that case (which, again, only constituted one among a series of allegedly false

20

or misleading statements) constituted commercial speech, as it pertained solely to the efficacy of the company's product. *Id.* at *12.

Perhaps most important, the primary focus of the June 19, 2018 Press Release was to draw attention to Geigtech's lawsuit against Lutron, not to propose a commercial transaction. This point is particularly important. Importing Lanham Act liability to the facts of this case, which concern public statements about pending litigation, would extend the Act beyond the parameters contemplated by Congress. As Judge Calabresi stated in *Boule v. Hutton*, 328 F.3d 84 (2d Cir. 2003), "Congress did not wish to extend federal Lanham Act liability to speech that is subject to broader general First Amendment protection than is commercial speech." *Id.* at 95 (Calabresi, J., concurring). And yet, characterizing the June 19, 2018 Press Release as "commercial speech" would do just that – thereby posing a chilling effect on the sort of statements litigants can make about pending litigation.[8] This is not to say that there is no redress for non-commercial speech. "Noncommercial speech . . . may well remain the grounds of recovery under state laws[,]" – a question that the Court has already addressed. *Id.* But Congress did not "cho[o]se to make that kind of speech federally actionable under the Lanham Act." *Id.*

The motion to dismiss Lutron's Lanham Act claim (Count I) is granted.

### 3. *Lutron's Cause of Actions for Deceptive Trade Practices and Unfair Competition under State Law (Counts III–IV) are Dismissed*

Lutron brings state law claims for unfair competition as well as deceptive acts or practices.

Once again, the parties disagree about which state's laws apply. Lutron argues that South Carolina law applies, because "[Geigtech and Geiger] are located in South Carolina, GeigTech is

---

[8]    A complaint cannot form the basis of a Lanham Act claim, because a complaint is not "commercial speech." *See, e g , Cartier Int'l AG v. Motion in Time, Inc* , No. 12 Civ. 8216 (JMF), 2013 WL 1386975, at *2 (S.D.N.Y. Apr. 5, 2013). It stands to reason, then, that a press release that does nothing more than parrot the allegations of a complaint cannot also form the basis for false advertising under the Lanham Act – at least not without other earmarks of commercial speech being present, including the presence of a broader advertisement campaign.

a South Carolina corporation, and the June 19, 2018 Press Release issued from South Carolina." (Opp. Br. at 23.) Geigtech and Geiger argue that New York law applies, (Mem. of Law in Supp. Mot. to Dismiss ("Supp. Br.) at 17– 20, Dkt. No. 78), although (as to be expected) they also take the position that the claim fails under South Carolina law. (Reply Br. at 9–10.)

Undertaking a choice of law analysis is, once again, not necessary, because the outcome is the same no matter which state's laws apply.

With respect to Lutron's cause of action for unfair competition under state law, both parties agree that the elements of unfair competition under New York and South Carolina law resemble the elements for proving false advertising under the Lanham Act. (Opp. Br. at 23 n.8; Reply Br. at 10.) The Court agrees. *See Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 606 (S.D.N.Y. 2012) (elements under New York law identical save for two additional requirements) *Secret of the Islands, Inc v. Hymans Seafood Co. Inc.*, No. 2-17 Civ. 00342 (DCN), 2018 WL 1566706, at *6 (D.S.C. Mar. 30, 2018) (elements of common law unfair competition under South Carolina "are identical to the elements of proving a Lanham Act claim"). Because the Court has found Lutron's Lanham Claim to be wanting, so too must the Court dismiss its cause of action for unfair competition.

With respect to Lutron's cause of action for deceptive trade practices under state law, if the Court were to apply New York law, codified at Gen. Bus. L. § 49, the Court's conclusion would follow from its decision regarding Lutron's claim for false advertising under the Lanham Act, because courts agree that § 49 is "analyzed using the same standard as [] Lanham Act claims" for false advertising. *See Mimedx Grp., Inc. v. Osiris Therapeutics, Inc.*, No. 16 CIV. 3645 (KPF), 2017 WL 3129799, at *14 (S.D.N.Y. July 21, 2017) (citing cases).

And if the Court were to assess Lutron's deceptive trade practices claim under the South Carolina Unfair Trade Practices Act ("SCUPTA"), codified at S.C. Code Ann. § 39–5–20(a), Lutron's claim would also fail, because Lutron has not adequately pleaded that the June 19, 2018 Press Release qualifies as "an unfair or deceptive act[] or practice[] in the *conduct of any trade or commerce*" within the meaning of SCUPTA. *Id.* (emphasis added). The South Carolina Supreme Court has held that SCUPTA only applies to "business or consumer transactions," which, in turn, it defined as the "advertisement, sale, or distribution of services or property within a business context." *Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*, 403 S.C. 623, 639 (2013); *see also* S.C. Code Ann. § 39–5–10(b) (defining "trade or commerce" as "advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State.")

For substantially the same reasons as those articulated earlier, *supra* at 20–21, the June 19, 2018 Press Release was not an act of trade or commerce. Indeed, Lutron does not allege that it *was* such an act. (*See* Countercl. ¶¶ 51–53.)

Based on the foregoing, Lutron's state law claims for deceptive trade practices (Count III) and unfair competition (Count IV) are dismissed.

### c. Implications of the Court's Decision Denying the Motion to Dismiss Lutron's Defamation Claim

Since the factual assertion underlying the June 19, 2018 Press Release – the basis for Lutron's defamation claim – is that Lutron infringed Geigtech's patent, this matter is now a patent infringement case again. Accordingly, the parties have fourteen days from the date of this Memorandum Decision and Order to exchange proposed constructions of claim terms.

## CONCLUSION

The motion to dismiss is granted in part and denied in part. All of Lutron's

counterclaims are dismissed, except for its claim of defamation (Count II). The Clerk of Court is

respectfully directed to remove the open motion at Dkt. No. 75.

It is so ordered.

Dated: April 4, 2019

_____

Chief Judge

BY ECF TO ALL COUNSEL

24