UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/5/2022

GEIGTECH EAST BAY LLC,

      Plaintiff,

    -against-

LUTRON ELECTRONICS CO., INC.,

      Defendant.

18 Civ. 05290 (CM)
19 Civ. 04693 (CM)
20 Civ. 10195 (CM)

_____X

## CLAIM CONSTRUCTION DECISION

McMahon, J.:

In the second (19 Civ. 04693) and third (20 Civ. 10195) of three consolidated lawsuits[1]

filed by GeigTech East Bay against Lutron Electronics – all of which allege that aspects of Lutron's

"Palladiom" high end window shade system infringe plaintiff's patents – the parties have

submitted competing proposed claim constructions for three terms that appear in the two patents

in suit: U.S. Patent No. 10,294,717 ("the '717 Patent"), and U.S. Patent No. 10,822,872 ("the '872

Patent"). The '872 Patent is a continuation of the patent asserted in the first of GeigTech's three

lawsuits, U.S. Patent No. 9,237,821 ("the '821 Patent")– as is the '717 Patent, which was asserted

in the second-filed lawsuit. In both lawsuits, GeigTech alleges that various aspects of the brackets

that secure the Palladiom window shade system to a ceiling or wall infringe on GeigTech's

patented technology.

The convoluted procedural history of these matters, as well as related proceedings before

the Patent Trial and Appeal Board (PTAB), is recounted in a number of prior opinions, most

_____

[1] The parties agreed to consolidate the original lawsuit – which no longer includes any patent claims – and the
second-filed lawsuit; the court on its own motion added the third case when it was filed.

recently at Docket No. 141 filed in the consolidated action (Decision and Order Denying Plaintiff's Motion for Preliminary Injunction and Staying the Case). Unfortunately, in order to understand fully some of Lutron's claim construction arguments, it will be necessary to recount it yet again.

## A.  The Parties

Plaintiff GeigTech East Bay LLC ("GeigTech") does business as J. Geiger Shading Technology. It is a South Carolina limited liability company with its principal place of business in South Carolina.

GeigTech was founded by James Geiger, who is a "pioneer and entrepreneur in the field of home integration" and has over twenty years' experience in the field. (Compl. at ¶ 10). Geiger installed his first set of window shades around 1999 and first conceived of the patented concept at issue in this case around 2011, when he "devised a new solution for exposed window roller shades . . . that did not require them to be hidden by the traditional methods." (Compl. at ¶¶ 14, 16). In 2012, Geiger added to his system by devising "a method to conceal electrical wiring inside a passage through the roller shade bracket." (Compl. at ¶ 18). Geiger began marketing and selling his "J Geiger Shading System" soon thereafter. (Compl. at ¶ 23).

Defendant Lutron Electronics Co., Inc. ("Lutron") is a Pennsylvania corporation. According to GeigTech's submissions in the first lawsuit, Lutron is an "industry leader in lighting and shade control," offering more than 15,000 products worldwide with thousands of employees and hundreds of millions of dollars in annual revenue. (Case No. 18-cv-5290, Dkt. No. 6).

## B.  The Patents and Claims in Suit

GeigTech holds the rights to the patent-in-suit, U.S. Patent No. 10,294,717 ("the '717 Patent"). The patent is entitled "Shade Bracket with Concealed Wiring," and was issued on May 21, 2019. It generally covers a bracket that is to be coupled to some sort of support system (a

2

wall or ceiling, generally) for use with motorized shade and shade systems. (Dkt. No. 151-1 at page 21 of 27). The "Background" section of the patent recites that "Current brackets and mounts for roller window shades are typically bulky, visible, and may detract from the aesthetics of the shade system. Hence, there remains a need for improved assembly for mounting shades and shade systems, including motorized shades." (*Id.*).

The '717 Patent is, as mentioned above, a continuation in part of an earlier patent, the '821 Patent, application for which was filed on May 15, 2013. Insofar as is here relevant, the '821 Patent recites *in haec verba* the "Background" section, indicating that it, too, was intended to solve the problem of "bulky, visible" aspects of a shade mounting system that detract from the system's aesthetics.

GeigTech also holds the rights to the second patent-in-suit, U.S. Patent No. 10,822,872 (the '872 Patent). The patent is entitled "Shade Bracket with Concealed Wiring" and was issued on November 3, 2020. The '872 Patent states that it is a continuation of both the '821 and the '717 Patents.

## C. The Palladiom Shading System

Lutron manufactures and sells the Palladiom Shading System, which is a mechanized window shade consisting of roller tubes with attached fabric shades, bottom rails, mounting brackets, sensors, motors, and power supplies – basically, an automated window shade. Lutron first began offering Palladiom products in 2017. It advertises the system as one that is "engineered to be beautiful" by hiding certain aspects of traditional shading systems that customers found aesthetically unpleasant. (Dkt. No. 33 at 2).

One aspect of the Palladiom System touted by Lutron is its use of exposed (i.e., visible) but decorative brackets, which Lutron describes as a "classic L-shape . . . that protrudes and is

3

used to secure the structure to a support surface – *i.e.*, a wall or ceiling." (*Ibid.*). The brackets are made so that wires can be hidden and run through them without the wires' being "exposed" to view. Palladiom System products "have won prestigious awards and are positioned at the top of Lutron's window shading product range." (*Id.* at 5).

GeigTech asserts that the brackets the Palladiom System uses to secure itself to a support surface infringe the '872 Patent. GeigTech observes that the Palladiom System "includes a side in the bracket configured to engage the support surface so that the bracket extends away from the support surface to carry a roller window shade assembly." (Compl. at ¶ 42). This configuration makes it so that the bracket lies "substantially flat" to fit onto a flat support surface. (Compl. at ¶ 43). GeigTech also claims that the System includes a "passage in the bracket configured to receive an electrical wire extending from the support surface through the bracket to a motor carried by the roller window shade assembly." (Compl. at ¶ 44). The brackets are configured "to obscure the electrical wire when the bracket is coupled to the support surface and supports the roller window shade assembly." (Compl. at ¶ 48). GeigTech claims that all of these elements are claimed by the '872 Patent – in essence, that Lutron infringes on the patent by offering brackets that lie flat against a support surface and by obscuring the electrical wiring that can be run through it.

**D.  The History of Litigation**

All three lawsuits between GeigTech and Lutron involve the same allegedly infringing product – Lutron's Palladiom Shading System. However, they involve (or at one time involved) three different patents and three very different sets of infringement allegations.

1.  First Infringement Case ("the Trade Dress Action")

GeigTech first filed suit against Lutron on June 12, 2018, alleging infringement of the '821 Patent and trade dress infringement.

4

Some history is in order.

In or about 2011, Geiger alleges that he conceived and developed an "elegant and distinct" shading system that "also allowed for screws and wires to be concealed from view."[2] Prior to that time, brackets used to mount window shades were screwed directly into the wall or ceiling adjacent to the window being covered; if they were hidden from view, it was by use of a ceiling pocket, a valence or fascia. GeigTech claimed a "pioneering signature look" for the brackets used to mount window shades in which all of the "ugly parts" – the mechanical devices that secure the shades to the wall or ceiling – were hidden. This resulted in a "sleek" look that appealed to high end decorators and their customers. Indeed, the invention may have come about in connection with a high-end decorating job in Dallas on which Geiger worked. (Decl. of C. Matthew Taylor, Dkt. No. 40, Ex. 1).

The '821 Patent was issued on January 16, 2016 and is entitled "Assembly for Mounting Shades." GeigTech's provisional application was filed on May 15, 2012. The Patent recites "a system of fastening devices, *e.g.*, mounts, brackets, and assemblies for installing roller window shades" that "provide for improved means for mounting window shades (roller shades), including motorized shades, in which the portion of the mounting means (*i.e.*, the 'mount,' 'mounting plate,' or 'mounting bracket') affixed to the supporting structure (*e.g.*, the window casing, walls, columns, etc.) are hidden from view by the structure of the bracket or mounting bracket." ('821 Patent, Dkt. No. 151-3 at page 20 of 24). The fact that these items were "typically bulky, visible, and may detract from the aesthetics of the shade system" was the justification for the invention; and in each of the 23 figures of the patent, the many configurations always feature footless brackets, with no

---

[2] I use the word "alleges" advisedly, as Lutron has submitted to the court an affidavit from one C. Matthew Taylor – the architect on the job for which this new bracketing system was allegedly invented – who claims that he is the actual inventor, or at least the co-inventor, of the '821 Patent. More on that later.

visible mounting structure. The lack of visibility of the hardware was emphasized in the Summary of the Invention, and the words "invisible mount...fastening device" appear repeatedly. (Breedlove Ex. C at 1-2, and Ex. D at 1:0003-0007; the '821 Patent, Dkt. No. 151-3 at page 20 of 24). The claims asserted that this result was achieved via the use of a mounting bracket that was secured to a mounting plate that attaches to the wall or ceiling, wherein the bracket obscures the plate from view. (*See Id.*, the '821 Patent).

In GeigTech's original lawsuit, it asserted that the jamb brackets in Lutron's Palladiom System's infringed two claims of the '821 Patent, in that "at least one of the mounting brackets is configured as a key to engage a tube shade clutch or a tube shade motor" and that "at least one of the mounting brackets is configured to receive a tube shade pin or a motorized tube shade idler pin." ('821 Patent, Claims 9, 15; Case No. 18-cv-5290, Dkt. No. 1, Ex. A at 24). The parties referred to these elements as the "key" and "pin" elements; these elements were central to achieving the desired "sleek" look by rendering invisible the ugly, bulky mechanical elements that were used to attach the shade to the wall or ceiling. GeigTech did not allege that the infringing aspect of the Palladiom System's jamb brackets was its support structure to a wall or ceiling – only the brackets' "key" and "pin" elements. Needless to say, the parties disagreed over how the terms "key" and "pin" should be construed. The court resolved this disagreement by issuing a claim construction decision in connection with eight contested claim terms on September 30, 2019. (Dkt. No. 107)

Ironically, on October 5, 2018 – one month after the denial of GeigTech's motion for a preliminary injunction on September 5, 2018 (Dkt. No. 57) –GeigTech had voluntarily dismissed its claim that Lutron had infringed the '821 Patent. (Dkt. No. 63). That did not dispose of the lawsuit, because the complaint in the first lawsuit contained a trade dress claim that relates to the

6

design of the Palladiom jamb brackets; this claim remains pending. For that reason, this case is referred to as the "Trade Dress Action." Lutron's counterclaim for defamation also remains pending.[3]

2. Second Infringement Case ("the '717 Action")

GeigTech filed a second suit against Lutron on May 21, 2019, this time alleging infringement of U.S. Patent No. 10,294,717. Not at all coincidentally, that was the day the '717 Patent was allowed. The '717 Patent was based on an application (the '687 application) that was filed on Mary 31, 2018 – which was within a month of the filing of the Trade Dress Lawsuit. It was filed as a continuation of the claims in the parent '821 Patent. A "continuation application" is a patent application filed by an applicant who wants to pursue additional claims to an invention that was disclosed in an earlier application of the applicant (the "parent application") that has not yet been issued or abandoned. The continuation uses the same specification as the pending patent application, claims the priority based on the filing date of the parent, and names at least one of the inventors named in the parent application. *See* Wikipedia, "Continuing Patent Application," https://en.wikipedia.org/wiki/Continuing_patent_application (last visited May 5, 2022).

The '717 Patent recites eighteen claims for "A bracket configured to be coupled to a support surface and configured to support a roller window shade assembly." (Case No. 19-cv-4693, Dkt. No. 5). GeigTech accused Lutron of infringing at least five of the patent's claims by using similar support brackets.[4] For example, one allegedly infringing aspect is that the Palladiom

---

[3] The great complication in this case is that Lutron's libel claim relates to GeigTech's public accusation that Lutron infringed the '821 patent – which kept the patent issues in the case, despite the fact that GeigTech had discontinued its patent infringement claim. That is why the court engaged in claim construction – because in order to resolve the libel claim, we will have to try the issue of patent infringement in any event.

[4] For example, Claim 4 of the '717 Patent – one of the claims that GeigTech accused Lutron of infringing – recites, in relevant part (Case No. 19-cv-4693, Dkt. No. 5, Ex. A): A bracket configured to be coupled to a support surface and configured to support a roller window shade assembly, the bracket comprising:

      a side configured to bear against the support surface such that the bracket extends away from the support surface and is adjacent an end of the roller window shade assembly;

System "includes a side configured to bear against the support surface such that the bracket extends away from the support surface and is adjacent to an end of the roller window shade assembly." (*Id.* at ¶ 43). Another allegedly infringing aspect is "a bracket configured to obscure the electrical wiring . . . wherein the side of the bracket is at least substantially flat to facilitate the side to bear against a substantially flat support surface." (*Id.* at ¶ 49). Figure 21 – not included in the original provisional patent application but added to the PCT patent application on May 15, 2013 – illustrated an opening in the bracket itself through which wiring could be passed, presumably in order to shield it from view. (Dkt. No. 151-1 at page 19 of 27).

And with that, the focus of litigation began to shift, from the "sleek" design that was facilitated by the "key" and "pin" elements and the use of a mounting bracket (the '821 patent) to the fact that the bracket itself was configured to obscure the electrical wiring that was used to power the motorized shade. (Independent Claim 1, '717 Patent at col. 10:28-36). The justification for the invention – the desire to avoid bulky, visible elements that detract from the aesthetics of a shade mount – remained exactly the same. (*See* '717 Patent at col. 1:27-31).

On August 9, 2019, Lutron filed its answer and several counterclaims against GeigTech. Lutron seeks to have the '717 patent declared invalid or unenforceable, for multiple reasons, including anticipation, obviousness, and prosecutorial misconduct due to Geiger's failure to disclose certain prior art to the PTO in connection with the prosecution of the parent ('821) patent. (Case No. 19-cv-4693, Dkt. No. 23). GeigTech filed a motion to dismiss Lutron's counterclaims

---

a passage extending through the bracket from the side to an area of the bracket adjacent the roller window shade assembly;

wherein the passage is configured to receive electrical wiring therethrough such that the electrical wiring can pass from the support surface to the roller window shade assembly to power a motor of the roller window shade assembly; wherein the bracket is configured to obscure the electrical wiring when the bracket is coupled to the support surface and supports the roller window shade assembly . . . .

and to strike its affirmative defenses insofar as they asserted that the patent was invalid or unenforceable.

Before the Court decided the motion to dismiss, Lutron notified the Court that it had filed two petitions for post grant review ("PGR") with the PTAB. The PGRs challenged the validity of the claims of GeigTech's '717 Patent; if sustained, they could invalidate the patent. The parties asked for a stay of the litigation until a final PTAB decision issued. The court granted that stay on January 28, 2020.

On August 26, 2020, the parties filed a proposed stipulation asking the court to consolidate the Trade Dress Action with the '717 Action, given the significant overlap of the evidence concerned in both cases. At that time, the parties advised the court that the PTAB had denied Lutron's first PGR challenging the '717 Patent. However, the PTAB granted the second PGR and was instituting a fuller review of those claims, and the parties asked that the court stay both lawsuits until the PTAB finished its full review. (Case No. 18-cv-5290, Dkt. No. 126).

The court granted the proposed order and consolidated and stayed both lawuits on September 10, 2020. (Case No. 18-cv-5290, Dkt. No. 128).

3. The Third Litigation: ("the '872 Action")

GeigTech procured a third patent relating to the "sleek" mechanical window shade mounting system on November 3, 2020, when the PTO issued U.S. Patent No. 10,822,872. Once again, on the very same day – and notwithstanding the stay that the court had entered at the parties' request just three months earlier – GeigTech commenced a third lawsuit against Lutron, this time alleging that the Palladiom System's end and center brackets, which were used to secure the system to a support surface (in contrast to the jamb brackets that allegedly infringed the '821 Patent in the trade dress case), infringed the '872 Patent. GeigTech's complaint is extremely similar to those it

9

filed against Lutron in the previous two litigations, with many of the same pictures of the Palladiom

System being used as descriptions for how the product allegedly infringes on GeigTech's patent.

GeigTech's complaint in the '872 Action alleges that Lutron's Palladiom System of

mechanized window shades infringes on "at least" claims 1–4 of the '872 Patent. Claim 1 – the

only independent claim of the four – describes, in relevant part ('872 Patent, Dkt. No. 1, Ex. A at

26):

> A fastening device for supporting a roller window shade assembly comprising:
>
> a bracket configured to be carried by a support surface;
> a side included in the bracket configured to engage the support surface so that
> the bracket extends away from the support surface to carry a roller window
> shade assembly;
> a passage included in the bracket configured to receiving an electrical wire
> extending from the support surface through the bracket to a motor carried by
> the roller window shade assembly; and,
> wherein the bracket is configured to obscure the electrical wire when the
> bracket is coupled to the support surface and supports the window shade
> assembly . . . .

On January 15, 2021, Lutron filed an answer and countercomplaint against GeigTech,

asserting twelve affirmative defenses and four counterclaims. Among the defenses and

counterclaims are Lutron's assertion that the '872 Patent is unenforceable on the ground of

inequitable conduct. This time, the inequitable conduct included GeigTech's alleged failure to

name an inventor of the '872 Patent in the application. The omitted inventor was an architect

named C. Matthew Taylor, who had worked with Geiger on the construction project for which the

"sleek" shade mounting assembly was first devised back in 2010. In a sworn statement, Taylor

declared that he, not Geiger, had the idea for, and created the sketches of, the brackets claimed in

the '872 Patent. (Decl. of C. Matthew Taylor, Dkt. No. 40, Ex. 1).

The court denied GeigTech's motion for a preliminary injunction predicated on the '872

Patent and to strike Lutron's affirmative defenses relating to inequitable conduct. (Dkt. No. 141).

### i. *Proceedings Before the PTAB*

Lutron commenced two proceedings before the PTAB seeking to have the '717 Patent stricken on a variety of grounds. It failed in one but succeeded in invalidating several of the patent's claims in the other.

In the first proceeding (PGR 2020-00012), Lutron sought a Post Grant Review (PGR) of Claims 1-6 and 8-15 of the '717 Patent as anticipated by the Colson application (WO 2013/052084 A1, published April 11, 2013) – and, as to claims 6 and 11, by the Fraczek patent (U.S. Patent No. 6,817,402 B1, issued Nov. 16, 2004). These sources disclosed architectural opening coverings (Colson) and a universal bracketing and cap system for multiple cassette roller shades (Fraczek). Lutron challenged the claims as both anticipated (35 U.S.C. § 102) and as obvious (35 U.S.C. § 103).

Per PTAB procedures, a petitioner like Lutron must make a preliminary showing that it is likely to succeed in invalidating at least one claim in order to obtain a full PGR hearing on the merits of the challenge. The PTAB concluded that Lutron failed to clear this hurdle in both respects in regard to the Colson/Fraczek challenge. With respect to anticipation/novelty, Lutron failed to convince the PTAB that, as to at least one of the challenged claims, a single prior art reference (Colson) likely set forth "each and every element....either expressly or inherently described...." in the challenged claims. *Verdegaal Bros. Inc. v. Union Oil Co.*, 814 F. 2d 628, 631 (Fed. Cir. 1987); *Finisar Corp. v. DirectTV Group, Inc.*, 523 F. 3d 1323, 1334 (Fed. Cir. 2008). With respect to obviousness, Lutron failed to convince the PTAB that either Colson or Fraczek likely rendered the challenged claims unpatentable. *KSR Int'l Co. v. Teleflex,* 550 U.S. 398, 406 (2007). As a result, the PTAB denied Lutron's request for a full hearing on this petition and dismissed it. I expect that this court will ultimately be required to address the same arguments in these lawsuits.

11

However, the PTAB held a full hearing on Lutron's second PRG (2020/00013) and sustained a number of its arguments, though not all of them.

In 2020/00013, Lutron challenged the patentability of claims 1-3, 7-12 and 15-18 of the '717 Patent. The PTAB concluded that Lutron had satisfied its preliminary burden – that is, it demonstrated that it was likely to succeed in establishing that at least some of the challenged claims (specifically, claims 7 and 15-18) were unpatentable. As a result, it held a hearing as to all of Lutron's claim challenges.

After hearing, the PTAB adhered to its earlier position and struck claims 8 and 15-18 as unpatentable, while rejecting Lutron's assertion that the other challenged claims were unpatentable.

Lutron challenged claim 7 as being anticipated by Malausa (EP 2 357 309 A1, published August 17, 2011) and claims 15-18 as being obvious in light of Malausa and an earlier disclosure by Geiger himself (Geiger, European Design Registration No. 002017376-0001). The other claims were challenged for indefiniteness pursuant to 35 U.S.C. § 112.

Malausa disclosed a "wall mounting device for a head of a tubular gearmotor for awnings and the like," and generally relates to devices for mounting or fixing a tubular gearmotor used with awnings, blinds, curtains or similar items to a wall or a box. (2020/00013, Decision at 43). The PTAB agreed that Malausa rendered claims 7 and 15-18 unpatentable for the reasons assigned.[5] Specifically, and insofar as is relevant to these lawsuits, Malausa compelled the conclusion that Independent Claim 15 was not patentable because it disclosed the key element of Claim 15 – an "opening for electrical wiring" that "obscures a view of the electrical wiring." Malausa both disclosed an opening that was configured in such a way that electrical wiring could run through it

---

[5] That being so, the PTAB declined to reach the issue of whether claims 15-18 were obvious in light of Geiger.

and taught, or at least suggested to one skilled in the art, that the wiring should be inserted into an inner cavity of an element, such that the wiring was housed inside the second element with the view to the interior blocked by what we have come to know in this litigation as the mounting device (the device that secures the bracket system to an adjacent wall). The PTAB relied in part on the testimony of Lutron's expert, Dr. Messner, who testified without contradiction that:

> …bringing the wiring through the bracket to the window shade is a simple solution that results in an aesthetically pleasing bracket that provides power to the window shade. Similar techniques have also been well-known for decades in brackets used to mount other powered equipment, such as display signs or heated towel racks.

For this reason, the PTAB overturned claims 15-18 of the '717 Patent (16 through 18 being dependent claims that depended on claim 15) as obvious and claim 7 as anticipated. The PTAB rejected Lutron's other arguments and did not strike the rest of the challenged claims.

And so we arrive at claim construction for disputed terms used in the '717 Patent and the '872 Patent.

## LEGAL STANDARD

In interpreting disputed patent claims, the court looks first to the intrinsic evidence of record – the patent itself, the claim language, the specification, and the prosecution history, if in evidence. *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F. 3d 1361, 1367 (Fed. Cir. 2004). The specification is always highly relevant to claim construction analysis. The Federal Circuit has indicated that the specification is "the single best guide to the meaning of a disputed term," (*Phillips v. AWH Corp.,* 415 F. 3d 1303, 1315 (Fed. Circ. 2005) (*en banc*)), and the Supreme Court has held that claims are to be construed "in light of the specifications and both are to be read with a view to ascertaining the invention. *United States v. Adams*, 383 U.S. 39, 39 (1966).

Claim construction is a straightforward process. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The words of a claim are generally given their ordinary and customary

meaning. *Phillips v. AWH Corp.*, 415 F.3d at 1313. In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. *Id.* at 1314. There is a "heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F. 3d 1359, 1366 (Fed. Cir. 2002).

## ANALYSIS

For the most part the parties agree on the meaning of the words used in the asserted claims. There are three disputed claim terms. Each of these terms appears in both patents in suit (the '717 Patent and the '872 Patent). They are used identically in the two patents and can be construed identically for both lawsuits. The parties' disputed claim construction summary is attached to this opinion as Exhibit 1; it was attached to Dkt. No. 150 as Attachment 1.

## I.   Claim Construction

### i.   *"A bracket configured to be coupled to a support surface"*

I reject out of hand Lutron's effort to have me construe this claim as limited to fit the preferred embodiment of the '821 Patent (the parent patent of the two patents in suit). This litigation was, in its earliest days, about a shade mounting system using a bracket that was configured to be secured to a mounting plate. But insofar as this is a patent suit, it is no longer about a shade mounting system using a bracket that is configured to be secured to a mounting plate. We have left that issue far behind us. Now the patent case is about a system for mounting a shade that incorporates a bracket with a feature that hides electrical wiring from view. The narrower claims relating to the system that incorporated a mounting plate, which appear in the '821 Patent, have been withdrawn from litigation. The original preferred embodiment is relevant

14

only insofar as the Lutron Palladiom shade system is alleged to infringe on GeigTech's trade dress, as shown in that particular embodiment.

There is nothing about the disputed claim term as used in the '717 or the '872 Patents – the patents in suit in these lawsuits – that limits the claimed bracket to a bracket that is coupled to a mounting plate, which in turn is coupled (attached) to a support surface (*i.e.*, to the wall). Using a mounting plate is, of course, one way to couple a bracket to a support surface; and as we learned in connection with the '821 patent, it solves the aesthetic problem that the patentee sought to eliminate – hiding the ugly parts of the mounting system (such as the wiring), so as to achieve a sleek look that is favored by interior decorators and their high-end clientele. But use of a mounting plate is not the only way that a bracket can be coupled to a support surface; and the language of the claim does not limit in any way the means that can be used to accomplish the coupling. What is claimed in this language is not a particular type of *mounting system*, but a particular type of *bracket* – a bracket configured so that it (the bracket) can be coupled (attached) to a support surface (generally, in the case of window shades, to a wall, though there is no such limitation in the claim language). Is that a different and broader claim than was asserted in the parent '821 Patent? Yes indeed. Does that mean the claim language must be limited to that used in the parent patent, as Lutron wishes the court to do? Certainly not.

I also reject Lutron's suggestion that, by ruling that claim language should be given its plain and ordinary meaning, this (or any) court is somehow dodging its obligation to engage in construction. In this particular case, the claim language requires no special interpretation; it is easily understood and speaks for itself. In so concluding, the court is in fact engaging in claim construction. The words used have no particular technical meaning, and I agree with GeigTech

that the jury will understand the plain English claim language perfectly without any further "redefinition" by the court.

ii.   *"A [side/first surface] configured to bear against the support surface [such that the bracket extends away from the support surface and is adjacent to an end of the roller window shade assembly]" (the '717 Patent)*

*"A side included in the bracket configured to engage the support surface so that the bracket extends away from the support surface to carry a roller window shade assembly" (the '872 Patent)*

Despite the slight variation in terminology, these are essentially identical terms in the two patents in suit.

GeigTech again argues that the plain meaning of the words suffices, and that all these phrases say is that the bracket has to be configured so that it can be attached in some way to the support surface (Docket No. 151 at page 4). GeigTech notes that the words do not require that the brackets be attached to the support surface in any particular way or by any identified fastening method.

As with the preceding claim language, Lutron argues that the bracket must be configured to fit over and secured to a separate mounting plate, which is in turn to be affixed to a support surface – again, trying to limit the claim language to the preferred embodiment of the '821 Patent, the parent patent that is in suit only because Lutron's libel claim is in suit.

Again, I side with GeigTech. If the patentee had wanted to limit his invention to a bracket mounting system that used a separate mounting plate, he could have used words to make his intention clear. He did use such words in the claims of the '821 patent. The '717 and '872 Patents are directed more broadly than was the '821 Patent. The fact that several of the embodiments described in the specification refer to the original invention, with its two-piece invisible mount

fastening device comprising a mounting plate and a bracket, does not mean that the claim language should be so limited. It is improper to limit claim language as limited to a disclosed embodiment – even if the patent describes only a single embodiment – absent the patentee's clear expression of intent to limit the scope of the claims. *N. Star Innovations, Inc., v. Hirshfeld*, 2021 WL 5121180, at *5 (Fed. Cir. Nov. 4, 2021).

No such clear intent is expressed in the language of either patent in suit.

### *iii.    "configured to obscure the electrical wiring"*

In every asserted claim in both patents in suit, the disputed phrase "configured to obscure the electrical wiring" appears in the following sentence: "Wherein the bracket is *configured to obscure the electrical wiring* when the bracket is coupled to the support surface and supports the window shade assembly." (Emphasis added).

This court has had occasion to construe the word "obscure[d]" before – specifically, in connection with the '821 Patent, the parent patent. In that patent, a window shade "obscured" a fastener. In resolving the parties' dispute over the meaning of that term, I announced that there was no ambiguity about the meaning of the word "obscured:" when something is obscured, it cannot be seen because it is hidden or concealed by something else.[6] I have not changed my mind about the meaning of the word "obscure" as used in any of these three related patents. The idea behind all three patents is to make window shade installations more aesthetically pleasing by hiding the "ugly," unsightly parts that are used to mount or to power the window shade. The "Background" section of the patents – identically worded in all three patents – makes that perfectly clear.

---

[6] The precise phrase under construction in the '821 Patent was "the fastener is obscured by the window shade," and the court's construction was "you can't see the fastener because it is hidden by the window shade." (First Claim Construction Decision, Docket No. 107).

In the PTAB proceeding, the PTAB was asked to construe the phrase "configured to obscure the electrical wiring" as used in challenged (and now stricken) claims 15-18. At Lutron's urging, the PTAB construed the phrase "configured to obscure the electrical wiring" to mean "wherein the bracket hides or blocks the electrical wiring *from any single viewpoint*." (2022-00013 Decision at 19). GeigTech took the position before the PTAB that Lutron's suggestion should be rejected because, inter alia, this court had already construed the analogous (and substantively identical) phrase in the '821 Patent without any suggestion that the electrical wiring could be blocked from one viewpoint but seen from another. Indeed, GeigTech urged the PTAB simply to adopt my construction of the analogous '821 language, and to conclude that this disputed claim term means "you can't see the electrical wiring because it is hidden by the bracket." The PTAB nonetheless concluded that requiring the wiring to be obscured from every viewpoint was not compelled by the claim language.

Lutron now urges this court to adopt the PTAB's reasoning and to construe the phrase "configured to obscure the electrical wiring" in the same manner the PTAB did. GeigTech asks the court to adhere to its previous construction of the term.

The critically important thing to note in resolving this dispute -- and the absolutely dispositive fact -- is that the PTAB's reasoning was a function of specific language used in Independent Claim 15 of the '717 Patent and its dependent claims -- language that differs in a critical respect from the language the court is here construing. In the now-disallowed claims (Claims 15, 16, 17 and 18 of the '717 Patent), the patentee claimed the following: "Wherein the mounting bracket obscures *a view* of the electrical wiring." (Emphasis added) By inserting the words "a view" into the phrase "the mounting bracket obscures the electrical wiring," the patentee plainly indicated that the mounting bracket did not need to obscure the electrical wiring from every

view – only from "a" view. I would likely have reached the same result as the PTAB had I been asked to construe the language of Claims 15, 16, 17 and 18.

But those critically important words – "a view" – do not appear in the claims in suit. In Claims 1, 4, 6, 8, 13 and 14 of the '717 patent and Claim 1 of the '872 Patent – the claims here in issue – the patentee uses the following language: "a bracket configured to obscure the electrical wiring when the bracket is coupled to the support surface." There is absolutely no mention of the bracket's obscuring just "a view" of the wiring in the claims that remain in suit. That makes a very big difference in how one construes the phrase "configured to obscure the electrical wiring." Without the limitation conferred by the patentee's use of the phrase "a view" in the now-disallowed claims, the plain meaning of the phrase "configured to obscure the electrical wiring" is exactly what I said was meant by similar language "is obscured by the window shade" in the '821 Patent – "you can't see the wiring because the bracket is configured to hide it." Period. End of story.

"Obscures" is a plain English word, not a technical term; one need not consult a dictionary, let alone any other source, to know that it means "hides" or "conceals." Something is "obscured" if it is hidden or concealed. And something that is hidden or concealed cannot be seen. Wiring that can be seen – from any view – is not "obscured" by the bracket. It is perhaps "partly obscured," but it is not "obscured." Therefore, if the wiring can be seen from certain vantage points, it does not fall within the claim language used in Claims 1, 4, 6, 8, 13 and 14 of the '717 Patent and Claim 1 of the '872 Patent.[7]

I remind the parties that a court engaged in claim construction is not supposed to redefine words; "….we do not redefine words. Only the patentee can do that." *Thorner v. Sony Computer*

---

[7] To the extent that the PTAB believed its construction was consistent with or identical to this court's claim construction of the phrase used in the '821 Patent, it was wrong. However, because the PTAB was construing claims that included a limitation – "a view" – that does not appear in the '821 Patent, its construction cannot be said to be inconsistent with this court's ruling in the now-discontinued lawsuit predicated on the parent patent.

*Entertainment Am LLC,* 669 F. 3d 1362 1366 (Fed. Cir. 2012). The patentee chose to redefine – more precisely, to limit – the meaning of "obscures" only in connection with Claim 15 and its dependent claims – the claims where the bracket obscures the wiring only from "a view" – in the '717 Patent. But the patentee did not elect to place such a limitation on Claims 1, 4, 6, 8, 13 or 14 in the '717 Patent, or on Claim 1 in the '872 Patent. I will not infer that his decision to use the phrase "a view" in some claims but not others was unintentional; I will not extend the PTAB's reasoning to claims where the patentee did not use the phrase "obscures *a view.*"

Not only is the court's construction of this phrase consistent with the plain English meaning of the claim language itself; it is consistent with the language in the parent application – parroted in each succeeding application – to the effect that the purpose of the invention was to hide bulky and ugly mechanical features so as to achieve a sleek, decorative, aesthetically pleasing look that window shade mounting systems had theretofore lacked. You don't need to be a POSITA in mechanical engineering to understand that visible wires detract from aesthetically pleasing décor. They destroy the sleek look that high end decorators and their suppliers (like Mr. Geiger) want to achieve for their clients. That is why decorators are always looking for ways to hide things like wires. The whole point of the Geiger shade mounting invention[s] was to *hide the ugly features – i.e.,* things like wires. Mr. Geiger made that clear every time he filed a new patent application. There was literally no other purpose for his inventions.

No customer looking for a sleek and aesthetically pleasing window shade assembly would be content with one that hid the wires only from some angles or some viewpoints, while they remained visible from others. The very idea is counterintuitive – as well as inconsistent with solving the problem that Mr. Geiger was trying to solve. Reading the claim language in a manner consistent with the Supreme Court's admonition in *United States v. Adams* – where, as noted

above, the Court said that it was fundamental to construe claims "with a view to ascertaining the invention" – it is simply not possible to construe this particular language, as extending to a bracket that is not configured to hide the ugly wires from view – unless, of course, the language is modified, as it was in the disallowed claims that were construed by the PTAB. Here there is no such modification.

Finally, complete concealment is embodied in the description of the invention and in every single figure illustrating the detailed description – most especially in Figure 21, which illustrates the bracket that is configured to accept the electrical wire and to obscure it when attached to the support (wall). I have noted previously that claim language cannot be limited to the preferred embodiment, even if only a single embodiment is disclosed. But where every disclosed embodiment shows a bracket containing an interior passage that would fully obscure any electrical wires run therethrough – and where nothing in the disputed claim language in the patents in suit, or in anything else in the patents that is not directed to the disallowed "obscures a view" claims, suggests any other meaning for the word "obscures" -- adding the words "from at least one viewpoint" to the claim language goes well beyond anything claimed by the inventor in the claims here under construction.

I thus adhere to the construction I put on "obscure/obscures/obscured" in connection with the '821 Patent. The jury will be told that the phrase means "you can't see the wires because the bracket is configured to hide them."

This constitutes the decision and order of the Court. It is a written opinion.

Dated: May 5, 2022

_____
U.S.D.J.

21

BY ECF TO ALL COUNSEL

ATTACHMENT 1
**U.S. Patent No. 10,294,717**

| Claim Term | GeigTech | Lutron |
|---|---|---|
| "A bracket configured to be coupled to a support surface"<br><br>Claims 1, 4, 6, 8, 13, and 14 | No construction necessary and/or plain and ordinary meaning. | A bracket configured to fit over and be secured to a separate mounting plate, which is in turn affixed to a support surface. |
| "a [side]/[first surface] configured to bear against the support surface [such that the bracket extends away from the support surface and is adjacent an end of the roller window shade assembly]"<br><br>Claims 1, 4, 6, 8, 13, and 14 | No construction necessary and/or plain and ordinary meaning | a [side/first surface] configured to abut the support surface, where the rest of the bracket extends away from the support surface to be adjacent an end of the roller window shade assembly. |
| "configured to obscure the electrical wiring"<br><br>Claims 1, 4, 6, 8, 13, and 14 | No construction necessary and/or plain and ordinary meaning | able to obscure the electrical wiring from at least one viewpoint. |

**U.S. Patent No. 10,822,872**

| Claim Term | GeigTech | Lutron |
|---|---|---|
| "a bracket configured to be carried by a support surface"<br><br>Claim 1 | No construction necessary and/or plain and ordinary meaning. | A bracket configured to fit over and be secured to a separate mounting plate, which is in turn affixed to a support surface. |
| "a side included in the bracket configured to engage the support surface so that the bracket extends away from the support surface to carry a roller window shade assembly"<br><br>Claim 1 | No construction necessary and/or plain and ordinary meaning | a side of the bracket configured to abut the support surface, where the rest of the bracket extends away from the support surface to carry the roller window shade assembly. |
| "configured to obscure the electrical wire"<br><br>Claim 1 | No construction necessary and/or plain and ordinary meaning | able to obscure the electrical wire from at least one viewpoint. |