UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

GEIGTECH EAST BAY LLC,

    Plaintiff,

  -against-

LUTRON ELECTRONICS CO., INC.,

    Defendant.

------------------------------------------------------------X

18 Civ. 05290 (CM)
19 Civ. 04693 (CM)
20 Civ. 10195 (CM)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/23/24

## BENCH TRIAL: FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMahon, J.:

    The court, for its findings of fact and certain conclusions of law regarding certain issues pertaining to Lutron's inequitable defenses.

    There are two issues that were the subject of a bench trial held on February 20, 2024: the first is Lutron's allegation that GeigTech hid from the United States Patent and Trademark Office (PTO) the identity of a co-inventor of the invention that underlies the '821 patent, the second is that the '821 patent was asserted against Lutron inequitably because Geiger knew that the patent was invalid owing to the applicability of the on-sale bar, 35 U.S.C. § 102(b). These relate to Lutron's contention that GeigTech engaged in inequitable conduct such that the '717 patent – the patent in suit – should be deemed unenforceable under the infectious unenforceability doctrine.

**Co-Inventorship:**

    Inventorship is an issue of law to be decided by the court. *See, e.g., Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). I can resolve any disputed issues of fact in that regard and do not require the jury's assistance in that regard – especially since there are actually only one or two disputed issues of fact – only different interpretations of the essential facts that are easily established.

    I adopt as the guiding principles of law to be used in resolving this issue the following conclusions of law proposed by the parties:

    Lutron's Proposed Conclusions of Law: 1, 2, 3, 4

    GeigTech's Proposed Conclusions of Law: 58, 59, 60, 61, 62, 63,64

I make the following findings of fact concerning inventorship after trial: [1]

1. James Geiger worked on a variety of issues at Charbon relating to audio-visual and other aspects of the project, at the request of Roger Gump, for whom he had worked between 1998-2007, at a company called Bay Ten. (Tr. 7-8). It is fair to say that Mr. Geiger was a kind of jack-of-all-trades who made multiple contributions to the project. (Tr. 32). He was not initially hired to do any work on the shading system. But that didn't stop him from thinking about it.

2. Geiger first understood that the shades needed to be "exposed" (i.e., could not be hidden behind a soffit/fascia board or in a ceiling pocket) when he walked through the job site early in 2010 with Charlie Lovely, who did high end technical architectural drawings. (Tr. 6). The ceiling structure would not admit any pocket; it was made of steel; the beams were made of steel and the windows intersected with the beams. However, Matthew Taylor, the architect, insisted that hidden fasteners were required; no visible screws or fasteners were to be allowed on this very high-end project. (PX 1100 ¶ 8).

3. Geiger had a general idea about using a circular jamb bracket to solve the problem of hiding the fasteners on the exposed shades. PX 6 shows that Geiger was already at work on "conceptual ideas" for a round-edged bracket that could be used at the Charbon residence in March 2010. PX 6, however, is not a drawing of the bracket that was eventually the subject of the '821 patent; it simply shows what looks like a cap at the end of the shade, which would give the exposed shade the "clean" look that Matt Taylor, the architect, wanted.

4. In any event, Mr. Geiger concluded that the idea he was trying to depict in PX 6 would not work. He spent some months modifying commercially available brackets (Acmedo in particular) to try to solve the problem. (*See* DX 147, indicating payment to Mr. Geiger for work on shades as early as July 2010). By around the end of July 2010, it looked to Mr. Taylor like Mr. Geiger would not be able to find an existing shading product that would work in the Charbon house. (Tr. 95).

5. Mr. Taylor also consulted Lutron about possible solutions, and Lutron presented one or two ideas. In a July 27, 2010 email (PX 8), Andrew Fishkind, the general contractor on the project, rejected working with Lutron on the shading system, despite Taylor's protest. (*Id.*) Fishkind indicated in his email that he had already engaged "James and Allison Smith" to work on a shading solution involving Somfy products. (*Id.*) I specifically find that Lutron was out as a possible competitor on the project as of July 27, 2010, and that Geiger had been hired (verbally) to come up with a shading system on what Fishkind called a "fast track schedule" (*id.*) – even though Matt Taylor was worried that Geiger, who was working on other aspects of the house, would be overextended on what was a time-sensitive project. (Tr. 109-11). Mr. Geiger admitted that he was already the subcontractor for the shades at the time he made the proposals discussed below. (Tr. 17).

---

[1] I failed to mark into evidence the two essential declarations that are the direct testimony of the key witnesses. James Geiger's declaration dated January 19, 2024, which constituted his direct testimony, is hereby marked as Plaintiff's Exhibit 1100; Matthew Taylor's declaration dated August 9, 2020, which constituted his direct testimony, is deemed marked as Defendant's Exhibit 1049. Both were admitted into evidence at the trial held on February 20, 2024.

6.      I credit the testimony of Matthew Taylor that he and Mr. Geiger discussed various ideas for how to create a bracket without any visible fasteners. While I reject as inadmissible evidence the "reconstructed" drawing created by Mr. Taylor for purposes of this lawsuit in 2020 (DX 1049, p. 11), I have no doubt that Mr. Taylor, during the course of his discussions with Mr. Geiger, might well have created a "back of an envelope" sketch showing some conceptual idea for a portion of what eventually became the side jamb bracket that is the part of the fastening system patented in the '821 patent. I have no idea what that sketch might have looked like; I certainly cannot conclude that it looked like a sketch drawn years later, after the actual brackets had been milled and installed (so Taylor knew what they looked like) and especially after a patent infringement suit had been commenced. There is certainly no evidence that Taylor ever reduced the sketch to a computerized drawing or put his name or copyright on it, which was his common practice when he created architectural drawings. Taylor himself testified, credibly, that this was simply a sketch on a piece of paper, which he gave to Geiger.

7.      Assuming arguendo that Mr. Taylor sketched out an idea for a side jamb bracket, that would not entitle him to inventorship credit for the fastening device system that is the subject of claims 9 and 15 of the '821 patent. Indeed, Mr. Taylor (whom I found to be a generally credible witness) candidly admitted on the witness stand that he did not solve the problem of the bracket that hid the fasteners: "I never claimed anything more than the general idea in that initial sketch . . . . Give James the credit" for "the mechanics of how these brackets actually work in a shading system." (Tr 103). Mr. Taylor equally candidly admitted that he did not know whether "what [he] contributed" to the shading system would make him a co-inventor, and said that he did not know whether he actually had anything to license to Lutron. (Tr. 103). I thus have no reason to disbelieve his otherwise credible testimony on the ground that he was asserting co-inventorship; it seems to me that Lutron made this assertion, not Taylor.

8.      Lutron has failed to persuade me by clear and convincing evidence that Matthew Taylor was a co-inventor of the fastening device system in suit. In fact, Lutron has failed to persuade me of that by a preponderance of the evidence. Therefore, there was no failure to disclose the identity of any co-inventor to the PTO, and no inequitable conduct in this regard.

**On-Sale Bar: Failure to Disclose to the PTO**

The second alleged item of inequitable conduct is the assertion of the validity of the '821 patent when it was invalid for violating the rule that a patent cannot be obtained on an invention that was offered commercially more than one year prior to the application for the patent.

This presents a question of law for the court to decide. I can resolve any issues of fact myself and do not need the jury's assistance in that regard. Again, there really are few if any disputed issues of fact; what needs to be resolved is how to interpret the facts.

I adopt the following conclusions of law to guide my evaluation of the evidence.

This is a pre-American Invents Act (AIA) patent. The AIA became effective March 15, 2013. The provisional was applied for on May 15, 2012. So the critical date for this patent is one year prior to the date the patent application went in, so that is May 15, 2011.

35 USC § 102(b), as in effect prior to the AIA, provides that the on-sale bar is triggered when the claimed invention is both (1) ready for patenting, and (2) the subject of a commercial offer for sale prior to the critical date. If the on-sale bar is triggered because the patentee made a commercial offer for sale prior to the critical date, the patent is invalid as a matter of law. *Atlanta Attachment Co. v. Leggett & Platt, Inc*, 516 F. 3d 1361, 1366 (Fed. Cir. 2008).

An invention is ready for patenting when it meets one of two criteria: either it has been reduced to practice, or the inventor has prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art (POSA) to practice the invention. *Id.* (citing *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998)).

An invention is reduced to practice when it has been constructed or performed within the scope of the patent claims and determined that it works for its intended purpose. *Id.; see also, Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 997 (Fed. Cir. 2007) (citing *Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000)). An invention is said to work for its intended purpose when there is a demonstration of its workability or utility. *Id.* (citing *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1563 (Fed. Cir. 1996)). While the case of *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998), on which plaintiff relies (Tr. 124), does say, "In order to establish an actual reduction to practice, the inventor must prove that . . . [the inventor] determined that the invention would work for its intended purpose," *id.* at 1327, that does not mean that an inventor can avoid a finding of patentability simply by testifying that he harbored a subjective belief that it did not work, notwithstanding objective evidence that it was tested and did work. *Cf. Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1335 (Fed. Cir. 2012). The test announced in *Atlanta Attachment* (which post-dates *Cooper* by a decade) is not a subjective one; once there is an objective demonstration of workability, the invention has been reduced to practice. *Id.*

The Federal Circuit applies traditional contract law principles in determining whether an invention was the subject of a commercial offer for sale. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002). The offer must meet the level of an offer for sale in the contract sense, one that would be understood as such by the commercial community. Only an offer that rises to the level of a commercial offer for sale – that is, an offer that the other party could make into a binding contract by simple acceptance (assuming consideration) – constitutes an offer for sale under Section 102(b). *Group One Ltd. v. Hallmark Cards*, 254 F. 3d 1041, 1047-48 (Fed. Cir. 2001). The Uniform Commercial Code provides the general rules for deciding whether a series of communications rises to the level of a commercial offer for sale.

So-called "secret sales" have been held by the Supreme Court to satisfy the "subject of a commercial offer for sale" aspect of the pre-AIA on-sale bar. The Supreme Court unanimously so held in *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 633, in 2019. The Charbon sale was a private sale – Mr. Geiger's invention was not generally made available to the public until after the critical date – but in light of *Helsinn*, that does not mean that Charbon was not a "commercial" project, or that any offer for sale associated therewith was not a "commercial" offer for sale within the meaning of 35 U.S.C. §102(b). I note that *Helsinn* was not decided until January 22, 2019, which is many months after the initial lawsuit alleging infringement of the '821 patent was filed in June 2018.

So the factual questions that must be answered are two: was the invention patentable prior to May 15, 2011, and was there a commercial offer for sale of the invention prior to that date?

The standard of proof is clear and convincing evidence; the burden rests with Lutron.

Lutron has more than satisfied its burden of proving both questions.

**Findings of Fact Relevant to the On-Sale Bar**

9. Geiger was testing sample shade installations "throughout 2010" (Tr. 33). He installed four sample shades using his Acmeda solution at the Charbon residence as early as July 2010. (Tr. 59-60, DX 306).

10. In December 2010, Geiger sent Taylor a set of drawings of an idler, motor mount and coupler (DX 295) – components of the fastening system that eventually became the subject of the '821 patent (which, as I keep reminding the parties, is the patented invention – not a "shading system"). (PX 11). Geiger indicated that this was the next idea he intended to try – "the next set of brackets I am having milled" (DX 295).

11. Mr. Taylor was skeptical that Geiger's idea as presented in DX 295 would work. Referring specifically to the proposed coupler (which was not part of the jamb bracket design), he thought the center bar would be unstable and might break under vibration. Taylor specifically refused to approve use of Geiger's proposed brackets until he saw them reduced to practice – "not approved until I see a working model attached to sheetrock." His refusal to approve Geiger's idea without proof that it worked is contemporaneously recorded in an email and is undisputed. (DX 294).

12. On December 12, 2010 – prior to his exchange with Taylor – Geiger had sent Fishkind a "shade proposal" for mechanical components that would be required to create the shading system for a large number of windows at the Charbon residence. (PX 154). It is identified as "Order No. Charbon Shades 1."

13. After his exchange with Taylor, Geiger changed the coupler design slightly. (Tr. 70, 75). He also sent a second "shade proposal," this one dated January 18, 2011 (PX 155), for slightly fewer windows and at a lower price. The document is identified as "Order No. Charbon Shades 1.1." When asked if he was offering the brackets he had designed in December 2010 for sale, Geiger testified, "I was offering to create a shading system" for the residence. (Tr. 14).

14. I specifically do not find that these two proposals (and most specifically the January 18 proposal) were simply "cost estimates," as Mr. Geiger testified in his declaration. (PX 1100 at ¶ 11). The proof of the pudding is that, on January 28, 2011 – just ten days after sending out PX 155 – Geiger sent an invoice for a 50% deposit for the creation and installation of the shading system ($71,529.50) – that is, 50% of the price quoted in the January 18 proposal. (PX 156). Geiger testified that he received payment of the deposit. (Tr. 16). He also testified, credibly, that "nothing [to be made or used for the Charbon shades] would be ordered until they paid" that invoice. (Tr.

77). Since we know that the items he needed to create the shading system were ordered, Mr. Geiger must have been paid.

15. Upon receipt of the January 18 Order, the people who were working on the Charbon project forged ahead, making arrangements for the installation of Mr. Geiger's shading system. DX 303, an email from General Contractor Andrew Fishkind, indicates that all the wiring for the blinds had been done and the hardware, including the custom-made mounting hardware (the brackets) had been ordered – as early as January 21, 2011. Mr. Geiger believes that the milling on the custom brackets began "a few weeks after" he sent his January 18 proposal. (Tr. 73). That is consistent with his testimony that "nothing would be ordered until they paid" his invoice for the 50% deposit (PX 156).

16. In February 2011, Geiger prepared a mock-up of the shading system, including the proposed fastening system, which he installed in Bedroom #3 at Charbon. It included all three brackets that are the subject of the patent; the two disc shaped brackets and the modified U-shaped coupler bracket. (Tr. 78). These were exactly the same brackets that were ultimately installed at the Charbon house. (Tr. 79-80).

17. Geiger tried the mock-up at some point prior to February 17, 2011, but the shade did not work; the motor failed and had to be replaced. Whether this was the fault of the brackets or any aspect of the fastening system, I do not know; there is no evidence on the point. I do know, however, that the motor that broke is not part of the patented invention in claims 9 and 15. Geiger replaced the broken motor on February 17; there is no evidence that he had to replace any brackets or any part of the fastening system on that date, or at any time. (DX 162).

18. On February 23, 2011, the owner's representative (Paul Miller), the architect (Matt Taylor), the GC (Fishkind) and others conducted a walk-through of the project. Per the Field Report 73 prepared by Mr. Miller after the walk-through (DX 315), they were shown the mock-up of the shading system in Bedroom #3. (*See* photograph at DX 315, page 315.0007). The system includes the brackets with the hidden fasteners that had been designed by Mr. Geiger in December 2010, as well as a tube and shading fabric (though it was not the fabric that was ultimately used on the shades at the Charbon house).

19. Per the testimony of Matt Taylor, which I credit, the mock-up they were shown worked, which is to say, the shades went up and down and the screws, which had to be hidden, could not be seen. ("Once I saw the mock-up, it works, it works, it's great" – Tr. 112; "[I]t went up and down." – Tr. 114). The mock-up satisfied Taylor's December demand that he would only approve the system if he saw a working model attached to sheetrock. And that was when Taylor finally approved the installation of Geiger's shading system. (Tr. 121).

20. In his declaration, (PX 1100), Mr. Geiger testified about just one failed experiment in February 2011 – the one that involved failure of the motor. The undisputed evidence indicates that this failed experiment took place prior to the February 23, 2011 walk-through. Mr. Geiger offered no testimony at all about any second failed test in February, or specifically about the February 23, 2011 walk through. It is, therefore, undisputed that the shading system – including the fasteners that are the subject of the '821 patent – worked on that date.

21. I accept that Mr. Geiger continued to tinker with the shading system for many months – during the installation of the brackets (which began on May 10, 2011) and even after the fabric arrived (September 2011). On September 29, 2011, he filed for two design patents – one for the shading system (PX 238) and one for a coupler that looks like Figure 21 of the '821 and '717 patents. (PX 237). He did not file for a utility patent for the fastening system that incorporated the brackets at that time. Not until after the Charbon job concluded did Mr. Geiger consult with the patent lawyers who ultimately filed the provisional application for what became the '821 patent on May 15, 2012. (DX 398). It was Mr. Geiger's decision to wait; he wanted to be 1000% sure that the shading system worked before he filed for a patent. (Tr. 29). But of course this simply reflects Mr. Geiger's lack of understanding of the technicalities and details of patent law – with which, he testified credibly in response to the court's question, he was unfamiliar at the time. (Tr. 28, 90).

22. It is apparent from all of his testimony that Mr. Geiger was fixated on the shading system rather than on its component parts. In fact, when the court called his attention to the fact that the patents at issue in this case were not for a shading system, Mr. Geiger protested, "I believe I was trying to get a patent on a shading system." (Tr. 38). And in fact one of the two design patents Mr. Geiger obtained appears to be for a shading system. (PX 238). But the '821 patent (the utility patent) was for a "fastening device system" for mounting a roller window shade. That is one component part of the shading system, but it is not the shading system. The patent claims in suit cover brackets the outer circumference of which could be seen when holding the tube shade that obscured the things that fastened the brackets to the wall (screws). For that reason, Mr. Geiger's uninformed decision to postpone seeking a utility patent turns out to have been unwise.

23. Of course, an invention is not finally reduced to practice if the inventor continues to experiment with it. *Atlanta Attachment*, 516 F.3d at 1365 (*citing City of Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 137 (1877)). Geiger argues that his months of tinkering with the shading system constituted the experimentation that put off the "ready for patenting" date. However, once again Mr. Geiger confuses the shading system, which is not the subject of the '821 patent, with the fastening system with the sleek brackets and hidden screws, which is. There is no evidence whatsoever that any experiments were performed on, or that any resulting changes were made, to the jamb brackets and the coupler that were used on the mock-up that was shown to the owner's rep, the architect and others on February 23, 2011. Mr. Geiger specifically testified that it took a lot of trial and error to install "the shading system;" in fact, he rejected Lutron's attorney's suggestion that it took a lot of trial and error to install "the brackets." (Tr. 24). And Mr. Geiger further testified that, "The design of the brackets didn't change" after the installation of the first bracket on May 10, 2011 – which is to say, during the purported extended period of experimentation. (Tr. 25) It is well settled that experiments that do not relate to the actual patented invention, but are merely designed to determine whether that invention would fit a particular customer's needs, do not allow an inventor to claim that he was still experimenting with his invention, such that it (the invention) had not been reduced to practice. *Atlanta Attachment*, 516 F.3d at 1366. I conclude that any experiments Mr. Geiger was running during the long installation period were directed at making sure the shading system fit the customer's needs – there is no evidence that they were directed toward making modifications to the patented invention.

24. I can only conclude that the invention claimed in the '821 patent was reduced to practice no later than February 23, 2011. As of that date, the invention had been shown to work for the purpose for which it (the fastening system that hid the fasteners) was intended (it held up working shades while hiding the fasteners). The invention was thus patentable from and after that date.

25. Mr. Geiger's subjective belief that the shading system did not yet work (assuming *arguendo* that he actually harbored such a belief – I make no finding on that subject one way or the other) does not bar a finding of patentability even under plaintiff's strained reading of *Cooper v. Goldfarb*, because there is no evidence whatever in the record that Mr. Geiger subjectively believed that the patented invention – the fastening system that is the subject of the patent -- did not work as of the date of its successful demonstration. All of the objective evidence is to the contrary.

So we turn to the next question: Did Mr. Geiger make a commercial offer for sale of his patentable invention prior to May 15, 2011? The answer is most assuredly yes.

26. Geiger's proposal dated January 18, 2011, for the components to create 70 shading systems (minus fabric) for the Charbon project constitutes a commercial offer for sale. It was an offer for sale of a shading system (per Mr. Geiger) and all of its component parts – including the custom-milled brackets that were the invention in suit. It qualified as a firm offer (U.C.C. 2-205). The record shows at least three commercially reasonable indications that the offer was accepted: Mr. Geiger received his 50% deposit, the parts were ordered, and Taylor the architect gave final approval for the installation of the system after seeing it work on February 25, 2011.

27. I cannot accept Mr. Geiger's argument that the entire installation period constituted one long experiment, essentially making his entire shading project one done "on spec," without knowing whether or not his idea would work.

28. First of all, Geiger did not do the project "on spec" – he quoted a price, his quote was accepted and he was paid a 50% deposit before he started work on the actual system that was installed at Charbon. Geiger's statement that he would have had to refund the money and start over with a substitute system (his "Plan B") if the shading system did not work is contradicted by his own testimony, in which he admitted that, because of the time sensitivity of the Charbon project, "there was no way to switch it out after September [2011] to do anything else." (Tr. 22). Even if there were a viable Plan B, that does not preclude a finding that the installation of the shading system at Charbon was not one long experiment.

29. Second, whatever experimentation might have been needed during the installation period on the "shading system" did not extend to making any change in the patented invention, which worked for its intended purposes from and after February 25, 2011 at the latest.

30. Finally, all the evidence indicates that this project was a very high-end project, very novel and creative, that it was being done for a particularly persnickety owner and on a short, tight time line. It strains credulity to think that the architect would have authorized and the general contractor would have paid for the installation of an experimental system that had not been tested

and shown to work. As I said during oral argument after the evidence came in (Tr. 134-35), it defies common sense for anyone – even a risk-taking inventor – to install dozens and dozens of high end shades if they failed in the only mock-up demonstration done for the people in control of the project. It is far more credible that Mr. Geiger would plow forward with purchasing his supplies and milling all his custom brackets and installing them in the Charbon house after he had *successfully* demonstrated a mock-up of the system to the people who needed to approve it – which is what Mr. Taylor credibly testified, and what I am convinced happened. Frankly, if the mock-up had not worked, the owner's representative would have noted that problem in his Report 73. (DX 315). There is no such note.

31. Now I am positive that, during the lengthy installation process, a particular shade didn't work. Maybe the tube was not cut to Mr. Geiger's exacting specifications, so the screw heads were visible. Or perhaps the fabric was hung incorrectly and the shade jammed. Or maybe a motor turned out to be defective and had to be replaced. I am sure there was considerable tweaking done to the *shading system* during the installation process.

32. But despite Mr. Geiger's fixation on the shading system, the shading system is not what is patented in the '821 or the '717 patents. A fastening system device was patented. And that feature of the shading system had proven itself – you couldn't see the screws and the brackets held up the shade – during the February 25, 2011 showing. Therefore, I conclude that – whether or not the shading system was reduced to practice – the invention was reduced to practice as of that date.

33. This means that the '821 patent is invalid under 35 U.S.C. § 102(b). *See Atlanta Attachment*, 516 F.3d at 1367.

However, this case is no longer about the '821 patent – it is about the '717 patent. Lutron argues that the '717 patent is unenforceable because it was infected by Mr. Geiger's failure to disclose during the prosecution of the '821 the material fact that Charbon sale occurred prior to the critical date. So a finding that Mr. Geiger violated the on-sale rule is simply the first step in the analysis of Lutron's inequitable conduct defense – a necessary step, but not a sufficient one.

**Findings of Fact and Conclusions of Law with Regard to Infectious Unenforceability**

And so we turn to infectious unenforceability. Lutron's theory is that Mr. Geiger committed inequitable conduct in connection with the prosecution of the '821 patent by failing to disclose the Charbon sale, which occurred prior to the critical date and so violated the on-sale bar. In analyzing this theory, the court applies the following principles of law:

To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). The accused infringer must prove both elements—intent and materiality—by clear and convincing evidence. *Id.* If the accused infringer meets its burden, then the district court must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable. *Id.*

A finding that the misrepresentation or omission amounts to gross negligence or negligence under a "should have known" standard does not satisfy this intent requirement. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988). "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995) (emphases added). The evidence must show that a *person*, i.e., the patent applicant, and not a corporation, had the requisite specific intent. *Id.* In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it. *Therasense*, 649 F.3d at 1290.

"A district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality." *Id.* Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive. *See Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008) ("[T]he fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct.").

Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence. *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1340 (Fed. Cir. 2009). However, to meet the clear and convincing evidence standard, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." *Star*, 537 F.3d at 1366. Indeed, the evidence "must be sufficient to require a finding of deceitful intent in the light of all the circumstances." *Kingsdown*, 863 F.2d at 873. Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. *See Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008) ("Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.").

Finally, because the party alleging inequitable conduct bears the burden of proof, the "patentee need not offer any good faith explanation unless the accused infringer first ... prove[s] a threshold level of intent to deceive by clear and convincing evidence." *Therasense*, 649 F.3d at 1291.The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive. *Id.*

For my findings of fact:

34.     Materiality has been proved by clear and convincing evidence. Because a violation of the on-sale bar automatically means no patent can issue – or invalidates a patent already issued

– any information about a commercial sale made prior to the critical date is material. 35 U.S.C. §102(b).

35. However, there is no *clear and convincing* evidence that Mr. Geiger had an intent to deceive the PTO in connection with the prosecution of the '821 patent. Put otherwise, there is no clear and convincing evidence that Mr. Geiger made a deliberate decision to withhold information about the Charbon sale from the patent office with knowledge that he had in fact run afoul of that bar.

36. There is no evidence that Mr. Geiger was aware, at any time during the prosecution of the '821 patent, that his sale to Charbon precluded the granting of the '821 patent. Mr. Geiger testified, credibly, that he was unfamiliar with patent law when he consulted with patent lawyers about patenting his invention. In response to the court's questions he replied that, at the time of the '821 patent application, he knew "absolutely nothing" about patent law, had never read the patent statute, and had not to his knowledge even heard the phrase "on-sale bar." (Tr. 90)

37. Lutron argues that this testimony is irrelevant, as Mr. Geiger cannot hide behind his ignorance of the law – especially because he filed for the '821 patent through his attorneys. *See* Dkt. No. 429 at p. 1-2 (*citing Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1385 (Fed. Cir. 2001); *Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1361–62 (Fed. Cir. 2005)). However, GeigTech responds – correctly – that Lutron's argument is foreclosed by law. Mr. Geiger's ignorance of the law would qualify as negligence or possibly even gross negligence, not deliberate intent, and, "A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy th[e] intent requirement . . . In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *Therasense*, 649 F.3d at 1290 (quotations omitted). Accordingly, Lutron must prove more than merely that there was a violation of law that occurred while Mr. Geiger had legal representation. It had to prove that Mr. Geiger knew that he was in violation of the on-sale bar and that this fact precluded him from getting a patent.

38. There is only one piece of evidence contemporaneous with the prosecution of the '821 patent that might tend to show that someone – Mr. Geiger or his attorneys – was aware of the on-sale bar during the prosecution of the '821 patent. The '821 provisional included a claim of priority relating back to the filing date of Mr. Geiger's design patents. Lutron argues that any competent patent lawyer would know that one filing a *provisional* application for a utility patent cannot claim priority back to a design patent. Under 35 U.S.C. § 111(b)(7), a provisional application is not entitled to claim such priority, although a non-provisional application can do so. Lutron argues that the very fact that this legally erroneous priority claim was included in the provisional necessarily means that Geiger and his lawyers were aware of the possibility of an on-sale bar violation and were trying to find a way to avoid it.

39. Lutron's inference that Geiger was trying to avoid the on-sale bar is certainly one inference that can be drawn from this evidence. But it is not the only inference that can be drawn; for one thing, Geiger's attorneys could have made a mistake with the '821 filing – it would certainly not be the first time that happened (it would not even be the first time it happened in a

case pending before this court). Moreover, the inference Lutron asks the court to draw is not a particularly compelling inference – it piles unsupported supposition upon unsupported supposition (Mr. Geiger told his attorneys about the Charbon transaction; they in turn told him about the on-sale bar, even though Mr. Geiger testified that he was unaware of it at the time the provisional was filed; they then collectively cooked up a scheme – in violation of ethical rules – to make an argument that the lawyers knew was incorrect in order to try to get around the law). "For want of a nail the kingdom was lost" arguments of this sort do not satisfy the exacting standards applicable to findings of intent to deceive the PTO. Finally, there is absolutely no evidence that *Mr. Geiger* – the person whose intent is relevant -- was aware of this hyper-technical point of law – one that this court had to ask the parties to explain before I could finish this decision. Dkt. No. 435.

40. It is also possible that, even if Geiger's attorneys were aware of Charbon, they concluded that this purely private transaction, done at a time when the invention was not made available on the market generally, did not qualify as a §102(b) commercial sale, such that it needed to be disclosed. That question of law was not finally settled as a matter of law until seven years later, when *Helsinn* was decided.

42. I conclude that this one piece of evidence, without more, does not rise to the level of a clear and convincing showing of intent to deceive the patent office.

43. And there is nothing more. Unlike the applicant in in *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1191 (Fed. Cir. 2014), a case on which Lutron relies, I do not find Mr. Geiger's testimony that he was unaware of the on-sale bar or its applicability to his patent application to be incredible – whereas in *Am Calcar*, the Federal Circuit affirmed the district court's finding that an inventor's testimony about his inexperience conflicted with other evidence in the case that pointed to a deliberative process rather than mistake, and so was not to be believed.

44. Lutron's reliance on the additional disclosures made to the PTO during the prosecution of the '717 are also not evidence of Mr. Geiger's state of mind at any *relevant* time – whether seven years earlier, when he filed for the '821, or at any time during the prosecution of that patent (which ended in 2016). For the infectious unenforceability argument, the relevant issue is whether the PTO was defrauded during the prosecution of the parent patent (the '821) – not during the prosecution of the continuation patent (the '717). Mr. Geiger's current attorneys filed the information about Charbon and Somfy in connection with the '717 application, and they did so in December 2018 – six years after Mr. Geiger allegedly defrauded the PTO by failing to disclose it.

45. Finally, Mr. Geiger claimed attorney-client privilege with respect to his communications with his patent attorneys, including the former attorneys at Hogan and Hartson who filed the '821 provisional. As a result, Geiger did not disclose what he told those attorneys about the Charbon project, and they were not deposed on that subject. Lutron argues that Geiger cannot hide behind the privilege on the issue of intent.

46. However, as noted above, as it is Lutron's burden to prove inequitable conduct, GeigTech is not required to offer any explanation or affirmative defense of its conduct. As far as this court knows (and we have searched the docket), Lutron never sought to depose GeigTech's attorneys at Hogan & Hartson, and made no motion for discovery from counsel of any information

relating to the substantive issue of inequitable conduct – motions that are sometimes granted in patent cases where inequitable conduct is alleged, despite the attorney-client privilege. *In re Queen's Univ. at Kingston*, 820 F.3d 1287, 1291 (Fed. Cir. 2016). The attorneys were not even deposed on subjects as to which they could have testified without breaching the privilege, such as the usual practices they followed in preparing patent applications or their pre-*Helsinn* interpretation of the "secret sale" issue.

47. In sum, while I find by clear and convincing evidence that Mr. Geiger violated the on-sale bar, I cannot and do not find by clear and convincing evidence that he knew that he had done so and then made a deliberate decision not to advise the PTO of that fact during the prosecution of the '821 patent.

48. That being so, I conclude that the '717 patent is not unenforceable on an "infectious unenforceability" theory.

**Additional Thoughts**

Whether Lutron infringed the '717 patent will be tried to the jury. The jury will also try the non-equitable issues relating to the validity of that patent. If there are any other equitable issues relating to the enforceability of the '717 patent, the court will address them after the jury reaches its verdict.

This constitutes the decision of the court after bench trial.

Dated: February 23, 2024

_____
U.S.D.J.

BY ECF TO ALL COUNSEL