UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

GEIGTECH EAST BAY LLC,

      Plaintiff,

-against-                                                     18 civ 5290 (CM)

LUTRON ELECTRONICS CO., INC.,

      Defendant.

------------------------------------------------------------X

## BENCH TRIAL VERDICT

McMahon, J.:

      The court, for its findings of fact, conclusions of law and verdict on trade dress issues:

**Findings of Fact and Conclusions of Law Concerning GeigTech's Trade Dress Claims Under the Common Law and the Lanham Act**

      1.      The elements of trade dress infringement are as follows: (i) a precise expression of the character and scope of the claimed trade dress, pointing to features that distinguish it; (ii) that is not overbroad or generic; (iii) that is nonfunctional from either a utilitarian or an aesthetic standpoint; and (iv) that has acquired secondary meaning; and (v) that defendant's product is so similar to plaintiff's that it is likely to cause confusion as to its actual source. GeigTech bears the burden of proving each element by a preponderance of the evidence.

      2.      In the Second Circuit, courts exercise "particular caution" in extending trade dress protection to product design, because "almost invariably, even the most unusual of product designs . . . is intended not to identify the source of the product but to render the product itself more useful or more appealing." *Yurman Design, Inc., v. PAJ, Inc.*, 262 F. 3d 101, 114-15 (2d Cir. 2001) (*quoting Wal-Mart Stores, Inc. v. Samara Bros*, 529 U.S. 205, 213 (2000)).

      3.      I agree with Lutron that the claimed trade dress in this case has been something of a moving target. It can fairly be summed up as "The J. Geiger Look" for high end exposed window shades, which consists of one or more of the following brackets when installed with a shade roller and shading fabric:

      *Jamb Bracket*: a clean circular element that is integral and seamless with both the shade and the wall.

*Center Bracket*: a clean, U-shaped element, where the U-shaped element fits seamlessly between two shade ends that abut those same shades, effectively creating a "shade sandwich" with the U-shaped element in the middle.

*End Bracket*: a clean U-shaped element that stands alone in its ornamental connection of the end of the shade to a wall, where the outward face of the U-shaped element is unencumbered with any of the normally ugly mechanisms required to attach the bracket to the wall.

The "J. Geiger Look" is "as installed" – the claimed trade dress is not simply the brackets, but the brackets as installed on shades to create a "look." Not all three brackets need to be installed on a single shade in order to create "the look;" in fact, because the jamb and end brackets both serve to attach a shade to the wall, it would rarely if ever be the case that all three brackets would be used in a single installation.

4. Geiger's trade dress consists of shapes of a product that conforms to a well-established industry custom. This makes the shape of the brackets generic and so not protectible as trade dress. *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F. 3d 993, 1000 (2d Cir. 1997); *Yurman*, 262 F. 3d at 115-16. Geiger' use of generic circular and "u" or "tombstone" shapes for the brackets in its shading systems is anything but original and certainly not unique to Geiger. These shapes have been used in brackets for almost a century. (Tr. 994; 996-97; 1643-44). According to Nancy Perkins, GeigTech's design expert, the tombstone shape has "been used and over used" and is a "popular shape." Indeed, Perkins said, "Almost every company I know uses those shapes." (Tr. 991-994). As Geiger's own experts admitted, most shading brackets are so shaped because the roller on a roller shade is round. (Tr. 853:12-24; 994:10-16). Lutron, the defendant in this case, has used those shapes in its Triathlon shading system, which has been on the market since 2012. (Tr. 620). Crestron has also used those shapes in its Décor Hardware Series shading system since 2012. (Tr. 999).

5. Geiger and John Nix, GeigTech's President, used vague descriptions of generalized types of appearance given by the Geiger brackets when installed with a shade roll – "clean," "seamless," "minimalistic," "modern" – to describe their trade dress. But these abstractions are not protectible as trade dress. *See, e.g., id.* at 116-117; *Landscape Forms, Inc v. Columbia Cascade Co.*, 113 F. 3d 373, 380-82 (2d Cir. 2007); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 542-43 (S.D.N.Y. 2003); *Cardinal Motors, Inc. v. H&H Sports Protection USA, Inc.*, 2021 WL 1758881, at *4 (S.D.N.Y. 2021).

6. Geiger's own witnesses made it clear that one key element distinguishing Geiger's brackets from the many shading systems on the market that have circular or tombstone shapes was their quality -- specifically (i) their use of brushed metal (a high end finish) and other excellent materials, (ii) the precision of their milling, (iii) their high quality, craftsmanship and durability, and (iv) the perception of their value. Those are all worthy features. But none of these things is claimed as an element of the trade dress in the definitions provided by GeigTech and none of them is protectible as trade dress. Rather, these things are merely improvements or refinements of existing elements of shading brackets. Such improvements do not turn generic or commonly used

shapes into protectible trade dress. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 33 (2d Cir. 1995).

7. Geiger's disclaimer of any trade dress in shading systems that use "caps" or "covers" over stamped metal brackets to achieve the circular or tombstone look does not work. The shading systems that use covers or caps to achieve a look remarkably similar to Geiger's (DX 1054 – "Coulisse", DX 1055 – "Crestron") are indistinguishable, or virtually so, to the naked eye of the average consumer. While brackets that are covered with caps to hide the "ugly parts" might be unacceptable to a high end customer – someone who was spending $3 million or more on a house and who wanted the very best decorative products – the evidence suggests that such brackets would be unacceptable because they were of lower quality, not because of Geiger's use of circular or tombstone shapes to achieve a "clean" or "modernistic" look.

8. Trade dress is, of course, directed to the look and feel of the product. The parties submitted a number of competing shades, all of which look remarkably similar unless one is standing practically on top of them – which is not how they would be viewed in the real world. Nonetheless, I did examine the shade boards very closely. Some of the shades on those boards do not hide the "ugly parts" – *see, e.g.,* DX 935, 944, 946, ,953, 1055, 1056, 1062, 1063. Others do hide the "ugly parts" – some with caps or covers, *see, e.g.,* DX 1054, 1059, 1064, and some without caps or covers. *See* DX 1057. The look and feel of the products that hide the ugly parts, however they do so, is not distinguishable to the eye of the consuming public. And when one stands just a few feet away from the shade board, all of the shades – even those that do not hide the "ugly parts" when they are viewed up close – convey the same general look and feel.

9. The brilliance of Geiger's invention, of course, was not his use of these generic shapes to make prettier brackets, or even the high quality of his product. It was the unique design of the interior of the end and jamb brackets so that they would hide the wiring needed to operate an electronic shading system, thereby ensuring that the highest of high end shades would have a clean, modernistic look. Geiger figured out how to hide the ugly parts without using caps. That is clearly part of the claimed trade dress; it is right there in the definition of the end bracket trade dress. But clever though it may be, it is simply a refinement of what was already out in the marketplace. It represented a very great improvement, but that does not make it protectible trade dress. *Fun-Damental*, 111 F.3d at 1000; *Jeffrey Milstein*, 58 F.3d at 33. In fact, such improvements indicate the exact opposite. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 219 (2d Cir. 2012).

10. Turning to functionality, GeigTech's trade dress is unregistered and so is presumed to be functional and unprotectable. 15 U.S.C. § 1125(a)(3); *TrafFix Devices, Inc v. Mktg. Displays, Inc.*, 532 U.S. 23, 29-30 (2001). Moreover, GeigTech's acquisition of utility patents covering many aspects of the brackets that are essential to the claimed trade dress heightens that presumption. As the Supreme Court said in *TrafFix*, "a utility patent is strong evidence that the features therein claimed are functional" and that "if trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional . . . ." *TrafFix*, 532 U.S. at 29-30.

11. Both the '717 patent and its parent patent, the '821 patent, claim exposed brackets that hide wires and fasteners (PX 1 at 11:4-6, DX 399 at 9:16-19); the circular and U-shaped configurations of GeigTech's brackets (PX 1 at 2:24-29, 11:14-15; DX 399 at 9:7-22); the flat lateral surfaces of the end and center brackets that help to conceal wires and fasteners (PX 1 at 10:36-55); the clean and unencumbered look of the brackets (DX 399 at 9:9-19); and the center bracket's placement between two shades. (PX 1 at 11:17-41). Nancy Perkins, GeigTech's design expert, testified that "the aesthetic of J. Geiger's bracket system is inseparable from the claimed invention in the asserted patent, the '717 patent," and further testified that "the look and feel of the GeigTech brackets is provided by the patented invention." (Tr. 980-90). Figures 6A, 9, 10, 12D, and 21 in the '717 patent depict elements of the claimed trade dress.

12. And while the patent says that the shapes (round and tombstone) were selected for aesthetic reasons, GeigTech represented to the Patent Office during prosecution that the "circumferential end" of the brackets "can provide a desirable *function* and design." Dkt. No. 231-56; Tr. 227:17-25 (emphasis added). This representation heightens the presumption that the claimed trade dress is functional in the utilitarian sense. McCarthy on Trademarks and Unfair Competition, § 7:89.30 (5th ed. 2023).

13. Utilitarian functionality is defined broadly as encompassing any improvement, no matter how slight, in the operation of the goods. *See Eco Mfg. LLC. v. Honeywell Int'l, Inc.*, 357 F.3d 649, 654–55 (7th Cir. 2003). I concede, as Lutron concedes, that nothing about the claimed trade dress (or for that matter, the patent-in-suit) makes a shade work better or is essential to the use or purpose of a window shade. So there are indeed many alternative possibilities to the J. Geiger shading system for covering windows. However, the test is not whether there are alternatives. *TrafFix*, 532 U.S. at 330; *In Re Becton, Dickinson & Co.*, 675 F. 3d 1368, 1376 (Fed. Cir. 2012). Trade dress can have utilitarian functionality when it affects the cost or quality of the device in any way. *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 262-65 (S.D.N.Y. 2016), *aff'd*, 699 F. App'x 93 (2d Cir. 2017).

14. Here, there can be no question that the claimed trade dress has utilitarian functionality in the sense of improving the quality of a shading system. Indeed, that was the reason it was invented – to improve the quality of a shading system by hiding the ugly parts without using a cover. Various witnesses have testified that the rounded feature of the brackets allows the shade fabric to drift, while the design minimizes light gaps and allows for flexibility of installation. (*See, e.g.,* Tr. 343:1-4, 344:8-22, 958:1-6, 962:9-14, 1003:7-12). The projection in the bracket itself helps with wire management. To the extent that witnesses testified about the clean minimalistic look of the Geiger system, that seems to have represented an improvement to high end purchasers; the improved quality of the Geiger product, which GeigTech's experts testified was a key aspect of its trade dress, qualifies as utilitarian.

15. GeigTech also had two design patents on the design of the shading system (PX 238) and one for a coupler that looks like Figure 21 of the '821 and '717 patents. (PX 237). A design patent can be some evidence that the elements described therein are non-functional. *Krueger Int'l, Inc. v. Nightingale Inc.*, 915 F. Supp. 595, 604–05 (S.D.N.Y. 1996), *overruled on other grounds by Landscape*, 113 F.3d at 378 n.3. However, "At best, a design patent can only help rebut the functionality defense . . . . The plaintiff still needs to show that, in its market at the time of the

alleged infringement, the design is both ornamental and deserving of trade dress protection." *Id.* GeigTech's design patent evidence is heavily outweighed by the fact that the utility patents that were subsequently issued disclose the same elements that are emphasized in the design patents (including the brackets as installed). (*See* PX 238).

16. GeigTech has also not proved that its product had acquired secondary meaning in the marketplace as of 2017, when Lutron launched Palladiom.

17. Secondary meaning occurs when, "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal-Mart*, 529 U.S. at 211. A plaintiff bears a heavy burden to show that its trade dress has acquired secondary meaning, proof of which "entails vigorous evidentiary requirements." *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985).

18. "Because the primary element of secondary meaning is 'a mental association in buyer[s'] minds between the alleged mark and a single source of the product,' the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638 (S.D.N.Y. 2016) (citation omitted), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017). "Accordingly, courts have long held that consumer surveys are the most persuasive evidence of secondary meaning." *Id.* (collecting cases). However, consumer surveys are not the only evidence relevant towards determining secondary meaning, and their results (contrary to Lutron's argument) are not dispositive of the issue. *Id.* at 639. Thus, there is not some "magic number" in a survey's results that effectively establishes (or disproves) secondary meaning. Other factors, such as the survey's methodology and the surveyor's expertise in the field, are also relevant towards weighing a survey's evidentiary weight. *See Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 123 (S.D.N.Y. 2022).

19. Besides consumer surveys, there are a number of factors for a court to consider when assessing whether a product has acquired "secondary meaning" in the marketplace. They include: sales success of GeigTech's trade dress, the nature and extent of its advertising and promotional activities, the length of time GeigTech has sold its trade dress, the exclusivity of the trade dress, unsolicited media coverage, and attempts to copy/plagiarize the trade dress. *Christian Louboutin*, 696 F.3d at 226. "[N]o single factor is determinative and every element need not be proved." *Thompson*, 753 F.2d at 217.

20. The evidence shows that, as of the time Palladiom was introduced, GeigTech had sold approximately 350 shading units, in a marketplace that, as defined by John Nix, its President, probably included about one million homes. (Tr. 380:20-25). Not all of these sales were of shading systems made with the patented high end brackets; approximately 40% were sales of brackets with plastic caps. (Tr. 304:21 - 305:4). But the sales trajectory was trending upward, and GeigTech was even on the verge of doing a nationwide distribution deal with Savant. This evidence shows that its product was becoming accepted and even making headway, but the small number of sales relative to the relevant market does not prove secondary meaning. *See Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 427 (S.D.N.Y. 2012); *Loctite Corp. v. Nat'l Starch & Chem. Corp.*, 516 F. Supp. 190, 209 (S.D.N.Y. 1981).

21. GeigTech spent about 25% of its earnings on advertising to the high end market. Its advertising expenditures were apparently not successful. Jeff Martens, the former GeigTech CEO, testified (by deposition) that the expenditures did not yield sufficient sales to justify them and that the ad campaign was so unsuccessful that GeigTech actually shut it down in 2016. (Martens Tr. 39:17 – 42:08). This does not suggest that GeigTech's advertising efforts led to the acquisition of secondary meaning. Moreover, some of that advertising featured a center coupler rather than the brackets that are part of the claimed trade dress. Nancy Perkins testified that the center coupler is not part of the claimed trade dress, but an entirely separate product. (Tr. 957).

22. GeigTech was in the market for high end exposed shading systems for five and one half years before Palladiom launched. Obviously in 2012 it was a newcomer to the overall market for shades – it was a start-up, operating out of James Geiger's home; and window shades, even exposed window shades, had been sold for many years prior to Geiger's entry into the market. (Tr. 994; 996-97). Geiger invented the very small niche in the market that it occupied by itself for that five- and one-half year period.

23. While "there is no magical time period which renders a mark sufficiently exclusive; the longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning." *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 203 (S.D.N.Y. 2000). Courts often point to five years of exclusive use of a mark as prima facie evidence of secondary meaning. *See, e.g., Quality Serv. Grp. v. LJMR Corp.*, 831 F. Supp. 2d 705, 709 (S.D.N.Y. 2011). However, "whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's overall strength." *BigStar*, 105 F. Supp. 2d at 203 (*citing Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998). Most (if not all) of the features of GeigTech's claimed trade dress have been in use for many years by competitors throughout the shading market (*e.g.*, exposed brackets, circular and u-shapes, hiding the ugly parts). Accordingly, any claim GeigTech can make to the exclusivity of its use of the "J. Geiger Look" is heavily outweighed by the lengthy use of similar designs throughout the shading industry. *Cf. EFS Mktg. v. Russ Berrie & Co.*, 76 F.3d 487, 491 (2d Cir. 1996) (no secondary meaning for "troll" doll design because many other companies sold "similar" designs); *In re NuWave, LLC*, 2018 WL 1225474, at *3 (TTAB 2018) (others' uses of rounded shapes for electric cooktops did "not have to be identical" to claimed design to undercut substantially exclusive use; "consumers would not find Applicant's rounded shape particularly exclusive, distinctive, or source-indicating").

24. Geiger did not introduce any survey evidence about secondary meaning in 2017. Although Geiger was by no means required to produce such evidence, the lack thereof "weighs heavily against a finding of secondary meaning." *Chum Ltd. v. Lisowski*, 198 F. Supp. 2d 530, 534 (S.D.N.Y. 2002); *LVL XIII*, 209 F. Supp. 3d at 657; *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12 CIV. 4112 AJP, 2014 WL 814532, at *12 (S.D.N.Y. Mar. 3, 2014).

25. Lutron had an expert, Dr. Bruce Isaacson, perform a survey in 2022 of high end customers and influencers (decorators, builders, architects), which indicated that, as of that date – when Palladiom had been on the market for 5 years and GeigTech for 10 years – neither company's shades had acquired secondary meaning in the mind of the consuming public (the survey had a 0.3% success rate). Courts in this Circuit have consistently found no secondary meaning when

presented with consumer survey results similar to those found by Dr. Isaacson. *See, e.g., LVL XIII*, 209 F. Supp. 3d at 657; *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 63 (S.D.N.Y. 2021). Although Dr. Isaacson, who conducted the survey, did so five years after the relevant date, he testified, credibly, that one would not expect a trade dress that had no consumer brand recognition in 2022 to have had any great degree of consumer brand recognition five years earlier. (Tr. 1741-42).

26. GeigTech introduced evidence that some participants in the marketplace during the 2015-17 period recognized its "look;" some of these individuals even went to Lutron and asked if it had, or could make, a competing product to GeigTech's – requests that led to the development of Palladiom via the Snowy Owl project. (PX 56, 65, 68, 73, 88, 98, 105). But this evidence of recognition of Geiger's look by a modest number of customers is insufficient to indicate that a sufficiently high percentage of the relevant market would have recognized "the J. Geiger look" and associated it with its source in 2017 – even conceding that the relevant market consists only of high end shade purchasers and represents approximately 1 million households. (Tr. 380:20-25).

27. There was only minimal evidence of unsolicited media coverage of the Geiger product during the roll out period 2012-2017. GeigTech introduced evidence of three online articles that appeared over a five year period on separate design websites. (PX 41, 42, 43). None of the articles calls attention to the claimed trade dress, and only one article (PX 43) mentions the "look" of GeigTech shades. These three online articles are plainly insufficient to establish secondary meaning. *See Easy Spirit*, 515 F. Supp. 3d 47 at 64.

28. The only factor that might support a finding of secondary meaning is the undeniable fact (found both by the jury and by this court) that Lutron engaged in a program designed to develop a product that could compete directly with Geiger's shades – which program unquestionably involved "industrial espionage" and copying (with some modification) the "look" that was beginning to attract customers at the high end of the marketplace (Snowy Owl). However, "it is well-established in this Circuit that 'imitative intent does not necessarily mandate' a finding of secondary meaning." *Id.* at 67 (*quoting Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir. 1992)). "Indeed, the 'value of evidence of intentional copying is particularly limited in cases involving product design, since the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product.'" *Id.* (*quoting Kaufman & Fisher Wish Co. v. F.A.O. Schwarz*, 184 F. Supp. 2d 311, 319 (S.D.N.Y. 2001)). Here there is no evidence that Lutron was copying Geiger's design for any reason except to exploit – and put its own name and brand on – the highly desirable features of GeigTech's shades. It wanted to create a Lutron shading system that looked like the Geiger shading system, not to fool customers about the source, but to capture GeigTech's marketplace.

29. In short, GeigTech has not proved that its design had acquired secondary meaning in the minds of any consuming public at the time Palladiom launched in 2017. That is not surprising, since, as one can see by looking at the many similar types of exposed brackets produced across the industry (*see, e.g.,* DX 1054, 1057, 1058, 1059, 1061, 1064), that GeigTech's design was simply not unique.

30.     The last factor in trade dress analysis is whether there is a likelihood of confusion between Geiger's product and Lutron's product. In this case, evidence of likelihood of confusion was weak to non-existent. All witnesses agreed that there was no risk that professional purchasers of custom shading (decorators, architects, builders) were likely to confuse the Lutron and Geiger products. Lutron's brackets, while similar to Geiger's, and while incorporating Geiger's patented wire-hiding features, have distinctive elements that differentiate the two company's products, including: Lutron's T bar, or "foot," for mounting, the lack of a "step" feature on Lutron's brackets, which is a very distinctive feature of GeigTech's center and end brackets.

31.     Lutron's Snowy Owl project is indicative of industrial plagiarism. Intentional copying can raise a presumption of consumer confusion. *Paddington Corp. v. Attiki Importers & Distributor, Inc.*, 996 F.2d 577, 586-587 (2d Cir. 1993); *Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 246–47 (2d Cir. 1983). However, that presumption, like all presumptions, is rebuttable; and here it has been rebutted. Where the evidence indicates that the copying was an effort to replicate a successful feature of a competitor's product, rather than an effort to confuse the consuming public as to the source of the product, there is no showing of bad faith and thus no presumption of customer confusion. *Crye Precision LLC v. Duro Textiles, LLC*, 689 F. App'x 104, 108 (2d Cir. 2017) (*citing Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009)). There is no evidence that Lutron wanted members of the consuming public to think that it was selling J. Geiger shades. Rather, Lutron wanted to sell a shade that incorporated features of the J. Geiger shades that made it attractive and desirable. With Palladiom, it achieved that goal – without creating any brand confusion whatsoever.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

In light of the above findings of fact and conclusions of law, I conclude that GeigTech has not proved its trade dress claims under either the Lanham Act or the common law by a preponderance of the evidence, and I issue a defendant's verdict in favor of Lutron dismissing GeigTech's trade dress claims.

Dated: March 21, 2024

_____
U.S.D.J.